## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C.G.B., f/k/a D.G.B.; A.F., f/k/a O.E.R.F.; M.M.S-M., f/k/a A.H.S-M.; L.R.A.P., f/k/a E.A.P.; K.S., f/k/a J.H.S.; K.M., f/k/a G.M.; R.H., f/k/a F.A.H.; L.M., f/k/a S.M.; M.J.J., f/k/a O.H.J.; D.B.M.U., f/k/a W.E.M.U.; K.R.H., f/k/a W.D.R.H.; G.P., f/k/a O.A.P.; and M.R.P., f/k/a J.N.R.P.,<br><br>        *Petitioners*,<br><br>            v.<br><br>Chad WOLF, in his official capacity as the acting Secretary of the U.S. Department of Homeland Security; and<br>        Physical Address:<br>        Office of the General Counsel<br>        U.S. Department of Homeland Security<br>        Washington, D.C.  20528;<br><br>William BARR, in his official capacity as the Attorney General of the United States,<br>        Physical Address:<br>        Office of the Attorney General<br>        U.S. Department of Justice<br>        950 Pennsylvania Avenue, N.W.,<br>        Washington, D.C.  20530-0001,<br><br>        *Respondents*. | Case: 1:20−cv−01072<br>Assigned To : Cooper, Christopher R.<br>Assign. Date : 4/23/2020<br>Description: TRO/PI (D−DECK)<br><br>Case No.<br><br>**EMERGENCY VERIFIED PETITION FOR A WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This lawsuit seeks to vindicate the constitutional and statutory rights to reasonable protection from the COVID-19 pandemic for an especially vulnerable group: transgender people in civil immigration detention.  These people are not being punished for any crime but are being put at unreasonable and unconstitutional risk of infection, disease and death by the government's failure to follow even its own basic safety and health rules.

**RECEIVED**

APR 23 2020

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

2.     Although federal authorities recognize the severe risks posed by outbreaks of the COVID-19 virus in immigration detention centers, Immigration and Customs Enforcement ("ICE") has done little more than pay lip service to protecting those in its custody.  Transgender people in civil immigration detention – many of whom came to this country seeking safety from violence and persecution in their home countries because of their gender identities – are among the most vulnerable during the current pandemic.  Petitioners therefore seek the supervised release of all transgender people in immigration detention because ICE has not provided and cannot implement sufficient measures to curb the spread of COVID-19 in its facilities.

3.     Since ICE first reported a COVID-19 infection in one of its detention centers on March 19, 2020, outbreaks have spread to at least 32 detention centers across the country.  As of April 21, 2020, ICE had publicly reported 285 confirmed cases of COVID-19 in those facilities, including 253 detainees and 32 staff members.  At least ten facilities where transgender people in civil immigration detention are housed are experiencing reported outbreaks with 103 detainees and 12 staff members infected.

4.     Immigration detention centers are congregate facilities in which detainees live in close proximity.  That fact makes them especially dangerous during pandemics such as COVID-19, which easily spreads from person to person, both through the air and on commonly used surfaces such as tables and toilets.

5.     On April 10, 2020, a month after the World Health Organization declared a global pandemic, ICE finally recognized this problem and issued rules for its detention centers to take some steps designed to reduce the risk of COVID-19 outbreaks, and also required its facilities to follow guidance for detention centers published by the Centers for Disease Control ("CDC") and

Prevention.  But ICE has systematically failed to provide even these fundamental protections to people in civil immigration detention.

6.       ICE's failures are dramatically illustrated by the experience of Petitioner C.G.B., a transgender woman who is being held at a detention facility in Arizona.  The facility placed a newly arrived detainee in the bunk above C.G.B., and he began coughing uncontrollably.  But he was not seen by a medical provider for several days, and then he was returned to the general population.  Days later, C.G.B. began experiencing symptoms of COVID-19, including vomiting, a fever, and what she described as pain in her bones.  C.G.B. was tested for COVID-19 on April 9, 2020, but has not been told what the results of that test were.  She is being held in a pod with a dozen other detainees suffering from COVID-19 symptoms, two of whom have confirmed cases of the disease.

7.       Transgender people in civil immigration detention report that it is often impossible to practice social distancing – beds and tables are bolted to the floor, forcing detainees to sleep and sit only a few feet from each other, and some detainees are still lining up in large groups for meals as they did before the outbreak.  Few guards and staff members wear face masks when interacting with detainees, and some wear no protective equipment at all – including a doctor who performed a physical examination of a transgender woman without even wearing gloves.  Most detainees have not been provided face masks; some do not have access to soap and must wash their hands with shampoo.  Many detainees must clean their own living spaces without disinfectant.  Detainees exhibiting symptoms such as coughing or fever are not always given a medical examination or isolated from the rest of the population.

8.       Transgender people in civil immigration detention are particularly susceptible to COVID-19 infection because as a group they are more likely to have underlying medical

conditions making them vulnerable, such as infection with HIV, diabetes and high blood

pressure.  Further, transgender people in civil immigration detention have not only suffered the

trauma of being discriminated against, persecuted, tortured and raped because of their gender

identity, they live with the constant stress of continuing discrimination, harassment and the risk

of sexual assault.  Such stress lowers their immune systems' response to infection, meaning

transgender detainees are more likely to become infected, become sick, and die from COVID-19.

9.      Petitioners have no other avenue to seek relief.  ICE has announced that it has

completed its release of detainees it determined to be at high risk of infection, yet Petitioners and

dozens, if not hundreds, of other transgender people remain in ICE custody as outbreaks inside

immigration detention centers rapidly worsen.  Absent this Court's intervention, Petitioners and

all other transgender people in civil immigration detention will continue to be at an unreasonably

high risk of falling victim to this deadly virus.

10.      ICE's failures have made detention centers death traps for transgender people in

civil immigration detention.  That situation violates Petitioners' Fifth Amendment due process

rights and the Administrative Procedure Act.  Therefore, this Court should issue an injunction

mandating the release on parole or other supervised release of all transgender people in civil

immigration detention so they may take the necessary precautions against COVID-19.  The

nonprofit organizations and other groups supporting transgender people in civil immigration

detention have the resources and plans necessary to support all of the transgender people in civil

immigration detention in release.

## **PARTIES**

11.      Petitioner C.G. B., f/k/a D.G.B., is a citizen of Mexico who has been detained at

the Florence Correctional Center ("Florence") in Florence, Arizona, since January 2020.  D.G.B.,

a transgender woman, is seeking asylum because she fears persecution in Mexico because of her

transgender status.  C.G.B. has experienced COVID-19 symptoms since April 9, 2020, and is being held in quarantine with other detainees who are showing symptoms of the virus.  She had a COVID-19 test performed on April 9, 2020, but despite being told she would have results in three days, she has not been told of those test results to date.  C.G.B. was being held in a pod with approximately 64 other detainees when, on April 2, 2020, the newly arrived man in the bunk above her began coughing uncontrollably.  He was eventually seen by a doctor five days later, but was returned to the general population and the bunk above C.G.B..  She saw nurses and then a doctor after she began vomiting, had a fever, had pain in her throat, head and bones, and began losing hair.  She is now housed in a pod with a dozen people experiencing COVID-19 symptoms, two of whom have tested positive for the virus.

12.     Petitioner A.F., f/k/a O.E.R.F., is a citizen of Nicaragua who is detained at the La Palma Correctional Center ("La Palma") in Eloy, Arizona.  She has been in ICE custody since January 9, 2020.  A.F., a transgender woman, intends to seek asylum because she was detained and tortured for her participation in a transgender rights organization.  A doctor at La Palma told A.F. that she is at greater risk for COVID-19 infection because she was born with only one kidney.  She is concerned because there is no way to practice social distancing at La Palma; for example, detainees have meals in groups of more than 100 people and cannot maintain a six-foot distance while waiting in line or eating.  Guards at La Palma refuse to answer questions about COVID-19, although ICE reports at least 13 confirmed cases of the disease among detainees there.  She has not observed guards wearing face masks or gloves while interacting with detainees.

13.     Petitioner M.M.S-M., f/k/a A.H.S-M., is a citizen of El Salvador who is detained at the Winn Correctional Center ("Winn") in Winnfield, La.  She has been in ICE custody for

nearly a year.  M.M.S-M., a transgender woman, is seeking asylum because she fears persecution

and death in El Salvador because of her transgender status.  She has been unable to obtain critical

health care, including hormone replacement therapy, while in ICE custody.  Because of her fear

and anxiety from being housed with 40 cisgender men, M.M.S-M. has been placed in

segregation, which is exacerbating her mental health issues.  Nurses at Winn do not wear gloves

or masks, and neither medical staff nor guards have provided M.M.S-M. with information about

COVID-19.

14.    Petitioner L.R.A.P., f/k/a E.A.P., is a citizen of Mexico who came to the United

States when she was three or four years old.  She has been detained at La Palma since December

16, 2019.  L.R.A.P., a transgender woman, is seeking asylum because she fears persecution in

Mexico because of her transgender status.  L.R.A.P. has not received information about COVID-

19 from the staff at La Palma and was not informed that there are 18 confirmed cases among

detainees there.  L.R.A.P. is "distressed, stressed, and panicked," both out of fear of contracting

the coronavirus and also because of the harassment she endures from both detainees and staff

members, who often use anti-gay and anti-transgender slurs.  Social distancing is impossible for

her because detainees congregate together and must sit at tables one foot apart.  She has not seen

any guards wearing face masks or gloves

15.    Petitioner K.S., f/k/a J.H.S., is a citizen of Jamaica who is detained at the Nevada

Southern Detention Center ("Nevada Southern") in Pahrump, Nevada.  She has been in ICE

custody since March 27, 2019.  K.S., a transgender woman, is seeking asylum because she has

received death threats from her family and fears persecution in Jamaica because of her

transgender status.  K.S., who is living with HIV, at times has difficulty ensuring that she

receives her antiretroviral medication as prescribed.  Staff at Nevada Southern, including medical staff, do not always wear gloves and masks.

16.     Petitioner K.M., f/k/a G.M., is a citizen of Haiti who has been detained at Nevada Southern since March 27, 2019.  K.M., a transgender woman, is seeking asylum because she fears persecution and violence in Haiti because of her transgender status.  A cousin of hers in Haiti was beheaded because he was gay.  Staff at the facility sometimes do not provide K.M., who is living with HIV, with her antiretroviral medication, causing her to miss doses.  She has observed other detainees in her pod showing possible COVID-19 symptoms such as coughing and fever; those detainees were sent to medical care but returned to the general population.

17.     Petitioner R.H., f/k/a F.A.H., is a citizen of Honduras who is detained at Caroline Detention Facility ("Caroline") in Bowling Green, Virginia.  She has been in ICE custody since January 18, 2020.  R.H., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She suffers from asthma, which requires her to use an inhaler three times a day.  She also takes medically necessary hormones as part of her gender-affirming care.  Upon being detained, her hormones were changed, and she experienced side effects including severe headaches.  Because of her asthma, she is at high risk for severe illness or death if she contracts COVID-19.  There are 35-40 people in her dorm, and she has experienced some harassment from the people with whom she is detained.  These conditions have made it impossible for her to practice social distancing.

18.     Petitioner L.M., f/k/a S.M., is a citizen of Jamaica who is detained at the Aurora Detention Center ("Aurora") in Aurora, Colorado.  She has been detained since she presented herself at the San Ysidro Port of Entry on February 17, 2020, seeking asylum because she has experienced beatings, death threats, discrimination and persecution in Jamaica because of her

status as a transgender woman.  At Aurora, it took approximately 3-4 weeks for her to obtain an appointment with a doctor, who resumed her prescribed hormone treatments at one-quarter of her previous dose, and who examined her without wearing gloves or a mask.

19.     Petitioner M.J.J., f/k/a O.H.J., is a citizen of Honduras who is detained at Aurora. She has been detained for about one month – originally at El Paso Processing Center ("El Paso") in El Paso, Texas, then transferred to Florence, and eventually to Aurora.  M.J.J., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She is in a dorm with seven other transgender women, five of whom are HIV positive. She does not believe that anyone in the dorm has been tested for COVID-19.  She has not been given gloves or masks.  The guards at Aurora wear gloves but do not wear masks.

20.     Petitioner D.B.M.U., f/k/a W.E.M.U., is a citizen of Honduras who is detained at Aurora.  She has been detained for more than a month – originally at El Paso, then transferred to Florence, and eventually to Aurora.  D.B.M.U., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She has not been given any information about why she has been transferred.  She is detained in a room with seven other transgender women.  She heard on the news that there was a confirmed case of COVID-19 at Aurora.  She does not have access to any disinfectants, gloves, or masks, and she has not seen anyone at Aurora being tested for COVID-19.  She is worried that she will contract COVID-19 and die.

21.     Petitioner K.R.H., f/k/a W.D.R.H., is a citizen of Guatemala who has been detained in ICE custody at the La Palma since the beginning of April 2020.  K.R.H., a transgender woman, is seeking asylum because she fears persecution based on her LGBTQ+ identity in Guatemala, where she experienced threats and a kidnapping attempt.  She suffers from

tachycardia (an abnormally rapid heartbeat) and anxiety.  In early April, K.R.H. suffered a headache and fever, which are potential symptoms of COVID-19, but a nurse at La Palma did not see her until a week later, did not test her for the virus, and did not provide medication for her symptoms.  Although as of April 21, 2020, ICE reported 18 detainees at La Palma had been diagnosed with COVID-19, staff members have not notified K.R.H. about the presence of the virus at the facility.  She learned of three cases of COVID-19 at La Palma from other detainees who work in the medical area.  K.R.H. is housed in a 120-person pod and does not have sufficient space in the pod to stay more than six feet away from other people; the detainees congregate in groups of 20 to 30 to have meals and watch television, and the beds in the two-person cells do not provide a six-foot distance for sleeping.

22.     Petitioner G.P., f/k/a O.A.P., is a citizen of Honduras who has been detained at Imperial Regional Detention Facility ("Imperial") in Calexico, California for fifteen months.  G.P., a transgender woman, is seeking asylum because she fled Honduras due to persecution because of her transgender status.  Until recently, she lived in a dorm with 64 people, which makes social distancing impossible.  She does not know if anyone at Imperial has contracted COVID-19, but she does not believe that anyone has been tested.  She does not have access to gloves or hand sanitizer and was offered a mask only in the past week.  She does not feel safe, and she is concerned because there are still new people coming into the Detention Center.

23.     Petitioner M.R.P., f/k/a J.N.R.P., is a citizen of El Salvador who has been detained since June 11, 2019.  Since February 2020, she has been detained at El Paso.  She was previously detained at Cibola and Otero Detention Center ("Otero") in Chaparral, New Mexico.  M.R.P., a transgender woman, is seeking asylum because she fled persecution, torture and death threats in El Salvador because of her transgender status.  She has respiratory issues,

hypothyroidism, Hepatitis A, abnormally high bilirubin, and abnormally high hemoglobin. She has a family history of diabetes, and while she does not have a formal diagnosis, she knows she is at risk of getting diabetes. She sleeps in a barrack with nine cisgender men. The beds in the barrack are only three or four feet apart, so social distancing is impossible. She is afraid that she will become infected with COVID-19 and that she will develop serious medical issues because people with diabetes and respiratory issues are at a higher risk for serious symptoms if they contract COVID-19.

24.    Respondent Chad Wolf is the acting secretary of the United States Department of Homeland Security ("DHS"). He is a legal custodian of Petitioners and is sued in his official capacity. Respondent Wolf is charged with the administration and enforcement of the immigration laws of the United States, 8 U.S.C. § 1103(a), and has supervisory authority over Immigration and Customs Enforcement ("ICE"), the Department of Homeland Security ("DHS") component responsible for the civil detention of immigrants including Petitioners.

25.    Respondent William P. Barr is the United States Attorney General. In this capacity, he has supervisory authority over all operation of the Executive Office of Immigration Review (EOIR), which includes all the immigration courts and the Board of Immigration Appeals (BIA). 8 U.S.C. § 1103(g); 8 C.F.R. § 1003.0. He is also charged with the administration and the enforcement of the immigration laws under 8 U.S.C. § 1103(a). Respondent Barr is a legal custodian of Petitioners. He is sued in his official capacity.

## PROPOSED CLASS

26.    Petitioners file this action on behalf of a highly vulnerable putative class: all transgender people in civil immigration detention in the United States.

27.    On information and belief, transgender people in civil immigration detention are being held in at least the following 17 facilities: Adelanto Detention Center/Adelanto ICE

Processing Center, Adelanto, California; Aurora Detention Center, Aurora, Colorado; Caroline

Detention Facility, Bowling Green, Virginia; Cibola Detention Center/Cibola County

Correctional Center, Milan, New Mexico; El Paso Processing Center, El Paso, Texas; Florence

Correctional Center, Florence, Arizona; Imperial Regional Detention Facility, Calexico,

California; Irwin County Detention Center, Ocilla, Georgia; La Palma Correctional Facility,

Eloy, Arizona; Nevada Southern Detention Center, Pahrump, Nevada; Otay Mesa Detention

Center, San Diego, California; Otero Detention Center/Otero County Processing Center,

Chaparral, New Mexico; Pearsall Detention Center/South Texas ICE Processing Center, Pearsall,

Texas; Prairieland Detention Center, Alvarado, Texas; Stewart Detention Center, Lumpkin,

Georgia; Tacoma Northwest Detention Center, Tacoma, Washington; and Winn Correctional

Center, Winnfield, Louisiana.

28.     Each transgender person in civil immigration detention is at imminent risk of

contracting COIVD-19 because of the life-threatening conditions under which they are

confined—conditions that violate CDC guidelines, ICE directives, and State and County orders

as they pertain to COVID-19.  This risk is heightened further because transgender people in civil

immigration detention suffer from medical conditions such as HIV, diabetes, and mental illness,

and have an increased likelihood of harassment and assault that put them at greater risk of

contracting COVID-19 and suffering serious symptoms and death as a result.

29.     Named Petitioners bring this action as representatives of the following proposed

class:

> All transgender people in civil immigration detention who are held, or who will
> be held, by Respondents in any U.S. detention center or facility during the
> pendency of the COVID-19 pandemic.

30.     The proposed class meets the requirements of Federal Rules of Civil Procedure

23(a) and (b).

31.    The class is sufficiently numerous.  Although ICE does not publish the number of transgender people in civil immigration detention, Petitioners on information and belief estimate that the number is at least 60 and may be as many as several hundred.

32.    All members of the class are bound together by common questions of law and fact – most prominently, whether in the face of the lethal COVID-19 pandemic, the continued civil detention of the class members at the Detention Centers in violation of the CDC guidelines placing the class members' health and safety at grave risk violates their constitutional rights.

33.    The named Petitioners are proper class representatives because their claims are typical of the absent class members and because they and their counsel will adequately and vigorously represent the class.

34.    Rule 23(b)(2) is also satisfied here because the Respondents have "acted or refused to act on grounds that apply generally to the class" through creating and maintaining conditions that put the class at imminent risk of contracting COVID-19, the deadly virus that is currently sweeping the globe.

## **VENUE**

35.    Venue in the District Court for the District of Columbia is proper under 28 U.S.C. § 1391(b) because Respondents reside in this district.

## **JURISDICTION**

36.    Respondents reside within the jurisdiction of this Court.

37.    This case arises under the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

38.    This Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a).

39.     This Court has jurisdiction pursuant to 28 U.S. Code § 1331 (Federal Question), 28 U.S. Code § 1361 (Action to compel an officer of the United States to perform his duty), and 28 U.S.C. § 2201(a), (Federal Declaratory Judgment Act).

## FACTS

**A.     COVID-19 is a Global Pandemic that Poses a Significant Risk of Death or Serious Illness to Petitioners.**

40.     Since the first confirmed case of COVID-19 in the United States in late January 2020, the number of infected people in this country has exploded to more than 746,000 as of April 20, 2020, with more than 39,000 deaths, according to the CDC.  *See Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 20, 2020).

41.     State and local governments across the country have implemented measures intended to curb the spread of the disease, including banning large gatherings, closing non-essential businesses, ordering people to stay home except for essential activities, and requiring the use of face masks where large groupings of strangers are unavoidable, such as in grocery stores.

42.     COVID-19 is a respiratory illness that is spread through airborne droplets, such as those expelled when a person coughs or sneezes, or via contact with contaminated surfaces such as doorknobs and countertops.  *See What you should know about COVID-19 to protect yourself and others*, Centers for Disease Control and Prevention (Apr. 15, 2020) ("CDC Factsheet"), *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

43.     Some people who are infected with the novel coronavirus that causes COVID-19 do not experience symptoms, but may nonetheless be contagious.  Even those who develop symptoms may be contagious before they exhibit symptoms and may be contagious afterwards.

44.     Those who do suffer illness from the disease experience flu-like symptoms such as fever, coughing, body aches, and difficulty breathing, and, in severe cases, the infection can cause pneumonia, multiple organ failure, and death.

45.     Severe cases require hospitalization, often with breathing assistance ranging from supplemental oxygen to use of a ventilator; those who survive severe illness may have permanent lung damage and other disability.  There is no vaccine or cure.

46.     Preventative measures recommended by public health experts include frequent and thorough hand washing; wearing a face mask in public; frequently disinfecting surfaces on which the virus could be deposited; and the now-familiar tactic of "social distancing" – staying at least six feet away from other people.

47.     Although young and otherwise healthy people can become ill and die from COVID-19, those at the highest risk for illness and death include those over age 55 and people with underlying medical issues such as asthma or other lung ailments; high blood pressure; suppressed immune systems; and diabetes.  *See* CDC Factsheet.

**B.      Transgender People in Civil Immigration Detention Are At High Risk for Becoming Infected, Experiencing Severe Illness, and Dying from COVID-19.**

48.     Transgender people in civil immigration detention, as a group, are at a greater risk of contracting the virus that causes COVID-19 than the general population and, if they do become infected, are more likely to become seriously ill or die.

49.     It is no exaggeration to state that during this pandemic, ICE detention facilities are death traps for the transgender people being held there.

50.     Several well-documented, preexisting factors combine to make transgender people in civil immigration detention a high-risk group for developing severe illness and death from COVID-19.

51.     First, transgender people are more likely to have underlying health conditions that put them at high risk for developing the most serious complications from COVID-19, including health conditions caused by tobacco use, immune suppression caused by HIV or viral hepatitis, diabetes, high blood pressure, and obesity.

52.     For example, some studies have found that 20% to 25% of transgender women are HIV-positive, with even higher rates among transgender women of color and those who live in urban areas.

53.     Second, transgender people in civil immigration detention also are far more likely to suffer from mental health issues such as depression, anxiety and post-traumatic stress disorder that cause immune suppression and other physical ailments.

54.     One common factor for transgender people is the mental and emotional trauma caused by the endemic discrimination, violence and social stigma against transgender people – a phenomenon known generally as "minority stress" – which, in turn, can further suppress the immune system and exacerbate other underlying medical conditions.

55.     Transgender people in ICE custody are especially vulnerable to mental health problems due to the fact that they left their native countries because of violence and persecution, and thus have a profound history of trauma leading to high rates of depression, anxiety, and post-traumatic stress disorder.  For example, a detainee at La Palma reports having her depression exacerbated by harassment by other detainees and staff.  Another La Palma detainee reports

being depressed by being called anti-transgender and anti-gay slurs by staff and other detainees, and being terrified when staff let men into the bathroom while she was showering.

56. In other words, transgender immigrants are at higher risk of infection for precisely the same reasons they fled their home countries and came to be in ICE custody.

57. Third, that discrimination, violence and social stigma means transgender people also are more likely to live in poverty and less likely to have health insurance or the ability to pay for health care, and therefore are less likely to have received proper, ongoing medical care for their underlying medical conditions prior to their detention.

58. Fourth, because transgender people in civil immigration detention cannot self-administer their injectable hormone treatments while in ICE custody, they must have more frequent interactions with medical staff, who themselves are at higher risk of contracting – and thus spreading – the Coronavirus because of their contact with sick people.

59. One transgender woman being detained in Aurora, for example, was examined by a doctor who was not wearing a face mask or gloves.

60. Another transgender woman being detained in Aurora has observed that the medical staff who distribute medication do so wearing gloves but not face masks.

61. Fifth, transgender people in ICE custody are far more likely to be victims of abuse and sexual assault than other detainees – indeed, ICE's own data show that lesbian, gay, bisexual and transgender detainees are 97 times more likely to be sexually victimized than non-LGBT detainees.

62. That abuse – and the fear of falling victim to it – only compounds the stress transgender people in civil immigration detention experience and exacerbates their other mental

and physical health problems.  For example, a transgender woman in civil immigration detention who was raped at age 12 suffered panic attacks when housed with dozens of cisgender men.

63.      Further, physical and sexual assaults by definition involve the kind of close contact that can spread Coronavirus and are more likely to occur when detainees are kept in close quarters.

64.      In sum, the distressing reality for transgender people in ICE custody is that they are more likely to be exposed to the Coronavirus; more likely to become infected if they are exposed; more likely to experience severe illness if they become infected; and more likely to die if they experience severe illness.

65.      The heightened susceptibility of transgender people in civil immigration detention to COVID-19 means that releasing them from detention will not only help curb their risks of illness and death, it will help protect any remaining detainees, guards and staff who might otherwise be exposed to enhanced spread of the virus and avoid further overwhelming area health care facilities.

**C.    ICE's Failure to Provide the Most Basic Pandemic Precautions Has Increased the Risk of Illness and Death to Transgender People in Civil Immigration Detention.**

66.      Despite the fact that transgender people in civil immigration detention are at high risk for contracting and suffering severe illness from COVID-19, ICE has not taken the steps necessary to protect transgender people from COVID-19, nor have the detention centers holding transgender people followed the COVID-19 response requirements that ICE itself sets forth.

67.      To the contrary, ICE's actions and inactions unacceptably and unconstitutionally have put transgender people in civil immigration detention at *increased* risk of suffering and dying from this pandemic.

### i.       Social Distancing

68.       As government and private sector medical experts have repeatedly emphasized, limiting the spread of the pandemic requires "social distancing" – keeping at least six feet away from other people.  ICE detention centers have not and cannot provide sufficient space to do so.

69.       The consequences of the lack of opportunity for social distancing in ICE custody are dramatically illustrated by the experience of C.G.B., who became ill with a suspected case of COVID-19 after a newly arrived bunkmate spent days coughing before being seen by a doctor and then returned to the general population.  The pod where C.G.B. became ill has beds spaced approximately three feet apart.

70.       At Winn, detainees stay in pods of approximately 44 people, sleeping in beds that are approximately four or five feet apart.

71.       At La Palma, some 100 to 120 detainees eat meals together, where they must sit approximately one foot away from each other and cannot keep a six-foot distance while waiting in line.  Approximately 60 detainees at a time are allowed on a patio, where they also do not have enough room to stay six feet apart.

72.       At the El Paso Processing Center, detainees sleep in beds four feet apart.

73.       At Aurora, beds, as well as the tables and seating where detainees eat, are bolted to the floor and cannot be moved to increase the distance between detainees. Detainees are not able to practice social distancing.

74.       At Southern Nevada, the beds are close enough for detainees to reach across the aisle and touch the adjacent bed.  Detainees eat at tables seating four people that are too small to accommodate all four food trays at once.

75.     At the Caroline detention facility, detainees cannot maintain proper social distancing because they sleep four to a room in close quarters, in dormitories of approximately 35-40 people.  Detainees from each dorm at Caroline travel as a group to the cafeteria for meals and to the law library, providing additional opportunities for disease to spread.

### ii.     Hand-washing and Hygiene

76.     Since the beginning of the pandemic, public health experts have emphasized that proper hand washing, cleaning and other hygiene practices are key preventative measures that everyone should follow.  *E.g.*, *How to Protect Yourself and Others*, Centers for Disease Control and Prevention (last updated Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

77.     ICE's pandemic response requirements – issued on April 10, 2020, a month after the World Health Organization declared a global pandemic – mandate that detention facilities require everyone in the facility, staff and detainees alike, "to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds," and to provide at no cost sufficient supplies such as hand soap and tissues to allow detainees to meet these requirements.[1]  ICE also requires its detention facilities to follow the guidance for detention facilities published by the CDC.  ICE Pandemic Requirements at 5-6.

78.     The CDC guidance also mandates that facilities provide staff and detainees with sufficient supplies and opportunities for frequent and adequate hand washing.[2]

---

[1]     *ERO COVID-19 Pandemic Response Requirements* at 9, U.S. Immigration and Customs Enforcement (Version 1.0, Apr. 10, 2020), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (hereinafter, "ICE Pandemic Requirements").

[2]     *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 10, U.S. Centers for Disease Control and

79.    Despite these basic requirements, ICE detention centers lack sufficient facilities to allow all detainees to practice frequent hand washing.

80.    At the Imperial Regional Detention Facility, 32 detainees residing on one floor of a dormitory share four sinks and one soap dispenser.

81.    At Winn, approximately 44 detainees share one bathroom with three sinks and toilets.  The only regular cleaning is sweeping by detainees once per day.  A transgender woman detained in segregation is able to clean her cell only once or twice a week, whenever a guard gets around to providing her with cleaning supplies.

82.    At Southern Nevada, 46 detainees share one bathroom with eight sinks and toilets.

83.    The bathroom sink in a dormitory housing transgender detainees in Aurora has been clogged for an extended period of time, and the detainees do not have the equipment to fix it.  Detainees use a container to capture the dirty water and pour it in the shower.

84.    ICE detention centers also fail to provide detainees with sufficient supplies.

85.    At La Palma, for example, detainees are provided with shampoo, but have to purchase soap—which indigent detainees are unable to do.  Detainees at Southern Nevada and Caroline also have to purchase soap at the commissary.

86.    ICE also requires that its detention centers use household cleaners and disinfectants several times a day to "clean and disinfect surfaces and objects that are frequently touched, especially in common areas (*e.g.*, doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment.)"  ICE Pandemic Requirements at 10.[3]

---

[3]   Prevention (last updated Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (hereinafter, "CDC Guidance.").
The mandatory CDC guidelines also require this kind of cleaning and disinfecting several times per day.  CDC Guidance at 9.

87.     ICE detention facilities holding transgender people in civil immigration detention are not even coming close to fulfilling this mandate.

88.     Frequently used surfaces such as sinks and toilets are cleaned, at most, once a day, and detainees often are not provided with the cleaning and disinfecting supplies necessary to protect themselves.

89.     For example, detainees in Aurora, who are responsible for cleaning their own living areas, attempt to clean three times daily but are provided only two rags, one for the living area and one for the bathroom.

90.     Sinks and bathrooms in the El Paso facility are cleaned only once daily, and the detainees are not provided with disinfectant to clean more often.

91.     ICE has failed to provide detainees with the supplies to permit them to follow the most basic hygiene measures required by its own regulations.

92.     The agency's inability to sufficiently provide for such common-sense and low-tech preventative measures shows that supervised release from detention is the only way to remedy the unacceptable risk of infection, disease and death ICE has created for transgender people in civil immigration detention.

**iii.    Protective Equipment**

93.     ICE regulations mandate that "[c]loth face coverings should be worn by detainees and staff . . . to help slow the spread of COVID-19." ICE Pandemic Requirements at 9. ICE facilities are not complying with this requirement, either.

94.     Many detainees report that they have not been provided with face masks, despite asking for them. One detainee states that she has not asked for a mask because she assumes they are unavailable since guards do not wear them.

95.     Detainees at La Palma were provided with one paper mask each on April 14, 2020, and were told that it would not be replaced if it was damaged.  Facility staff initially tried to require detainees to sign a liability waiver to obtain a mask, but relented after detainees refused to sign.  Detainees at Nevada Southern were not provided with cloth masks until April 16, 2020.

96.     Guards and other staff frequently interact with detainees without wearing protective equipment.

97.     A doctor at Aurora performed a hands-on medical examination without wearing gloves or a mask.  So did a doctor at La Palma.

98.     Medical personnel delivering medication to detainees at Aurora also do not wear masks.

99.     Ironically, a guard giving detainees a presentation on COVID-19 at Southern Nevada did so without wearing a mask or gloves.  Guards at Southern Nevada also perform pat-down searches of detainees without wearing gloves or masks.

100.    Several detainees report observing guards wearing gloves, but not masks.

101.    Guards at La Palma do not even wear gloves or masks.

102.    ICE's failure to provide protective gear such as face masks to detainees and to ensure that staff members use the required equipment further heightens the unconstitutional risk of infection to which transgender people in civil immigration detention are subjected through their continued detention.

### iv.     Information and Training

103.    Both the ICE rules and the CDC guidance require that detainees be provided with accurate and up-to-date information about COVID-19, precautions they can take to reduce the

risk of infection, and the presence of the virus in their facility.  ICE Pandemic Requirements at 7, 9; CDC Guidance at 6, 10, 12, 22.

104.    ICE has failed to provide *any* of this required lifesaving information to many detainees, has not provided regular updates to the limited amount of information it has provided to other detainees, and in some instances has misled detainees by falsely denying the presence of COVID-19 at their facility.

105.    Many current and recently released detainees report that guards or other staff gave them *no* information about COVID-19.  They include C.G.B., who received no information about COVID-19 from the staff at La Palma despite being quarantined with a suspected case of the disease.  Another La Palma detainee reports that she has not received any information from staff regarding COVID-19 and guards refuse to answer questions about the virus.  This problem also has occurred at Aurora.

106.    One detainee at Aurora said that the only information she received was a suggestion to wash her hands.

107.    At Southern Nevada, a guard gave a COVID-19 presentation in the morning while some detainees were sleeping and did not ensure that all detainees attended.

108.    The CDC Guidelines, which ICE facilities are required to follow, require that information about COVID-10 must be provided "in a manner that can be understood by non-English speaking individuals and those with low literacy."  CDC Guidelines at 22; *see also id.* at 6, 10 (same).

109.    Some statements made by facility staff have contradicted ICE's public statements. For example, staff informed detainees at Nevada Southern on April 15, 2020 that there was one person with COVID-19 at the facility, but ICE has not reported one to the public.

110.    Worse, ICE has violated the CDC Guidelines by affirmatively misinforming detainees about the presence of COVID-19 at their facility.

111.    Although ICE now reports that two staff members at Aurora have tested positive for the COVID-19 virus,[4] officials falsely denied to detainees that anyone at the facility had been infected.

112.    By failing to provide any information about the virus to many detainees and providing incomplete, false and misleading information to others, ICE has not only violated its own rules and mandatory CDC guidance, but also has further heightened the risks of COVID-19 transmission to transgender people in civil immigration detention.

113.    ICE regulations acknowledge that "[b]oth good hygiene practices and social distancing are critical in preventing further transmission" of COVID-19.  ICE Pandemic Requirements at 11.  In practice, however, neither are being implemented at ICE detention facilities.

114.    ICE's failure to follow its own regulations and inability to take the most basic precautions against the spread of this deadly virus pose dangers to transgender people in civil immigration detention that can be remedied only by the detainees' immediate release to safer areas.

**D.    ICE's Inadequate Medical Care For Transgender People in Civil Immigration Detention Enhances Their Risk**

115.    ICE detention centers are plagued by chronic and well-documented failures to provide proper medical care to transgender people in civil immigration detention – problems that

---

[4]    *See ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited Apr. 20, 2020).

have been exacerbated by the pandemic and pose another enhanced risk of infection, disease and death for transgender people in civil immigration detention.

116.    ICE's past handling of infectious disease outbreaks in detention centers has been inept—foreshadowing the impact COVID-19 will have if transgender people in civil immigration detention are not released.  Just last year, for example, a mumps outbreak across 57 immigration detention facilities throughout the country led to almost 900 cases of mumps overwhelmingly contracted inside the facilities before the outbreak spread to surrounding communities.

117.    As explained by Dr. Carlos Franco-Paredes, an infectious disease expert who has treated HIV-positive transgender detainees at the Aurora facility:

> [I]t is my professional opinion that the medical care available in immigration detention centers cannot properly accommodate the needs of patients should there be an outbreak of COVID-19 in these facilities. Immigration detention centers are often poorly equipped to diagnose and manage infectious disease outbreaks. Many of these centers lack onsite medical facilities or 24-hour medical care.

118.    Besides C.G.B., whose bunkmate was not isolated for many days despite showing classic COVID-19 symptoms, several other transgender people in civil immigration detention report that they or other detainees showing possible COVID-19 symptoms have not been tested, quarantined or isolated.  One detainee reports that when she had a cough, she saw medical personnel who gave her aspirin and returned her to the general population; another states that when she suffered COVID-19-like symptoms including a fever, she had to wait a week before seeing a nurse, who told her she was fine, did not test her or provide any medication, and did not schedule a follow-up appointment; and another reports that a fellow detainee with a fever and flu-like symptoms was told to make a regular medical request rather than receiving immediate attention.

119.    This is a violation of ICE regulations and CDC guidance, which require that people suspected or confirmed to have COVID-19 must be placed in medical isolation and their close contacts must be quarantined.  ICE Pandemic Requirements at 14-16; CDC guidance at 10-11.  Notably, ICE did not issue its regulations until the day after C.G.B. had her COVID-19 test, which was more than a week after she was first exposed to the coughing bunkmate.  ICE Pandemic Requirements at 1.

120.    Another alarming example of ICE's bungling of medical care during the pandemic is the failure to provide adequate treatment to transgender people in civil immigration detention living with HIV, which further threatens their already compromised immune response.

121.    Prior to the outbreak, Dr. Franco-Paredes, a doctor specializing in infectious diseases, was treating transgender people in civil immigration detention living with HIV at Aurora.

122.    Since the outbreak began, authorities at Aurora have barred Dr. Franco-Paredes from providing care to any if his patients there; as a result, Dr. Franco-Paredes has been unable to see any of his patients in person, and even has had difficulty in scheduling virtual evaluations.

123.    Dr. Franco-Paredes is concerned that the lack of adequate treatment will expose HIV-positive detainees to a high risk of contracting COVID-19, noting that one patient he evaluated had been given prescriptions for medications that negatively interacted with each other and thus could suppress the patient's immune response.

124.    Multiple transgender people in civil immigration detention living with HIV report that they do not receive their medication at regular times, which puts them at greater risk of contracting life-threatening infections such as COVID-19 because it can lessen their immune response.

125.    Other transgender people in civil immigration detention have had their medically necessary gender-affirming hormone treatments or other prescribed medications denied or changed without explanation.

126.    The COVID-19 outbreak has exacerbated the problems with a system that was already ill equipped to provide adequate medical care to transgender people in civil immigration detention.  Although ICE has stated that discrimination against transgender people in civil immigration detention is prohibited,[5] detainees report continued harassment; one detainee reports that when notified of such harassment, a facility psychologist said there was nothing to be done because "we aren't big on trans rights here."

127.    A June 2019 Department of Homeland Security Office of Inspector General report[6] found inadequate medical care at the Adelanto, California facility and other egregious health and safety violations at facilities in Aurora; Essex County, New Jersey; and LaSalle, Louisiana.

128.    A 2017 OIG report of inspections of six facilities found inadequate medical care including long delays for detainees to receive care, inadequate documentation of the care they

---

[5]    Thomas Homan, Executive Associate Director, U.S. Immigration and Customs Enforcement, *Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015), *available at* https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.

[6]    Report No. OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (June 3, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

received, and failure to use translation services to allow detainees to communicate their symptoms to medical workers and to understand and knowingly consent to medical treatment.[7]

129.    Congress has expressed concern about treatment of transgender people in civil immigration detention when approving the fiscal 2020 appropriations for DHS.  The congressional report accompanying the appropriations directs ICE to limit the detention of transgender people to facilities operating under contracts that comply with ICE's 2015 guidance on best practices for transgender detainees.  *See* H. R. Rep. No. 116-180 at 37 (2019).  Despite Congressional urging to push ICE to implement its own best practices, no ICE detention contracts so far have incorporated those improvements.

130.    In the last six months, two U.S. Senators and 45 members of the House of Representatives have written to the acting directors of ICE and DHS, citing "overwhelming evidence of systemic neglect and mistreatment of transgender individuals in immigration and detention facilities," including a lack of adequate medical care, that "demonstrate ICE's inability to provide adequate conditions for transgender immigrants."  Letter from Sens. Elizabeth Warren and Tammy Baldwin to Kevin McAleenan, Acting Secretary, U.S. Department of Homeland Security (Oct. 15, 2019), *available at* https://www.warren.senate.gov/imo/media/doc/2019.10.15%20Letter%20to%20DHS%20ICE%2 0and%20CPB%20regarding%20transgender%20migrants%20and%20asylum%20seekers.pdf; Letter from Rep. Mike Quigley, et al. to Chad Wolf, Acting Secretary, U.S. Department of

---

[7]    Report No. OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (Dec. 11, 2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

Homeland Security (Jan. 14, 2020), *available at*

https://quigley.house.gov/sites/quigley.house.gov/files/01.14.20%20ICE%20Letter.pdf.

131.    Advocacy organizations also have filed several complaints with DHS and ICE in the past year citing egregious examples of medical neglect and mistreatment of transgender people in civil immigration detention.

132.    Just last month, a coalition of eight groups led by the Santa Fe Dreamers Project filed a complaint with ICE, the DHS Office of Inspector General, and the DHS Office for Civil Rights and Civil Liberties over conditions for transgender people in civil immigration detention at the Winn Correctional Center.

133.    The complaint documented severe abuse and mistreatment of transgender people in civil immigration detention and medical care failings including interrupted and inconsistent provision of HIV medication; refusal to provide medically necessary gender-affirming hormone treatments; delayed or denied dental care causing extreme pain and weight loss; and refusal to allow a woman to perform physical therapy exercises after her leg was broken by another inmate because she was transgender.

134.    The Transgender Law Center and a dozen other nonprofit organizations filed a complaint with DHS and its Inspector General's Office in September 2019 over ICE's failure to provide adequate medical and mental health care to LGBT and HIV positive detainees, citing the maltreatment of 19 current and former detainees, most of them transgender.

135.    ICE's failures to provide adequate medical care during the pandemic—building upon its inability to do so even in the best of times—put transgender people in civil immigration detention at further risk of serious illness or death should they become infected with the Coronavirus.

136.     Because ICE cannot provide adequate medical care to them, transgender people in civil immigration detention should be released immediately to safer environments.

**E.     ICE Protocols for Dealing With COVID-19 Are Inadequate.**

137.     Even if it followed its own requirements, ICE could not adequately protect transgender people in civil immigration detention from unconstitutional risks of infection posed by suspected or confirmed COVID-19 infections of other detainees or facility staff.  Indeed, the shortcomings of these rules actually increase the risk that transgender people in civil immigration detention would contract, suffer and die from the virus.

138.     The screening procedures ICE has announced are insufficient to keep those infected with COVID-19 from spreading the disease.

139.     The ICE rules require facilities to screen employees and detainees upon entry for COVID-19 symptoms – fever, cough, and shortness of breath – and to bar entry to staff with those symptoms and to isolate incoming detainees with those symptoms.  ICE Pandemic Requirements at 12.

140.     However, many infected with the Coronavirus either never show symptoms or become infectious before they develop symptoms; and many with COVID-19 have gastrointestinal or other symptoms, not respiratory symptoms like a cough.

141.     Thus, ICE's screening would miss many infections which could then spread extensively in a crowded detention setting.

142.     ICE's website states that in detention centers, "cohorting" – keeping people together in a contained group – "serves as an alternative to self-monitoring at home" for those potentially exposed to the virus who do not have symptoms.  *See ICE Guidance on COVID-19*, www.ice.gov/coronavirus (last visited Apr. 19, 2020).  The CDC Guidelines, which the ICE

Pandemic Requirements make mandatory, state that cohorting should only be used as a last resort, however.  CDC Guidelines at 16.

143.    ICE's rules for its detention centers say "facilities should consider cohorting" all detainees who arrive on one or more days.  ICE Pandemic Requirements at 14.[8]  Cohorting is a dangerous practice for detention facilities because it could amplify, rather than prevent, an outbreak, because unless the detainees are able to stay six feet away from each other, one infected person could spread the virus to the entire cohort.

144.    The risk is particularly acute for anyone in the cohort with increased susceptibility to the virus, such as transgender people in civil immigration detention or others with underlying medical conditions.

145.    C.G.B.'s experience illustrates this problem.  Although she has been separated from the general population, she is not isolated in a single room but stays in a room with a dozen patients, two of whom have confirmed cases of COVID-19.  Thus, even if she and the other nine detainees without confirmed COVID-19 infections did not have the virus when they went into quarantine, they almost certainly do now.

146.    Because ICE's own guidelines are insufficient to reduce the risk of infection to transgender people in civil immigration detention and actually enhances that risk, transgender people in civil immigration detention should be paroled to safer quarters.

---

[8]    For suspected or confirmed COVID-19 cases, the rules state that "[c]ohorting should only be practiced if there are no other available options" and that only those who have tested positive should be "cohorted" together.  ICE Pandemic Requirements at 14.

## LEGAL FRAMEWORK

**A.     Violation of Constitutional Rights.**

147.     When the government detains or incarcerates a person, it has an affirmative duty to guarantee conditions of reasonable health and safety: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200.

148.     The Supreme Court has held that the Eighth Amendment protects against future harm to incarcerated people, as "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Further, in this context, "[t]he science is well established – infected, asymptomatic carriers of the coronavirus are highly contagious," and therefore "[t]he Government cannot be deliberately indifferent to the Petitioners' potential exposure to [COVID-19] on the ground that they are not, now, infected or showing current symptoms." *Castillo v. Barr*, No. 20-00605, 2020 U.S. Dist. LEXIS 54425, at *13–14 (C.D. Cal. Mar. 27, 2020) (citing *Helling*, 509 U.S. at 33).

149.     The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200).  The Supreme Court in *Helling* recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

150.     These Constitutional protections also apply in the context of immigration detention because immigrant detainees, even those with prior criminal convictions, are civil detainees held pursuant to civil immigration laws.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Because detained immigrants are civil detainees, they are entitled to the due process protections derived from the Fifth Amendment, which prohibit punishment.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished.").  Because the Fifth Amendment rather than the Eighth Amendment governs civil detention, the "deliberate indifference" standard required to establish a constitutional violation in the latter context does not apply to civil detainees like Petitioners.  *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005).  Still, the Eighth Amendment's guarantees represent a "constitutional floor" that must also be met for detainees who are not being punished, such as those jailed prior to trial and civil immigration detainees.  *United States v. Moore*, No. 1:18-cr-198 (JEB), 2019 U.S. Dist. LEXIS 104300, at *6-7 (D.D.C. June 21, 2019).

151.     A condition of confinement for a civil immigration detainee violates the Constitution "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 U.S. Dist. LEXIS 189767, at *13 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).  This Court has held that detaining people during the COVID-19 pandemic in such a manner that they are unable to practice social distancing or take other precautions necessary to contain the spread of the virus creates an unreasonable risk of damage to detainees' health.  *Banks v. Booth*, No. 20-849, 2020 U.S. Dist. LEXIS 68287, at *27–30 (D.D.C. Apr. 19, 2020) (holding that pre-trial

detainee plaintiffs established a likelihood of success on the merits on their Fifth Amendment

due process claim).  Other courts addressing TRO motions for civil detainees during the COVID-

19 pandemic  have found that detaining people under conditions such that they are unable to

practice social distancing or take other precautions necessary to contain the spread of the virus is

sufficient to establish a likelihood of success on the merits of a Fifth Amendment due process

claim.  *See, e.g.*, *Castillo*, 2020 U.S. Dist. LEXIS 54425, at *16 (plaintiffs established more than

a mere likelihood of success on the merits of their due process claim where the conditions of

confinement did not allow detainees to socially distance); *Thakker v. Doll*, No. 1:20-480, 2020

U.S. Dist. LEXIS 59459, at *25 (M.D. Pa. Mar. 31, 2020) (plaintiffs established likelihood of

success on the merits of their due process claim where plaintiffs were detained in "tightly-

confined, unhygienic spaces" and unable to socially distance).

152.    Similarly, here, Plaintiffs have established that they are unable to practice social

distancing or take other precautions to contain the spread of the virus under their current

conditions of confinement.  Therefore, they have established a likelihood of success on the

merits of their Fifth Amendment Due Process claim.

**B.      Violation of the Administrative Procedures Act.**

153.    Respondents are also in violation of the Fifth Amendment Due Process Clause by

depriving detainees the rights guaranteed under the COVID-19 regulations enacted by ICE.

154.    When the government has promulgated "[r]egulations with the force and effect of

law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel.*

*Accardi v. Shaughnessy*, 347 U.S. 260, 266, 268 (1954) (reversing in immigration case after

review of warrant for deportation). Agencies must follow their own "existing valid regulations,"

even where government officers have broad discretion, such as in the area of immigration. *Id.* at

268; *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to

follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."). Breaches of Accardi's rule constitute violations of both the Administrative Procedures Act ("APA") and the Fifth Amendment's Due Process Clause.

155.    While violations of "internal agency procedures" do not always require a remedy, Accardi's rule applies with full force when "the rights or interests of the objecting party" are "affected." *Monitlla v. INS*, 926 F.2d 162, 167 (2d. Cir. 1991) (citing cases) ("Accardi doctrine is premised on fundamental notions of fair play underlying the concept of due process"); *see also Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545-46 (6th Cir. 2004) (noting that an Accardi violation may be a due process violation, and the government's action may be set aside pursuant to the APA); *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations . . . may result in a violation of an individual's constitutional right to due process.").

156.    Under the *Accardi* doctrine, due process and the basic principle of administrative law dictate that rules promulgated by a federal agency regulating the rights and interests of others are controlling upon the agency. That doctrine is premised on the fundamental notion of fair play underlying the concept of due process. 322. The *Accardi* doctrine applies with particular force when "the rights of individuals are affected." *Morton*, 415 U.S. at 235.

157.    The D.C. Circuit has explained "that 'agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion.'" *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018), citing *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) as amended (Feb. 11, 2003).

158.    On March 18, 2020, ICE issued a statement on enforcement during the COVID-19 crisis:



159.    In the statement, ICE states that as a result of the COVID-19 epidemic, "ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals subject to mandatory detention based on criminal grounds.  For those individuals who do not fall into those categories, ERO will exercise discretion to delay enforcement actions until after the crisis or utilize alternatives to detention, as appropriate." *Id.*

160.    ICE did not issue its mandatory rules for COVID-19 response until April 10, 2020, nearly a month later.  *See* ICE Pandemic Requirements at 1.

161.    ICE has the authority to comply with its constitutional requirements by paroling transgender people in civil immigration detention, who are vulnerable to severe illness or death if they contract COVID-19.  Section 212(d)(5)(A) of the Immigration and Nationality Act permits the Attorney General, at his or her discretion, to parole any noncitizen into the United States "temporarily under such conditions as [she or] he may prescribe only on a case-by-case basis for

urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Further, 8

C.F.R. § 235.3(b)(2)(iii) vests the Attorney General with the discretion to parole detained aliens

with negative credible/reasonable fear findings as required "to meet a medical emergency."

Responding to the current pandemic appropriately by releasing transgender people in civil

immigration detention who are not a threat to public safety meets all three standards: a medical

emergency, a legitimate law enforcement objective and a "significant public benefit."  Even if

the government paroles a detainee, it can still issue notices to appear and place parolees in

removal proceedings, thus ensuring that their immigration court cases continue even if they are

released from detention.  *See* 8 C.F.R. § 235.3(c).

162.    Here, ICE's failure to implement even the most basic protections its rules require

violates both the Fifth Amendment and the APA.  *See Torres v. United States Dep't of Homeland

Sec.*, 411 F. Supp. 3d 1036, 1068-69 (C.D. Cal. 2019) (detainees stated *Accardi* claim with

allegations an ICE detention center did not follow the agency's standards for treatment of

detainees).

163.    Even if Respondents have taken some proactive measures to address the crisis,

this is not enough to achieve compliance with CDC guidelines or to eliminate risk of exposure.

*See Cristian A.R. v. Decker*, No. 20-3600, 2020 U.S. Dist. LEXIS 66658, at *34 (D.N.J. Apr. 12,

2020).  For example, because detainees cannot avoid coming into close contact with frequently

used surfaces and shared spaces, Respondents' failure to ensure proper disinfecting of detainees'

living areas at the recommended intervals of several times per day exposes detainees to a high

risk of infection, even if some cleaning is performed.

164.    Respondents' failure to act in a timely manner to protect Petitioners interferes

with the rights of Petitioners in an arbitrary and capricious manner and is without justification.

165.     The continued refusal to establish and implement policies and procedures designed to prevent the transmission of COVID-19 violates the substantive and procedural due process rights of Petitioners and all transgender people in civil immigration detention.  Courts have consistently held that detainees are likely to succeed on the merits of their claims under similar circumstances.  *See, e.g.*, *Castillo*, 2020 U.S. Dist. LEXIS 54425, at *16 ("Civil detainees must be protected by the Government.  Petitioners have not been protected").

166.     By failing to establish and implement policies and procedures to protect to prevent Petitioners from the transmissions of COVID-19 in the Detention Centers, Respondents have enacted a final decision that violates both the APA and the Fifth Amendment.  *See Torres*, 411 F. Supp. 3d at 1069.

## CLAIMS FOR RELIEF

### Count I

### (Violation of Fifth Amendment Right to Due Process – Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)

167.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

168.     The Fifth Amendment to the U.S. Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment.  The federal government violates this substantive due process right when it subjects civil detainees to treatment and conditions of confinement that amount to punishment or does not does ensure those detainees' safety and health.

169.     Respondents' conditions of confinement subject Petitioners and all class members to heightened risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure.

170.     Respondents are subjecting Petitioners and all class members to a substantial risk of serious harm, in violation of Petitioners' and class members' rights under the Due Process Clause.

171.     As public health experts in correctional medical care and infectious disease agree, transgender people in immigration detention are at grave risk of COVID-19 infection, illness and death.

172.     Accordingly, Respondents are subjecting Petitioners and class members to detention conditions that amount to punishment and that fail to ensure their safety and health.

173.     For these reasons, Respondents' ongoing detention of Petitioners and all class members violates the Due Process Clause.

## Count II

### (Violation of the Administrative Procedure Act as to All Respondents)

174.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

175.     Respondents' failure to act in a timely manner to protect Petitioners and class members interferes with the rights of Petitioners and class members in an arbitrary and capricious manner and is without justification.

176.     The continued refusal to establish and implement policies and procedures designed to prevent the transmission of COVID-19 is contrary to Petitioners' and class members' constitutional rights as it violates their substantive and procedural due process rights, as outlined above.

177.     By failing to establish and implement policies and procedures to protect Petitioners from the transmission of COVID-19 in the Detention Centers, Respondents have enacted a final decision.

178.     This decision constitutes a final agency action and is reviewable by this Court.

179.     When a government agency detains people for civil immigration purposes during a pandemic crisis and fails to adhere to the most basic and minimally adequate plan or procedure it is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law." 5 U.S.C. § 706(2)(A).

180.     Here, detaining Petitioners and class members without a minimally adequate plan or procedure for their safety is arbitrary and capricious and an abuse of discretion.  The failures to comply with Respondents' own policies and procedures is not in accordance with law – in violation of the Administrative Procedure Act.

**Count III**

**(Writ of Mandamus)**

181.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

182.     As set forth above, Respondents are in violation of federal statutes and regulations and the U.S. Constitution.

183.     These legal obligations for care of people held in civil immigration detention create affirmative duties to act, which Respondents have failed to respect.

184.     Petitioners accordingly seek a writ of mandamus to require the Respondents to act immediately in accordance with their legal obligations to protect Petitioners and class members and to follow their own parole guidelines and directives.

185.     Petitioners are contemporaneously filing a motion for a temporary restraining order.

**Count IV**

**(Declaratory Judgment Act)**

186.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

187.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

188.    There is an actual controversy between the parties because Respondents are failing to implement adequate protocols to prevent the transmission of COVID-19 in the ICE detention centers.

189.    The Court should exercise its authority under the Declaratory Judgment Act to declare that Respondents have no basis to refuse to implement adequate protocols to prevent the transmission of COVID-19 and should order Respondents to immediately release on parole or other supervised released Petitioners and all class members to protect them from the dangers of COVID-19 transmission.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request this Court to:

1. Assume jurisdiction over this matter;

2. Declare that the Respondents' conduct constitutes a danger to public health and safety;

3. Order the immediate release on parole or other supervised release of Petitioners and all class members pending the completion of these proceedings, pursuant to the Court's inherent powers;

4.  Prohibit Respondents from placing any new transgender people in civil immigration detention;

5.  Order Respondents to immediately implement all protocols designed to prevent the transmission of COVID-19 as indicated in the attached expert declarations or protocols of the CDC;

6.  Declare that Respondents' detention of Petitioners and class members creates an undue increased risk of infection, disease and death, and therefore is unconstitutional in violation of the Fifth Amendment;

7.  Declare that Respondents have violated the Administrative Procedures Act;

8.  Award Petitioners and the Class their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act; and

9.  Grant such further relief as the Court deems just and proper.

April 23. 2020                             Respectfully submitted,

                                           */s/ Matthew E. Kelley*
                                           Matthew E. Kelley (Bar No. 1018126)

Gregory P. Copeland (D.D.C. Bar #          Matthew E. Kelley (Bar. No. 1018126)
NY0311                                     Leslie E. John **
RAPID DEFENSE NETWORK                      Elizabeth Weissert **
11 Broadway, Suite 615                     Alex Levy **
New York, NY 10004-1490                    BALLARD SPAHR LLP
Phone: (212) 843-0910                      1909 K Street, NW - 12th Floor
Fax: (212) 257-7033                        Telephone: (202) 661-2200
Email: gregory@defensenetwork.org          Facsimile: (202) 661-6299
Email: sarah@defensenetwork.org            Email: kelleym@ballardspahr.com
                                           Email: johnl@ballardspahr.com
Lynly S. Egyes**                           Email: weisserte@ballardspahr.com
Transgender Law Center                     Email: levya@ballardspahr.com
PO Box 70976
Oakland, CA 94612-0976
Telephone: (973) 454-6325
Facsimile: (917) 677-6614
lynly@transgenderlawcenter.org


*Attorneys for Petitioners*

*** Application for admission pro hac vice forthcoming*

## **VERIFICATION**

I am submitting this verification on behalf of the Petitioners because I am one of the Petitioners' attorneys.  I have discussed the claims and the events described in this Emergency Petition with Petitioners' legal team.  On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in the attached Emergency Verified Petition for a Writ Of Mandamus are true and correct to the best of my knowledge.

Dated: April 23, 2020     By: */s/ Matthew E. Kelley*
             Matthew E. Kelley (Bar No. 1018126)