# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| C.G.B., f/k/a D.G.B.; A.F., f/k/a O.E.R.F.; M.M.S-M., f/k/a A.H.S-M.; L.R.A.P., f/k/a E.A.P.; K.S., f/k/a J.H.S.; K.M., f/k/a G.M.; R.H., f/k/a F.A.H.; L.M., f/k/a S.M.; M.J.J., f/k/a O.H.J.; D.B.M.U., f/k/a W.E.M.U.; K.R.H., f/k/a W.D.R.H.; G.P., f/k/a O.A.P.; and M.R.P., f/k/a J.N.R.P., | ) ) ) ) ) ) ) ) ) ) | Case No.   Case: 1:20–cv–01072<br>Assigned To : Cooper, Christopher R.<br>Assign. Date : 4/23/2020<br>Description: TRO/PI (D–DECK) |
| *Petitioners*, | ) ) |  |
| v. | ) ) |  |
| Chad WOLF, in his official capacity as the acting Secretary of the U.S. Department of Homeland Security; and | ) ) ) ) |  |
| William BARR, in his official capacity as the Attorney General of the United States, | ) ) ) |  |
| *Respondents*. | ) ) ) |  |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PETITIONERS' MOTION
## FOR TEMPORARY RESTRAINING ORDER AND
## REQUEST FOR AN EMERGENCY HEARING

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 5

    I.    The COVID-19 Global Pandemic ............................................................ 5

    II.   Transgender Detainees Have A High Risk Of Becoming Infected,
           Experiencing Severe Illness, and Dying From COVID-19 ..................... 6

    III.  ICE's Failure to Provide the Most Basic Pandemic Precautions Has
           Increased Transgender Detainees' Risk of Illness and Death ............... 10

           A.    Social Distancing ....................................................... 10
           B.    Hand-washing and Hygiene ...................................... 12
           C.    Protective Equipment ................................................ 14
           D.    Information and Training ........................................... 15

    IV.  ICE's Inadequate Medical Care For Transgender Detainees Enhances
           Their Risk ............................................................................................. 17

    V.   ICE Protocols for Dealing With Suspected and Confirmed COVID-19
           Infections Do Not Adequately Protect Detainees and Put Them at Greater
           Risk ..................................................................................................... 22

    VI.  Sufficient Private Resources Exist to Support the Release of All
           Transgender Detainees Into Safer Settings ........................................... 24

ARGUMENT ..................................................................................................... 25

    I.    Legal Standard ..................................................................................... 25

    II.   Petitioners Are Entitled to Injunctive Relief ...................................... 26

           A.    Petitioners Are Likely to Succeed on the Merits of Their Claims ........... 26
           B.    Petitioners Will Be Irreparably Injured if The Court Does Not
                 Grant the Relief Sought ............................................ 34
           C.    There is No Substantial Injury to Other Parties and Injunctive
                 Relief is in Public Interest. ....................................... 35

CONCLUSION .................................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ............................................................................................29, 30, 32

*Al-Joudi v. Bush*,
  406 F. Supp. 2d 13 (D.D.C. 2005) ..............................................................................34

*Banks v. Booth*,
  No. 20-849, 2020 U.S. Dist. LEXIS 68287 (D.D.C. Apr. 19, 2020) ..................28, 34

*Battle v. FAA*,
  393 F.3d 1330 (D.C. Cir. 2005) ...................................................................................29

*Bell v. Wolfish*,
  441 U.S. 520 (1979) .....................................................................................................27

*Bent v. Barr*,
  No. 19-06123, 2020 U.S. Dist. LEXIS 62792 (N.D. Cal. Apr. 9, 2020) ....................36

*Brown v. Plata*,
  563 U.S. 493 (2011) .....................................................................................................26

*Castillo v. Barr*,
  No. 20-00605, 2020 U.S. Dist. LEXIS 54425 (C.D. Cal. Mar. 27, 2020) .........26, 28, 33, 36

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .....................................................................................25

*Citizens for Responsibility & Ethics in Washington v. Cheney*,
  577 F. Supp. 2d 328 (D.D.C.) ......................................................................................25

*City of Sacramento v. Lewis*,
  523 U.S. 833 (1998) .....................................................................................................27

*Council on American-Islamic Relations v. Gaubatz*,
  667 F. Supp. 2d 67 (D.D.C. 2009) ...............................................................................25

*Cristian A.R. v. Decker*,
  No. 20-3600, 2020 U.S. Dist. LEXIS 66658 (D.N.J. Apr. 12, 2020) ..........................33

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) ..............................................................................30

*Davis v. District of Columbia*,
   158 F.3d 1342 (D.C. Cir. 1998) ..................................................................................35

*DeShaney v. Winnebago County Dept. of Soc. Servs.*,
   489 U.S. 189 (1989).............................................................................................26, 27

*Doe v. Barr*,
   No. 20-02141-LB, 2020 U.S. Dist. LEXIS 64459 (N.D. Cal. Apr. 12, 2020)..........................7

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ..................................................................................35

*Hall v. Johnson*,
   599 F. Supp. 2d 1 (D.D.C. 2009)...............................................................................25

*Harris v. Bd. of Supervisors, Los Angeles Cnty.*,
   366 F.3d 754 (9th Cir. 2004) ....................................................................................34

*Helling v. McKinney*,
   509 U.S. 25 (1993)............................................................................................26, 27

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005) .............................................27

*League of Women Voters of the United States v. Newby*,
   838 F.3d at 12 .....................................................................................................36

*Lopez v. FAA*,
   318 F.3d 242 (D.C. Cir. 2003) ..................................................................................30

*MGU v. Nielsen*,
   325 F. Supp. 3d 111 (D.D.C. 2018) ...........................................................................36

*Monitlla v. INS*,
   926 F.2d 162 (2d. Cir. 1991)....................................................................................29

*Morton v. Ruiz*,
   415 U.S. 199 (1974)...........................................................................................29, 30

*Open Communities Alliance v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ...........................................................................35

*R.I.L–R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................................35

*Sameena, Inc. v. U.S. Air Force*,
   147 F.3d 1148 (9th Cir. 1998) ..................................................................................30

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*,
   105 F. Supp. 3d 108 (D.D.C. 2015) ................................................................25

*Sibley v. Obama*,
   810 F. Supp. 2d 309 (D.D.C. 2011) ................................................................25

*Thakker v. Doll*,
   No. 1:20-480, 2020 U.S. Dist. LEXIS 59459 (M.D. Pa. Mar. 31, 2020) ..........28, 34

*Torres v. United States Dep't of Homeland Sec.*,
   411 F. Supp. 3d 1036 (C.D. Cal. 2019) ..........................................................32, 34

*United States v. Moore*,
   No. 1:18-cr-198 (JEB), 2019 U.S. Dist. LEXIS 104300 (D.D.C. June 21,
   2019) ...............................................................................................................28

*United States v. Salerno*,
   481 U.S. 739 (1987) ........................................................................................27

*Unknown Parties v. Johnson*,
   No. CV-15-00250-TUC-DCB, 2016 U.S. Dist. LEXIS 189767 (D. Ariz. Nov.
   18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) ...................28

*Wilson v. Comm'r of Soc. Sec.*,
   378 F.3d 541 (6th Cir. 2004) ..........................................................................30

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008).............................................................................................25

*Zadvydas v. Davis*,
   533 U.S. 678 (2001).........................................................................................27

**Statutes**

8 U.S.C. § 1182(d)(5)(A)......................................................................................32, 35

Administrative Procedure Act............................................................................ *passim*

**Other Authorities**

8 C.F.R. § 235.3(b)(2)(iii)....................................................................................32, 35

8 C.F.R. § 235.3(c)...............................................................................................32, 36

Fifth Amendment ................................................................................................ *passim*

Eighth Amendment .............................................................................................26, 27

*Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention ................................................................................5

*ERO COVID-19 Pandemic Response Requirements*, U.S. Immigration and Customs Enforcement (Version 1.0, Apr. 10, 2020) ...................................... *passim*

Fed. R. Civ. P. 65 ..............................................................................................1

H. R. Rep. No. 116-180 (2019)........................................................................20

*ICE Guidance on COVID-19, Confirmed Cases*, Immigration and Customs Enforcement..............................................................................................4, 17, 23

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 10, U.S. Centers for Disease Control and Prevention (last updated Mar. 23, 2020).........................................12

Letter from Rep. Mike Quigley, et al. to Chad Wolf, Acting Secretary, U.S. Department of Homeland Security (Jan. 14, 2020) ...................................21

Letter from Sens. Elizabeth Warren and Tammy Baldwin to Kevin McAleenan, Acting Secretary, U.S. Department of Homeland Security (Oct. 15, 2019).........................21

Loc. Civ. R. 5.1(h) ............................................................................................4

Loc. Civ. R. 65.1 ...............................................................................................1

Report No. OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (Dec. 11, 2017)................................................................20

Report No. OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (June 3, 2019)..............................................................20

Thomas Homan, Executive Associate Director, U.S. Immigration and Customs Enforcement, *Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015)........................................................................19

*What You Should Know About COVID-19 to Protect Yourself and Others*, Centers for Disease Control and Prevention (Apr. 15, 2020) ...........................5, 6

Pursuant to Fed. R. Civ. P. 65 and Loc. Civ. R 65.1, Petitioners, by and through undersigned counsel, respectfully request that this Court enter an Order:  (1) immediately releasing, on parole or other supervised release, Petitioners and all transgender detainees in the Immigration and Customs Enforcement Detention Centers ("Detention Centers") pending the completion of these proceedings, pursuant to the Court's inherent powers; (2) immediately ordering Respondents to implement, without exception, all protocols designed to prevent the transmission of COVID-19 coronavirus as indicated in the attached expert declarations and/or protocols of the CDC[2] and the WHO;[3] and (3) prohibiting the placement of any and all new transgender detainees in the Detention Centers until all protocols designed to prevent the transmission of the COVID-19 coronavirus have been implemented sufficient to adequately protect detainees from contracting COVID-19.

The grounds for this Motion are set forth below and in the accompanying declarations.

**<u>INTRODUCTION</u>**

Although federal authorities recognize the severe risks posed by outbreaks of the COVID-19 virus in immigration detention centers, Immigration and Customs Enforcement (ICE) has done little more than pay lip service to protecting those in its custody.  Transgender people in civil immigration detention – many of whom came to this country seeking safety from violence and persecution in their home countries because of their gender identities – are among the most vulnerable to infection, disease and death during the current pandemic.  This lawsuit seeks the parole or supervised release of all transgender people in civil immigration detention because ICE

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-prevent-spread.html

[3] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public

has not provided and cannot implement even the most basic measures to curb the spread of COVID-19 in its facilities.

Transgender detainees are particularly susceptible to COVID-19 infection because as a group they are more likely to have underlying medical conditions making them vulnerable, such as infection with HIV, diabetes and high blood pressure.  Further, transgender detainees have not only suffered the trauma of being discriminated against, persecuted, tortured and raped because of their gender identity, but they also live with the constant stress of continuing discrimination, harassment and the risk of sexual assault.  Such stress lowers their immune systems' response to infection, meaning transgender detainees are more likely to become infected, become sick, and die from COVID-19.

Immigration detention centers are congregate facilities in which detainees live in close proximity.  That fact makes them especially dangerous during pandemics such as COVID-19, which easily spreads from person to person, both through the air and on commonly used surfaces such as tables and toilets.

In fact, since ICE first reported a COVID-19 infection in one of its detention centers on March 19, 2020, outbreaks have spread to at least 32 detention centers across the country.  As of April 22, 2020, ICE had publicly reported 322 confirmed cases of COVID-19 in those facilities, including 287 detainees and 35 staff members.  At least ten facilities where transgender detainees are housed are experiencing reported outbreaks with 103 detainees and 12 staff members infected.

On April 10, 2020, a month after the World Health Organization declared a global pandemic, ICE finally issued rules for its detention centers to take some steps designed to reduce the risk of COVID-19 outbreaks, and also required its facilities to follow guidance for detention

centers published by the Centers for Disease Control and Prevention.  But ICE has systematically failed to provide even these fundamental protections to civil immigration detainees.  Indeed, in precisely the scenario envisioned by public health experts, a transgender detainee in Arizona is being treated for a suspected case of COVID-19 after her bunkmate spent several nights uncontrollably coughing.  The health workers at that detention center only cursorily examined the bunkmate, sending him right back to the general population.

Transgender detainees report that it is often impossible to practice social distancing and take other necessary measures that are required to protect from COVID-19.  Beds and tables are bolted to the floor, forcing detainees to sleep and sit only a few feet from each other, and some detainees are still lining up in large groups for meals as they did before the outbreak.  Few guards and staff members wear face masks when interacting with detainees, and some wear no protective equipment at all – including a doctor who performed a physical examination of a transgender woman without even wearing gloves.  Most detainees have not been provided with face masks; some do not have access to soap and must wash their hands with shampoo.  Many detainees must clean their own living spaces without disinfectant.  Detainees exhibiting symptoms such as coughing or fever on occasion are not given medical examinations or isolated from the rest of the population.

On top of these failures, transgender detainees continue to be subject to harassment and threats of assault from other detainees, further making social distancing an impossibility.  Transgender detainees that live with HIV report that detention center staff do not provide needed medications at the prescribed intervals, compromising their immunity.  And transgender

detainees on medically necessary hormone replacement therapy must interact frequently with medical staff, further exposing them to infection.

The COVID-19 outbreak has spread to several ICE detention centers, including those in which transgender detainees are held.  As of April 22, 2020, ICE reported at least 322 confirmed COVID-19 cases in its detention centers, including 287 detainees and 35 ICE staff members. *See ICE Guidance on COVID-19, Confirmed Cases*, Immigration and Customs Enforcement, www.ice.gov/coronavirus (last visited Apr. 22, 2020).  Eleven detention centers known to house transgender detainees have outbreaks, including the Prairieland Detention Center in Texas, where 33 detainees have tested positive; the Otay Mesa Detention Center in San Diego, where 42 detainees and eight staff members have confirmed COVID-19 infections; and the La Palma Correctional Facility in Arizona, where there are 18 detainees with confirmed cases of COVID-19.  *Id.*  The official figures likely underestimate the actual number of COVID-19 infections at ICE detention centers, because detainees report that not all of those with symptoms of the virus are treated, let alone tested, and some detainees have been informed of COVID-19 infections at detention centers that ICE has not publicly acknowledged.  K.S. Decl. ¶¶ 20, 27, Ex 5.[4]

ICE's failures have made detention centers death traps for transgender detainees.  That situation violates detainees' Fifth Amendment due process rights and the Administrative Procedure Act.  Therefore, this Court should issue an injunction mandating the release on parole or other supervised release of all transgender people in civil immigration detention so they may

---

[4]     Because they contain the names and other highly personal information about Petitioners, who are seeking asylum because of fear of persecution because of their transgender status, Petitioners' declarations have been filed under seal, accompanied by a motion to seal pursuant to Local Civil Rule 5.1(h).  Additionally, because in-person access to Petitioners is not allowed, and given the exigent circumstances, the declarations were signed by attorneys or their representatives who had phone access to Petitioners and received their consent to execute the declarations on their behalf.

take the necessary precautions against COVID-19.  The nonprofit organizations and other groups

supporting transgender detainees have the resources and plans necessary to support all of the

transgender detainees so that, if released, they can protect themselves and other from COVID-19.

**FACTUAL BACKGROUND**

      **I.**        **The COVID-19 Global Pandemic**

Although there is much about the novel coronavirus that causes COVID-19 that is still a

mystery, the basic facts about the viral pandemic and its effects on nearly every aspect of our

society are well known.  Since the first confirmed case of COVID-19 in the United States in late

January 2020, the number of infected people in this country has exploded to more than 802,000

as of April 20, with nearly 45,000 deaths, according to the federal Centers for Disease Control

and Prevention ("CDC").  *See Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers

for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-

updates/cases-in-us.html (last visited Apr. 22, 2020).  State and local governments across the

country have implemented measures intended to curb the spread of the disease, including

banning large gatherings, closing non-essential businesses, ordering people to stay home except

for essential activities, and requiring the use of face masks where large groupings of strangers are

unavoidable, such as in grocery stores.

COVID-19 is a respiratory illness that is spread through airborne droplets, such as those

expelled when a person coughs or sneezes, or via contact with contaminated surfaces such as

doorknobs and countertops.  *See What You Should Know About COVID-19 to Protect Yourself*

*and Others*, Centers for Disease Control and Prevention (Apr. 15, 2020) ("CDC Factsheet"),

*available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

Some people who are infected with the novel coronavirus that causes COVID-19 do not

experience symptoms, but may nonetheless be contagious, as are those who exhibit symptoms

before, during and after they are ill.  *Id.*; *see also* Decl. of R. Nick Gorton, M.D. ("Gorton Decl.") ¶ 4, Ex 14.  Those who do suffer illness from the disease experience flu-like symptoms such as fever, coughing, body aches, and difficulty breathing, and in severe cases the infection can cause pneumonia, multiple organ failure, and death.  Gorton Decl. ¶ 4, Ex 14.; *see also* Decl. of Carlos Franco-Paredes ("Franco-Paredes Decl.") ¶ 16, Ex 15.  Severe cases require hospitalization, often with breathing assistance ranging from supplemental oxygen to use of a ventilator; those who survive severe illness may have permanent lung damage and other disability.  Gorton Decl. ¶ 4, Ex 14.   There is no vaccine or cure.  *Id.* ¶ 6; *see also* CDC Factsheet, Ex 16.

Preventative measures recommended by public health experts include frequent and thorough hand washing; wearing a face mask in public; frequently disinfecting surfaces on which the virus could be deposited; and the now-familiar tactic of "social distancing" – staying at least six feet away from other people.  CDC Factsheet, Ex 16; Gorton Decl. ¶ 6, Ex 14.   Although young and otherwise healthy people can become ill and die from COVID-19, those at the highest risk for illness and death include those over age 55 and people with underlying medical issues such as asthma or other lung ailments; high blood pressure; suppressed immune systems; and diabetes.  Franco-Paredes Decl. ¶ 10, Ex 15; CDC Factsheet, Ex 16.

## II.   Transgender Detainees Have A High Risk Of Becoming Infected, Experiencing Severe Illness, and Dying From COVID-19

Transgender detainees, as a group, are at a greater risk of contracting the virus that causes COVID-19 than the general population and, if they do become infected, are more likely to become seriously ill or die.  Gorton Decl. ¶ 10, Ex 14; Franco-Paredes Decl. ¶ 17, Ex 15.  It is no exaggeration to state that during this pandemic, ICE detention facilities are death traps for the transgender people being held there.  Gorton Decl. ¶¶ 12-13, Ex 14 ("[B]ecause transgender

people are at much higher risk due to the above described clinical vulnerabilities in this group, I also expect that if kept in detention, transgender detainees will have a disproportionately higher risk of severe or critical COVID-19 and death or permanent pulmonary disability as a consequence."); *see also* Franco-Paredes Decl. ¶¶ 5-6, 28, Ex 15.

Several well documented, preexisting factors combine to make transgender detainees a high-risk group for developing severe illness and death from COVID-19.

First, transgender people are more likely to have underlying health conditions that put them at high risk for developing the most serious complications from COVID-19, including health conditions caused by tobacco use, immune suppression caused by HIV or viral hepatitis, diabetes, high blood pressure, and obesity.  Gorton Decl. ¶ 10, Ex 14; Franco-Paredes Decl. ¶ 17, Ex 15.  For example, some studies have found that 20% to 25% of transgender women are HIV-positive, with even higher rates among transgender women of color and those who live in urban areas.  Gorton Decl. ¶ 10(B), Ex 14.  Ronica Mukerjee, a nurse practitioner who treats transgender patients in Tijuana, Mexico for an immigrant rights organization, estimates that 30% of her patients are HIV-positive, and in most the infection is not well controlled.  Mukerjee Decl. ¶¶ 5, 8, Ex 17.  In this case, two of the named Petitioners are HIV-positive.

Second, transgender detainees also are far more likely to suffer from mental health issues such as depression, anxiety and post-traumatic stress disorder that cause immune suppression and other physical ailments.  Gorton Decl. ¶ 10(F), Ex 14; Franco-Paredes Decl. ¶ 17, Ex 15; *see also Doe v. Barr*, No. 20-02141-LB, 2020 U.S. Dist. LEXIS 64459, at *7 (N.D. Cal. Apr. 12, 2020) ("weakened immunity due to mental-health disorders can put detainees 'at increased risk of contracting and suffering from more severe forms of COVID-19'").  One common factor for transgender people is the mental and emotional trauma caused by the endemic discrimination,

violence and social stigma against transgender people – a phenomenon known generally as "minority stress" – which, in turn, can further suppress the immune system and exacerbate other underlying medical conditions.  Gorton Decl. ¶ 10(D), Ex 14.

Transgender people in ICE custody are especially vulnerable to mental health problems due to the fact that they left their native countries because of violence and persecution, and thus have "a profound history of trauma leading to high rates of depression, anxiety, and post-traumatic stress disorder."  Franco-Paredes Decl. ¶ 17, Ex 15.  For example, a detainee at La Palma reports that harassment by other detainees and staff is exacerbating her depression.  A.F. Decl. ¶ 20, Ex 2.  Another La Palma detainee reports being depressed by being called anti-transgender and anti-gay slurs by staff and other detainees, and being terrified when staff let men into the bathroom while she was showering.  L.R.A.P. Decl. ¶¶ 13-15, Ex 4.  In other words, transgender immigrants are at higher risk of infection for precisely the same reasons they fled their home countries and came to be in ICE custody.

Third, that discrimination, violence and social stigma means transgender people also are more likely to live in poverty and less likely to have health insurance or the ability to pay for health care, and therefore are less likely to have received proper, ongoing medical care for their underlying medical conditions prior to their detention.  Gorton Decl. ¶ 10, Ex 14.

Fourth, because transgender detainees are not allowed to self-administer their injectable hormone treatments while in ICE custody, they must have more frequent interactions with medical staff, who themselves are at higher risk of contracting – and thus spreading – the Coronavirus because of their contact with sick people.  Gorton Decl. ¶ 11, Ex 14.  One detainee in Aurora, for example, was examined by a doctor at the facility who was not wearing gloves or a face mask.  L.M. Decl. ¶ 105, Ex 8.  Another Aurora detainee has observed that the medical

staff who distribute medication do so wearing gloves but not face masks.  D.B.M.U. Decl. ¶ 22, Ex 10.

Fifth, transgender people in ICE custody are far more likely to be victims of abuse and sexual assault than other detainees – indeed, ICE's own data show that lesbian, gay, bisexual and transgender detainees are 97 times more likely to be sexually victimized than non-LGBT detainees.  Gorton Decl. ¶ 11, Ex14; *see also* Franco-Paredes Decl. ¶ 17, Ex 15.  That abuse – and the fear of falling victim to it – only compounds the stress transgender detainees experience and exacerbates their other mental and physical health problems.   *See* M.M.S-M. Decl. ¶¶ 8, 16-17 (transgender woman describing sexual harassment and assault in ICE detention and having panic attacks when housed with cisgender men because of her past history of surviving rape), Ex 3.  And, needless to say, physical and sexual assaults by definition involve the kind of close contact that can spread Coronavirus and are more likely to occur when detainees are kept in close quarters.   See Gorton Decl. ¶ 11, Ex 14 (noting that "even if a transgender person wanted to attempt social distancing [while in ICE custody], it might not be an option because of the high likelihood of getting sexually assaulted.").

In sum, the distressing reality for transgender people in ICE custody is that they are more likely to be exposed to the Coronavirus; more likely to become infected if they are exposed; more likely to experience severe illness if they become infected; and more likely to die if they experience severe illness.  Gorton Decl. ¶¶ 10-13, Ex 14.  And the heightened susceptibility of transgender detainees to COVID-19 means that releasing them from detention will not only help curb their risks of illness and death, it will help protect any remaining detainees, guards and staff who might otherwise be exposed to enhanced spread of the virus and avoid further burdening area health care facilities.  Franco-Paredes Decl. ¶¶ 28-29, Ex 15; Gorton Decl. ¶ 13, Ex 14.

III.   **ICE's Failure to Provide the Most Basic Pandemic Precautions Has Increased Transgender Detainees' Risk of Illness and Death**

Despite the fact that transgender detainees are at high risk for contracting and suffering severe illness from COVID-19, ICE has not taken the steps necessary to protect transgender detainees from the disease, nor have the detention centers holding transgender detainees followed even the minimal COVID-19 response requirements that ICE itself sets forth. To the contrary, ICE's actions and inactions have unacceptably and unconstitutionally put transgender detainees at *increased* risk of suffering and dying from this pandemic.

A.   **Social Distancing**

As government and private sector medical experts have repeatedly emphasized, limiting the spread of the pandemic requires "social distancing" – keeping at least six feet away from other people. *See, e.g.*, Gorton Decl. ¶ 6, Ex 14; Franco-Paredes Decl. ¶ 14, Ex 15. ICE detention centers have not and cannot provide sufficient space to do so. *See id.*

The consequences of the lack of opportunity for social distancing in ICE custody are dramatically illustrated by the experience of C.G.B., who became ill with a suspected case of COVID-19 after a newly arrived bunkmate spent days coughing before being seen by a doctor and then was returned to the general population. C.G.B. Decl. ¶¶ 7-8, Ex 1. The pod where C.G.B. became ill has beds spaced approximately three feet apart. Id. ¶ 6.

At Winn, detainees stay in pods of approximately 44 people, sleeping in beds that are approximately four or five feet apart. M.M.S-M. Decl. ¶ 30, Ex 3. At La Palma, some 100 to 120 detainees eat meals together, where they must sit approximately one foot away from each other and cannot keep a six-foot distance while waiting in line. A.F. Decl. ¶ 12, Ex 2; see also L.R.A.P. Decl. ¶ 8, Ex 4 (another La Palma detainee explaining social distancing is impossible because detainees must sit at tables one foot apart). Approximately 60 detainees at a time are

allowed on a patio, where they also do not have enough room to stay six feet apart.  A.F. Decl. ¶ 13, Ex 2.

At the El Paso Processing Center, detainees sleep in beds four feet apart. M.R.P. Decl. ¶ 34, Ex 13.  At Aurora, beds, as well as the tables and seating where detainees eat, are bolted to the floor and cannot be moved to increase the distance between detainees.  L.M. Decl. ¶¶ 92-93, Ex 8; D.B.M.U. Decl. ¶ 17, Ex 10.  Detainees are not able to practice social distancing.  M.J.J. Decl. ¶ 17, Ex 9.

At Southern Nevada, the beds are close enough for detainees to reach across the aisle and touch the adjacent bed.  K.M. Decl. ¶ 22, Ex 6.  Detainees eat at tables seating four people that are too small to accommodate all four food trays at once.  Id. ¶ 26.  At the Caroline detention facility in Virginia, detainees cannot maintain proper social distancing because they sleep four to a room in close quarters, in dormitories of approximately 35-40 people.  R.H. Decl. ¶ 20, Ex 7. Detainees from each dorm at Caroline travel as a group to the cafeteria for meals and to the law library, providing additional opportunities for disease to spread.  Id. ¶ 21.

ICE regulations acknowledge that "[b]oth good hygiene practices and social distancing are critical in preventing further transmission" of COVID-19.  *ERO COVID-19 Pandemic Response Requirements* at 11, U.S. Immigration and Customs Enforcement (Version 1.0, Apr. 10, 2020), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (hereinafter, "ICE Pandemic Requirements").  In practice, however, neither are being implemented at ICE detention facilities.  ICE's failure to follow its own regulations and inability to take the most basic precautions against the spread of this deadly virus pose dangers to

transgender detainees that can be remedied only by the detainees' immediate release to safer areas.

### B.     Hand-washing and Hygiene

Since the beginning of the pandemic, public health experts have emphasized that proper hand washing, cleaning and other hygiene practices are key preventative measures that everyone should follow.  *E.g.*, *How to Protect Yourself and Others*, U.S. Centers for Disease Control and Prevention (last updated Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; *see also* Gorton Decl. ¶ 6, Ex 14.  ICE's pandemic response requirements – issued on April 10, 2020, a month after the World Health Organization declared COVID-19 a global pandemic – mandate that detention facilities require everyone in the facility, staff and detainees alike, "to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds," and to provide at no cost sufficient supplies such as hand soap and tissues to allow detainees to meet these requirements.[5]  ICE also requires its detention facilities to follow the guidance for detention facilities published by the CDC.  ICE Pandemic Requirements at 5-6.  The CDC guidance also mandates that facilities provide staff and detainees with sufficient supplies and opportunities for frequent and adequate hand washing.[6]

Despite these basic requirements, ICE detention centers lack sufficient facilities to allow all detainees to practice frequent hand washing.  For example, at the Imperial Regional Detention

---

[5] *ERO COVID-19 Pandemic Response Requirements* at 9, U.S. Immigration and Customs Enforcement (Version 1.0, Apr. 10, 2020), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (hereinafter, "ICE Pandemic Requirements").

[6] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 10, U.S. Centers for Disease Control and Prevention (last updated Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (hereinafter, "CDC Guidance.").

Facility in California, 32 detainees residing on one floor of a dormitory share four sinks and one soap dispenser, G.P. Decl. ¶ 19, Ex 12, while at Southern Nevada, 46 detainees share one bathroom with eight sinks and toilets.  K.M. Decl. ¶ 23, Ex 6.  The conditions are worse at Winn, where approximately 44 detainees share one bathroom with three sinks and toilets.  M.M.S-M. Decl. ¶ 30, Ex 3.  The only regular cleaning is sweeping by detainees once per day.  *Id.* ¶ 31.

At Aurora, the bathroom sink in a dormitory housing transgender detainees has been clogged for an extended period of time, and the detainees do not have the equipment to fix it. D.B.M.U. Decl. ¶ 21, Ex 10.  Detainees use a container to capture the dirty water and pour it in the shower.  *Id.*

ICE also fails to provide detainees with sufficient supplies.  La Palma, for example, provides shampoo, but detainees have to purchase soap—which indigent detainees are unable to do.  A.F. Decl. ¶ 14, Ex 2; L.R.A.P. Decl. ¶ 9, Ex 4; K.R.H. Decl. ¶ 15, Ex 11.  Detainees at Southern Nevada also have to purchase soap at the commissary, K.M. Decl. ¶ 30 Ex 6, as do detainees at Caroline, R.H. Decl. ¶ 25, Ex 7.

ICE also requires that its detention centers use household cleaners and disinfectants several times a day to "clean and disinfect surfaces and objects that are frequently touched, especially in common areas (*e.g.*, doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment.)"  ICE Pandemic Requirements at 10.[7]  However, ICE detention facilities holding transgender immigrants are not even coming close to fulfilling this mandate.

---

[7]     The mandatory CDC guidelines also require this kind of cleaning and disinfecting several times per day.  CDC Guidance at 9.

Frequently used surfaces such as sinks and toilets are cleaned, at most, once a day, and detainees are not provided with the cleaning and disinfecting supplies necessary to protect themselves.  For example, detainees in Aurora, who are responsible for cleaning their own living areas, attempt to clean three times daily but staff provides only two rags, one for the living area and one for the bathroom.  M.J.J. Decl. ¶ 22, Ex 9; D.B.M.U. Decl. ¶ 20, Ex 10.  Sinks and bathrooms in the El Paso facility are cleaned only once daily, and the detainees are not provided with disinfectant to clean more often.  M.R.P. Decl. ¶¶ 33, 37, Ex 13.

ICE has failed to provide detainees with the supplies to permit them to follow the most basic hygiene measures required by its own regulations.  The agency's inability to sufficiently provide for such common-sense and low-tech preventative measures shows that supervised release from detention is the only way to remedy the unacceptable risk of infection, disease and death ICE has created for transgender detainees.

### C.     Protective Equipment

ICE regulations mandate that "[c]loth face coverings should be worn by detainees and staff . . . to help slow the spread of COVID-19."  ICE Pandemic Requirements at 9.  ICE facilities are not complying with this requirement, either.

Many detainees report that they have not been provided with face masks, despite asking for them.  M.M.S-M. Decl. ¶ 23, Ex 3; L.M. Decl. ¶ 51, Ex 8; M.J.J. Decl. ¶ 19, Ex 9; R.H. Decl. ¶¶ 22, 26, Ex 7; M.R.P. Decl. ¶ 30, Ex 13; *cf.* D.B.M.U. Decl. ¶ 18, Ex 10 (stating she has not asked for a mask because she assumes they are unavailable since guards do not wear them).  Detainees at La Palma were provided with one paper mask each on April 14, 2020, and were told that it would not be replaced if it were damaged.  A.F. Decl. ¶ 15, Ex 2.  Facility staff initially tried to require detainees to sign a liability waiver to obtain a mask, but relented after detainees refused to sign the waiver.  *Id.*; *see also* K.R.H. Decl. ¶ 9 (same), Ex 11.  Detainees at Nevada

14

Southern were not provided with cloth masks until April 16, 2020.  K.S. Decl. ¶ 20, Ex 5; K.M. Decl. ¶ 31, Ex 6.

Guards, medical personnel, and other staff frequently interact with detainees without wearing protective equipment.

A doctor at Aurora performed a hands-on medical examination without wearing gloves or a mask.  L.M. Decl. ¶ 105, Ex 8.  So did a doctor at La Palma.  A.F. Decl. ¶ 16, Ex 2.  Medical personnel delivering medication to detainees at Aurora also do not wear masks.  D.B.M.U. Decl. ¶ 22, Ex 10.

Ironically, a guard giving detainees a presentation on COVID-19 at Southern Nevada did so without wearing a mask or gloves.  K.S. Decl. ¶ 18, Ex 5.  Guards at Southern Nevada also perform pat-down searches of detainees without wearing gloves or masks.  K.M. Decl. ¶¶ 33-34, Ex 6. Several detainees report that guards do not wear gloves or masks.  A.F. Decl. ¶ 17, Ex 2; L.R.A.P. Decl. ¶ 12, Ex 4; K.R.H. Decl. ¶ 11, Ex 11; D.B.M.U. Decl. ¶ 22, Ex 10.  Other detainees report observing guards wearing gloves, but not masks.  M.J.J. Decl. ¶ 23, Ex 9; K.M. Decl. ¶¶ 33-34, Ex 6.

ICE's failure to provide protective gear such as face masks to detainees and to ensure that staff members use the required equipment further heightens the unconstitutional risk of infection to which transgender detainees are subjected through their continued detention.

### D.    Information and Training

Both the ICE rules and the CDC guidance require that detainees be provided with accurate and up to date information about COVID-19, precautions they can take to reduce the risk of infection, and the presence of the virus in their facility.  ICE Pandemic Requirements at 7, 9; CDC Guidance at 6, 10, 12, 22.  The CDC Guidelines, which ICE facilities are required to follow, require that information about COVID-10 must be provided "in a manner that can be

understood by non-English speaking people and those with low literacy." CDC Guidelines at 22; *see also id.* at 6, 10 (same).

ICE has failed to provide *any* of this required lifesaving information to many detainees, has not provided regular updates to the limited amount of information it has provided to other detainees, and in some instances has misled detainees by falsely denying the presence of COVID-19 at their facility.

Many current and recently released detainees report that guards or other staff gave them *no* information about COVID-19. They include C.G.B., who received no information about COVID-19 from the staff at La Palma despite being quarantined with a suspected case of the disease. C.G.B. Decl. ¶ 11, Ex 1; *see also* L.R.A.P. Decl. ¶ 6 (same), Ex 4; A.F. Decl. ¶ 10 (La Palma detainee stating she has not received any information from staff regarding COVID-19 and guards refuse to answer questions about the virus), Ex 2. This problem also has occurred at Aurora. D.B.M.U. Decl. ¶ 12, Ex 10.

One detainee at Aurora said that the only information she received was a suggestion to wash her hands. M.J.J. Decl. ¶ 12, Ex 9. At Southern Nevada, a guard gave a COVID-19 presentation in the morning while some detainees were sleeping and did not ensure that all detainees attended. K.M. Decl. ¶ 18, Ex 6.

Some statements made by facility staff have contradicted ICE's public statements. For example, staff informed detainees at Nevada Southern on April 15, 2020 that there was one person with COVID-19 at the facility, but ICE has not reported one to the public. K.S. Decl. ¶ 20, Ex 5.

Worse, ICE has violated the CDC Guidelines by affirmatively misinforming detainees about the presence of COVID-19 at their facility. Although ICE now reports that two staff

members at Aurora have tested positive for the COVID-19 virus,[8] officials falsely denied to detainees that anyone at the facility had been infected.  *See* M.J.J. Decl. ¶ 14, Ex 9; D.B.M.U. Decl. ¶ 14, Ex 10.

By failing to provide any information about the virus to many detainees and providing incomplete, false and misleading information to others, ICE has not only violated its own rules and mandatory CDC guidance, but also has further heightened the risk of COVID-19 transmission to transgender detainees.

### IV.    ICE's Inadequate Medical Care For Transgender Detainees Enhances Their Risk

ICE detention centers are plagued by chronic and well-documented failures to provide proper medical care to transgender detainees – problems that have been exacerbated by the pandemic and pose another enhanced risk of infection, disease and death for transgender detainees.  ICE's past handling of infectious disease outbreaks in detention centers has been inept—foreshadowing the impact COVID-19 will have if transgender detainees are not released.  Just last year, for example, a mumps outbreak across 57 immigration detention facilities throughout the country led to almost 900 cases of mumps overwhelmingly contracted inside the facilities before the outbreak spread to surrounding communities.  As explained by Dr. Carlos Franco-Paredes, an infectious disease expert who has treated HIV-positive transgender detainees at the Aurora facility:

> [I]t is my professional opinion that the medical care available in immigration detention centers cannot properly accommodate the needs of patients should there be an outbreak of COVID-19 in these facilities. Immigration detention centers are often poorly equipped to diagnose and manage infectious disease outbreaks. Many of these centers lack onsite medical facilities or 24-hour medical care.

---

[8]    *See ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited Apr. 19, 2020).

Franco-Paredes Decl. ¶ 5, Ex 15.

Besides C.G.B., whose bunkmate was not isolated for many days despite showing classic COVID-19 symptoms, several other transgender detainees report that they or other detainees showing possible COVID-19 symptoms have not been tested, quarantined or isolated.  A.F. Decl. ¶ 16 (reporting that fellow detainee with fever and flu-like symptoms was told to make a regular medical request rather than receiving immediate attention), Ex 2; M.J.J. Decl. ¶ 30 (reporting that when she had a cough, she saw medical personnel who gave her aspirin and returned her to the general population), Ex 9; K.R.H. Decl. ¶ 12 (stating that when she suffered COVID-19-like symptoms including a fever, she had to wait a week before seeing a nurse, who told her she was fine, did not test her or provide any medication, and did not schedule a follow-up appointment), Ex 11.

This is a violation of ICE regulations and CDC guidance, which require that individuals suspected or confirmed to have COVID-19 must be placed in medical isolation and their close contacts must be quarantined.  ICE Pandemic Requirements at 14-16; CDC guidance at 10-11.

Another alarming example of ICE's bungling of medical care during the pandemic is the failure to provide adequate treatment to transgender detainees living with HIV, which further threatens their already compromised immune response.  Prior to the outbreak, Dr. Franco-Paredes, a doctor specializing in infectious diseases, was treating transgender detainees living with HIV at Aurora.  Franco-Paredes Decl. ¶ 3, Ex 15.  Since the outbreak began, authorities at Aurora have barred Dr. Franco-Paredes from providing care to any if his patients there; as a result, Dr. Franco-Paredes has been unable to see any of his patients in person, and even has had difficulty in scheduling virtual evaluations. *Id.*; *see also id.* ¶ 29.  Dr. Franco-Paredes is concerned that the lack of adequate treatment will expose HIV-positive detainees to a high risk

of contracting COVID-19, noting that one patient he evaluated had been given prescriptions for medications that negatively interacted with each other and thus could suppress the patient's immune response.  *Id.*

Multiple transgender detainees living with HIV report that they do not receive their medication at regular times, which, because it can lessen their immune response, puts them at greater risk of contracting life-threatening infections such as COVID-19.  *See* K.S. Decl. ¶ 12, Ex 5; K.M. Decl. ¶ 14; *see also* M.J.J. Decl. ¶ 27 (Aurora detainee stating that fellow detainees who are HIV-positive have gotten their medication at varying times during the day), Ex 9.  Other transgender detainees have had their medically necessary gender-affirming hormone treatments or other prescribed medications denied or changed without explanation.  M.M.S-M. Decl. ¶¶ 12, 14, Ex 3; R.H. Decl. ¶¶ 11-13, 17, Ex 7; M.R.P. Decl. ¶¶ 17-18, Ex 13; L.M. Decl. ¶¶ 15-21, Ex 8; A.F. Decl. ¶ 18, Ex 2; K.R.H. Decl. ¶¶ 12, 16, Ex 11.

The COVID-19 outbreak has exacerbated the problems with a system that was already ill equipped to provide adequate medical care to transgender detainees.  Although ICE has stated that discrimination against transgender detainees is prohibited,[9] detainees report continued discrimination from health workers; one detainee reports that when she complained about harassment, a facility psychologist said there was nothing to be done because "we aren't big on trans rights here."  L.R.A.P. Decl. ¶ 13, Ex 4.

---

[9]     Thomas Homan, Executive Associate Director, U.S. Immigration and Customs Enforcement,  *Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015), *available at* https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.

A June 2019 Department of Homeland Security Office of Inspector General report[10]

found inadequate medical care at the Adelanto, California facility and other egregious health and

safety violations at facilities in Aurora; Essex County, New Jersey; and LaSalle, Louisiana.  A

2017 OIG report of inspections of six facilities found inadequate medical care including long

delays for detainees to receive care, inadequate documentation of the care they received, and

failure to use translation services to allow detainees to communicate their symptoms to medical

workers and to understand and knowingly consent to medical treatment.[11]

Congress has expressed concern about treatment of transgender detainees when

approving the fiscal 2020 appropriations for the Department of Homeland Security.  The

congressional report accompanying the appropriations directs ICE to limit the detention of

transgender people to facilities operating under contracts that comply with ICE's 2015 guidance

on best practices for transgender detainees.  *See* H. R. Rep. No. 116-180 at 37 (2019), Ex 18.

Despite Congressional urging to push ICE to implement its own best practices, no ICE detention

contracts so far have incorporated those improvements.

In the last six months, two U.S. Senators and 45 members of the House of

Representatives have written to the acting directors of ICE and the Department of Homeland

Security, citing "overwhelming evidence of systemic neglect and mistreatment of transgender

individuals in immigration and detention facilities," including a lack of adequate medical care,

---

[10]     Report No. OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (June 3, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

[11]     Report No. OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (Dec. 11, 2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf .

that "demonstrate ICE's inability to provide adequate conditions for transgender immigrants."

Letter from Sens. Elizabeth Warren and Tammy Baldwin to Kevin McAleenan, Acting

Secretary, U.S. Department of Homeland Security (Oct. 15, 2019), available at

https://www.warren.senate.gov/imo/media/doc/2019.10.15%20Letter%20to%20DHS%20ICE%2

0and%20CPB%20regarding%20transgender%20migrants%20and%20asylum%20seekers.pdf;

Letter from Rep. Mike Quigley, et al. to Chad Wolf, Acting Secretary, U.S. Department of

Homeland Security (Jan. 14, 2020), available at

https://quigley.house.gov/sites/quigley.house.gov/files/01.14.20%20ICE%20Letter.pdf.

Advocacy organizations also have filed several complaints with DHS and ICE in the past

year citing egregious examples of medical neglect and mistreatment of transgender detainees.

Just last month, a coalition of eight groups led by the Santa Fe Dreamers Project filed a

complaint with ICE, the DHS Office of Inspector General, and the DHS Office for Civil Rights

and Civil Liberties over conditions for transgender detainees at the Winn Correctional Center in

Winnfield, Louisiana.  *See* Ex 19.  The complaint documented severe abuse and mistreatment of

transgender detainees and medical care failings including interrupted and inconsistent provision

of HIV medication; refusal to provide gender-affirming hormone treatments; delayed or denied

dental care causing extreme pain and weight loss; and refusal to allow a woman to perform

physical therapy exercises after her leg was broken by another inmate because she was

transgender.  *Id.*; *see also* Declaration of Allegra Love, Esq. ("Love Decl.") ¶¶ 15-20 (describing

these incidents), Ex 20.  The Transgender Law Center and a dozen other nonprofit organizations

filed a complaint with DHS and its inspector general's office in September 2019 over ICE's

failure to provide adequate medical and mental health care to LGBT and HIV positive detainees,

citing the maltreatment of 19 current and former detainees, most of them transgender.  *See* Ex 21 (copy of complaint).

ICE's failures to provide adequate medical care during the pandemic—building upon its inability to do so even in the best of times—put transgender detainees at further risk of serious illness or death should they become infected with the Coronavirus.  Because ICE cannot provide adequate medical care to them, transgender detainees should be released immediately to safer environments.

V.    **ICE Protocols for Dealing With Suspected and Confirmed COVID-19 Infections Do Not Adequately Protect Detainees and Put Them at Greater Risk**

Even if it followed its own requirements, ICE could not adequately protect transgender detainees from unconstitutional risks of infection posed by suspected or confirmed COVID-19 infections of other detainees or facility staff.  Indeed, the shortcomings of these rules actually increase the risk that transgender detainees would contract, suffer and die from the virus.  *See* Gorton Decl. ¶ 7 ("The ICE COVID-19 guidelines place persons in detention at significant risk."), Ex 14.

The screening procedures ICE has announced are insufficient to keep those infected with COVID-19 from spreading the disease.  Gorton Decl. ¶ 9, Ex 14.  The ICE rules require facilities to screen employees and detainees upon entry for COVID-19 symptoms – fever, cough, and shortness of breath – and to bar entry to staff with those symptoms and to isolate incoming detainees with those symptoms.  ICE Pandemic Requirements at 12.  However, as Dr. R. Nick Gorton explains, many infected with the Coronavirus either never show symptoms or become infectious before they develop symptoms; and many with COVID-19 have gastrointestinal or other symptoms, not respiratory symptoms like a cough.  Gorton Decl. ¶ 9, Ex 14.  Thus, Dr.

Gorton concludes, "[a] significant number of infections which could spread extensively in a crowded detention situation would be missed by ICE's screening." *Id.*

ICE's website states that in detention centers, "cohorting" – keeping people together in a contained group – "serves as an alternative to self-monitoring at home" for those potentially exposed to the virus who do not have symptoms. *See Ice Guidance on COVID-19*, www.ice.gov/coronavirus (last visited Apr. 20, 2020).  The agency's rules for its detention centers say "facilities should consider cohorting" all detainees who arrive on one or more days. ICE Pandemic Requirements at 14.[12]  ).  The CDC Guidelines, which the ICE Pandemic Requirements make mandatory, state that cohorting should only be used as a last resort, however.  CDC Guidelines at 16.

Cohorting is a dangerous practice for detention facilities because it could amplify, rather than prevent, an outbreak, because unless the detainees are able to stay six feet away from each other, one infected person could spread the virus to the entire cohort.  Gorton Decl. ¶¶ 7-8, Ex 14.  The risk is particularly acute for anyone in the cohort with increased susceptibility to the virus, such as transgender detainees or others with underlying medical conditions.  *Id.*  As Dr. Gorton explains, "[f]or example, if you have 10 people, 8 with COVID-19 and 2 with flu or another virus, soon you will have 10 very sick people with all three conditions." *Id.* ¶ 8, Ex 14.

C.G.B.'s experience illustrates this problem.  Although she has been separated from the general population, she is not isolated in a single room but stays in a room with a dozen patients, two of whom have confirmed cases of COVID-19.  C.G.B. Decl. ¶ 10, Ex 1.  Thus, even if she

---

[12]    For suspected or confirmed COVID-19 cases, the rules state that "[c]ohorting should only be practiced if there are no other available options" and that only those who have tested positive should be "cohorted" together.  ICE Pandemic Requirements at 14.

and the other nine detainees without confirmed COVID-19 infections did not have the virus when they went into quarantine, their risk of contracting COVID-19 has risen exponentially.

Because ICE's own guidelines are insufficient to reduce the risk of infection facing transgender detainees and would actually enhance that risk, this Court should order the parole of transgender detainees to safer quarters.

**VI.**     **Sufficient Private Resources Exist to Support the Release of All Transgender Detainees Into Safer Settings**

A coalition of organizations supporting transgender detainees has amassed funding and put together a plan to support the sheltering in place of transgender detainees upon their immediate release.  The Santa Fe Dreamers Project is a non-profit legal services organization that has resettled transgender detainees released from ICE detention to 11 states and 20 major U.S. cities.  As set forth in the letter of Allegra Love, Executive Director of the Santa Fe Dreamers Project, attached hereto as Ex 22, the project has experience with large-scale releases and has put together a plan to support the release of transgender immigrants in this case, to ensure that all of their needs are met, including shelter, food, clothing, medical care and transportation.  This plan will allow the safe shelter of all released detainees and will allow them to follow all CDC and WHO guidelines to prevent the spread of COVID-19.

The Santa Fe Dreamers project together with the Transgender Law Project and a group of foundations have already secured nearly $100,000 in funds to implement the release plan. *See* Exhibits 22 - 26 .  Moreover, a number of detainees have secured private sponsors. Thus, adequate plans are in place for all transgender detainees to be immediately released and moved to safer settings.

**ARGUMENT**

I.      **Legal Standard**

The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established.   "A moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."   *Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 74 (D.D.C. 2009) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions")).

A district court considering a motion for preliminary injunction must balance the strengths of the requesting party in each of the four areas.   *Sibley v. Obama*, 810 F. Supp. 2d 309, 311 (D.D.C. 2011).   "In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another." *Citizens for Responsibility & Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 334-35 (D.D.C.).[13]

Here, each of the factors weighs in favor of granting Petitioners the injunctive relief sought.

---

[13] The Court of Appeals for the D.C. Circuit has not definitively stated whether this sliding-scale approach was displaced by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  *See, e.g.*, *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015).  Petitioners respectfully submit that they are entitled to injunctive relief regardless of whether the likelihood of success is an independent requirement.

## II.    Petitioners Are Entitled to Injunctive Relief

### A.    Petitioners Are Likely to Succeed on the Merits of Their Claims

Petitioners are likely to succeed on the merits of their claims because the law is clear that exposure to a high risk of infection with a deadly pathogen violates detainees' constitutional rights. Ordering parole for transgender detainees, who are particularly susceptible to COVID-19 infection, is well within the Court's authority; the Supreme Court has held that "[w]hen necessary to ensure compliance with a Constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

### i.    Violation of Constitutional Rights and the Administrative Procedure Act (APA)

When the government detains or incarcerates a person, it has an affirmative duty to guarantee conditions of reasonable health and safety: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200.

The Supreme Court has held that the Eighth Amendment protects against future harm to inmates, as "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Further, "[t]he science is well established – infected, asymptomatic carriers of the coronavirus are highly contagious," and therefore "[t]he Government cannot be deliberately indifferent to the Petitioners' potential exposure to [COVID-19] on the ground that they are not, now, infected or showing current symptoms." *Castillo v. Barr*, No. 20-

00605, 2020 U.S. Dist. LEXIS 54425, at \*13–14 (C.D. Cal. Mar. 27, 2020) (citing *Helling*, 509 U.S. at 33).

The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). The Supreme Court in *Helling* recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

These Constitutional protections also apply in the context of immigration detention because immigrant detainees, even those with prior criminal convictions, are civil detainees held pursuant to civil immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Because detained immigrants are civil detainees, they are entitled to the due process protections derived from the Fifth Amendment, which prohibit punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."). "The touchstone of due process is protection of the individual against arbitrary action of government … whether the fault lies in the denial of fundamental due process fairness [procedural due process],… or in the exercise of power without any reasonable justification in the service of a legitimate government objective [substantive due process].…" *City of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citations and internal quotations omitted). "'Substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987). (internal citations omitted).

Because the Fifth Amendment rather than the Eighth Amendment governs civil detention, the "deliberate indifference" standard required to establish a constitutional violation in the latter context does not apply to civil detainees like Petitioners. *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005). Still, the Eighth Amendment's guarantees represent

a "constitutional floor" that must also be met for detainees who are not being punished, such as those jailed prior to trial and civil immigration detainees. *United States v. Moore*, No. 1:18-cr-198 (JEB), 2019 U.S. Dist. LEXIS 104300, at *6-7 (D.D.C. June 21, 2019).

A condition of confinement for a civil immigration detainee violates the Constitution "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 U.S. Dist. LEXIS 189767, at *13 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).  This Court has held that detaining individuals during the COVID-19 pandemic in such a manner that they are unable to practice social distancing or take other precautions necessary to contain the spread of the virus creates an unreasonable risk of damage to detainees' health.  *Banks v. Booth*, No. 20-849, 2020 U.S. Dist. LEXIS 68287, at *27–30 (D.D.C. Apr. 19, 2020) (holding that pre-trial detainee plaintiffs established a likelihood of success on the merits on their Fifth Amendment due process claim). Other courts addressing TRO motions for civil detainees during the COVID-19 pandemic have found that detaining people under conditions such that they are unable to practice social distancing or take other precautions necessary to contain the spread of the virus is sufficient to establish a likelihood of success on the merits of a Fifth Amendment due process claim.  *See, e.g.*, *Castillo*, 2020 U.S. Dist. LEXIS 54425, at *16 (plaintiffs established more than a mere likelihood of success on the merits of their due process claim where the conditions of confinement did not allow detainees to socially distance); *Thakker v. Doll*, No. 1:20-480, 2020 U.S. Dist. LEXIS 59459, at *25 (M.D. Pa. Mar. 31, 2020) (plaintiffs established likelihood of success on the merits of their

due process claim where plaintiffs were detained in "tightly-confined, unhygienic spaces" and unable to socially distance).

Similarly, here, Plaintiffs have established that they are unable to practice social distancing or take other precautions to contain the spread of the virus under their current conditions of confinement.  Therefore, they have established a likelihood of success on the merits of their Fifth Amendment Due Process claim.

Respondents are also in violation of the Fifth Amendment Due Process Clause by depriving detainees the rights guaranteed under the COVID-19 regulations enacted by ICE. When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266, 268 (1954) (reversing in immigration case after review of warrant for deportation). Agencies must follow their own "existing valid regulations," even where government officers have broad discretion, such as in the area of immigration. *Id.* at 268; *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").  Breaches of Accardi's rule constitute violations of both the Administrative Procedures Act ("APA") and the Fifth Amendment's Due Process Clause.

While violations of "internal agency procedures" do not always require a remedy, Accardi's rule applies with full force when "the rights or interests of the objecting party" are "affected." *Monitlla v. INS*, 926 F.2d 162, 167 (2d. Cir. 1991) (citing cases) ("Accardi doctrine is premised on fundamental notions of fair play underlying the concept of due process"); *see also*

*Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545-46 (6th Cir. 2004) (noting that an Accardi violation may be a due process violation, and the government's action may be set aside pursuant to the APA); *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations . . . may result in a violation of an individual's constitutional right to due process.").

Under the *Accardi* doctrine, due process and the basic principle of administrative law dictate that rules promulgated by a federal agency regulating the rights and interests of others are controlling upon the agency. That doctrine is premised on the fundamental notion of fair play underlying the concept of due process. 322. The *Accardi* doctrine applies with particular force when "the rights of individuals are affected." *Morton*, 415 U.S. at 235.

The D.C. Circuit recently explained "that 'agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion.'" *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018), citing *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) as amended (Feb. 11, 2003).

On March 18, 2019, ICE issued a statement on enforcement during the COVID-19 crisis:

---

**OPERATIONAL**

03/18/2020

## Updated ICE statement on COVID-19

**Statement attributable U.S. Immigration and Customs Enforcement**

To ensure the welfare and safety of the general public as well as officers and agents in light of the ongoing COVID-19 pandemic response, U.S. Immigration and Customs Enforcement (ICE) will temporarily adjust its enforcement posture beginning today, March 18, 2020. ICE's highest priorities are to promote life-saving and public safety activities.

ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals subject to mandatory detention based on criminal grounds. For those individuals who do not fall into those categories, ERO will exercise discretion to delay enforcement actions until after the crisis or utilize alternatives to detention, as appropriate.

Homeland Security Investigations will continue to carry out mission critical criminal investigations and enforcement operations as determined necessary to maintain public safety and national security. Examples include investigations into child exploitation, gangs, narcotics trafficking, human trafficking, human smuggling, and continued participation on the Joint Terrorism Task Force. This work will be conducted based on ability to coordinate and work with prosecutors from the Department of Justice and intake at both the U.S. Marshals Service and Bureau of Prisons.

Consistent with its sensitive locations policy, during the COVID-19 crisis, ICE will not carry out enforcement operations at or near health care facilities, such as hospitals, doctors' offices, accredited health clinics, and emergent or urgent care facilities, except in the most extraordinary of circumstances. Individuals should not avoid seeking medical care because they fear civil immigration enforcement.

Last Reviewed/Updated: 04/03/2020

---

In the statement, ICE states that as a result of the COVID-19 epidemic, "ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals subject to mandatory detention based on criminal grounds. For those individuals who do not fall into those categories, ERO will exercise discretion to delay enforcement actions until after the crisis or utilize alternatives to detention, as appropriate." *Id.* ICE did not issue its mandatory rules for COVID-19 response until April 10, nearly a month later, however. *See* ICE Pandemic Requirements at 1. ICE has failed to release Petitioners and other transgender detainees under this program, and has announced that it has completed its reviews and releses of those detainees it considers high risk.

ICE has the authority to comply with its constitutional requirements by paroling transgender detainees, who are vulnerable to severe illness or death if they contract COVID-19. Section 212(d)(5)(A) of the Immigration and Nationality Act permits the Attorney General, at his or her discretion, to parole any noncitizen into the United States "temporarily under such conditions as [she or] he may prescribe only on a case-by-case basis for urgent humanitarian

reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Further, 8 C.F.R. § 235.3(b)(2)(iii) vests the Attorney General with the discretion to parole detained aliens with negative credible/reasonable fear findings as required "to meet a medical emergency." Responding to the current pandemic appropriately by releasing transgender civil immigration detainees who are not a threat to public safety meets all three standards: a medical emergency, a legitimate law enforcement objective and a "significant public benefit." Even if the government paroles a detainee, it can still issue notices to appear and place parolees in removal proceedings, thus ensuring that their immigration court cases continue even if they are released from detention. *See* 8 C.F.R. § 235.3(c).

Here, ICE's failure to implement even the most basic protections set forth in its rules require violates both the Fifth Amendment and the APA. *See Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068-69 (C.D. Cal. 2019) (detainees stated *Accardi* claim with allegations an ICE detention center did not follow the agency's standards for treatment of detainees).

As shown in detail by the declarations supporting this Motion, ICE has failed to ensure that its detention centers follow the ICE Pandemic Requirements or the guidance for detention facilities published by the CDC, which ICE also purports to require. Petitioners' evidence shows:

- Social Distancing—keeping a distance of 6 feet—is impossible, as detainees are surrounded by dozens of other detainees at any given time, sharing bedrooms, bathrooms, and communal spaces;

- Some of the ICE facilities have not provided any information about COVID-19 or instructions on how to maintain proper hygiene;

- Detainees do not have consistent access to soap, and often lack soap altogether if they do not have the funds to purchase soap themselves;

- Detainees are not provided with protective masks or gloves;

- Guards and staff working at the Detention Centers often do not use masks or gloves, and do not abide by the 6-foot social distancing rule, and;

- People in the Detention Centers are exhibiting symptoms of COVID-19, including coughs, fever, and shortness of breath, but are not being medically isolated, tested for COVID-19, or provided adequate medicine to address these symptoms.

The declarations of Petitioners also document the increased risks faced by transgender detainees:

- HIV-positive detainees are not provided their antiretroviral medication consistently, leading to gaps in doses that can compromise their immune systems;

- Transgender detainees suffer the additional burden and stress of experiencing harassment, discrimination and even violence at the hands of other detainees and guards (and further making social distancing impossible);

- Transgender detainees with chronic medical conditions are not consistently receiving proper care for those ailments – and in some cases are not receiving medical care for those conditions at all.

Even if Respondents have taken some proactive measures to address the crisis, this is not enough to achieve compliance with CDC guidelines or to eliminate risk of exposure. *See Cristian A.R. v. Decker*, No. 20-3600, 2020 U.S. Dist. LEXIS 66658, at *34 (D.N.J. Apr. 12, 2020). For example, because detainees cannot avoid coming into close contact with frequently used surfaces and shared spaces, Respondents' failure to ensure proper disinfecting of detainees' living areas at the recommended intervals of several times per day exposes detainees to a high risk of infection, even if some cleaning is performed.

Respondents' failure to act in a timely manner to protect Petitioners interferes with the rights of Petitioners in an arbitrary and capricious manner and is without justification. The continued refusal to establish and implement policies and procedures designed to prevent the transmission of COVID-19 violates Petitioners' and all transgender detainees' substantive and procedural due process rights. Courts have consistently held that detainees are likely to succeed on the merits of their claims under similar circumstances. *See, e.g.*, *Castillo*, 2020 U.S. Dist.

LEXIS 54425, at *16 ("Civil detainees must be protected by the Government.  Petitioners have not been protected").

By failing to establish and implement policies and procedures to protect Petitioners from the transmission of COVID-19 in the Detention Centers, Respondents have enacted a final decision that violates both the APA and the Fifth Amendment.  *See Torres*, 411 F. Supp. 3d at 1069.

For all of these reasons, Petitioners have established that they are likely to prevail on the merits.

### B.     Petitioners Will Be Irreparably Injured if The Court Does Not Grant the Relief Sought

COVID-19 is infecting and killing people in the United States at an ever-increasing rate. Avoiding transmission of the virus requires social distancing and proper hygiene.  Respondents have failed to implement sufficient protocols in the Detention Centers to ensure that these basic directives can be followed, imperiling the lives of Petitioners and every transgender detainee.  The imminent risk of infection, pain, disability and death is a well-established form of irreparable harm. *See, e.g., Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (affirming finding of irreparable harm to Medicaid recipients from pain, infection, and possible death due to delayed treatment from county's reduction of hospital beds); *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger."). In granting a preliminary injunction regarding similar dangers at the District of Columbia jail, Judge Kollar-Kotelly held that "Plaintiffs' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *43; *see also, e.g., Thakker*, 2020 U.S. Dist. LEXIS 59459, at *10 (granting injunction ordering immediate release of civil detainees from ICE detention centers

in central Pennsylvania and observing that "[b]ased upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns . . . Petitioners face a very real risk of serious, lasting illness or death.  There can be no injury more irreparable.").

Further, "'suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.'"  *Gordon v. Holder*, 721 F.3d 638, 643 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  "Thus, '[a]lthough a Petitioner seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes.'"  *Id.* (quoting *Davis*, 158 F.3d at 1346) (internal citation omitted).  Here, Petitioners have alleged that Respondents' conduct violates the Due Process Clause of the Fifth Amendment. That constitutional deprivation constitutes irreparable harm.

### C.    There is No Substantial Injury to Other Parties and Injunctive Relief is in Public Interest.

The Government "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017); *see also R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).  ICE has the authority to comply with its constitutional requirements by paroling transgender detainees, who are vulnerable to severe illness or death if they contract COVID-19.  Section 212(d)(5)(A) of the Immigration and Nationality Act permits the Attorney General, at his or her discretion, to parole any noncitizen into the United States "temporarily under such conditions as [she or] he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."   8 U.S.C. § 1182(d)(5)(A).  Further, 8 C.F.R. § 235.3(b)(2)(iii) vests the Attorney General with the discretion to parole detained aliens with negative credible/reasonable fear findings as required "to meet a

medical emergency."  Responding to the current pandemic appropriately by releasing transgender civil immigration detainees who are not a threat to public safety meets all three standards: a medical emergency, a legitimate law enforcement objective and a "significant public benefit." Even if the government paroles a detainee, it still can issue notices to appear and place parolees in removal proceedings, thus ensuring that their immigration court cases continue even if they are released from detention.  *See* 8 C.F.R. § 235.3(c).  Accordingly, there is no injury to Respondents should the Court grant the temporary restraining order.

Courts have granted temporary restraining orders where detainees have proposed a concrete and suitable release plan.  *See, e.g.*, *Bent v. Barr*, No. 19-06123, 2020 U.S. Dist. LEXIS 62792 (N.D. Cal. Apr. 9, 2020).  Courts also have acknowledged that the risk that detainees will flee, given the current global pandemic, is very low.  *See Castillo*, 2020 U.S. Dist. LEXIS 54426, at *15.  Here, many of the Petitioners have identified sponsors that will provide a residence where petitioners can shelter-in-place and remain on home detention.  A group of nonprofit organizations led by the Transgender Law Center has secured nearly $100,000 and has plans in place to provide for the former detainees' humanitarian needs, including safe housing where social distancing is possible, for detainees that do not have sponsors.  Ex 23 - 26; *see also* Ex 22.

Further, it is in the public interest that the Court grant the temporary restraining order. Where an injunction will "not substantially injure other interested parties," the balance of equities tips in the movant's favor.  *MGU v. Nielsen*, 325 F. Supp. 3d 111, 123 (D.D.C. 2018) (citing *League of Women Voters of the United States v. Newby*, 838 F.3d at 12 (citation omitted)). Petitioners have already demonstrated that they will suffer irreparable harm without immediate relief, including severe and significant medical harm or death if exposed to COVID-19.  *See supra* at Sec. II.C.  If there are further outbreaks of COVID-19 in the Detention Centers, detainees and

staff who require hospitalization could overwhelm the nearby hospitals, putting the communities in which the Detention Centers operate at risk.  *See* Franco-Paredes Decl. ¶ 26, Ex 15.  ICE has an interest in preventing the potential spread of COVID-19 because the risk of exposure and infection is so high due to lack of basic sanitation products, inability to maintain social distancing, and due to inadequate medical care and a large number of currently sick detainees.  There can be no greater public interest than preventing infection of dozens, if not hundreds, of detainees and preserving the resources of the local hospitals.

## CONCLUSION

For all of the foregoing reasons, Petitioners respectfully request that the Court enter an Order: (1) immediately releasing, on parole or other supervised release, Petitioners and all transgender detainees in the Immigration and Customs Enforcement Detention Centers pending the completion of these proceedings, pursuant to the Court's inherent powers; (2) immediately ordering Respondents to implement all protocols designed to prevent the transmission of COVID-19 as indicated in the attached expert declarations or protocols of the CDC and the WHO; and (3) prohibiting the placement of new transgender detainees in the Detention Centers.

April 23, 2020                              Respectfully submitted,

                                           /s/ Matthew E. Kelley
                                           Matthew E. Kelley (Bar No. 1018126)

Gregory P. Copeland                        Matthew E. Kelley (Bar. No. 1018126)
(D.D.C. Bar # NY0311)                      Leslie E. John **
Sarah T. Gillman                           Elizabeth Weissert **
(D.D.C. Bar # NY0316)                      Alex Levy **
RAPID DEFENSE NETWORK                       BALLARD SPAHR LLP
11 Broadway, Suite 615                     1909 K Street, NW - 12th Floor
New York, NY  10004-1490                   Telephone: (202) 661-2200
Phone: (212) 843-0910                      Facsimile: (202) 661-6299
Fax: (212) 257-7033                        Email: kelleym@ballardspahr.com
Email: gregory@defensenetwork.org          Email: johnl@ballardspahr.com
Email: sarah@defensenetwork.org            Email: weisserte@ballardspahr.com
                                           Email: levya@ballardspahr.com
Lynly S. Egyes**
Transgender Law Center
PO Box 70976
Oakland, CA 94612-0976
Telephone: (973) 454-6325
Facsimile: (917) 677-6614
lynly@transgenderlawcenter.org


*Attorneys for Petitioners*

*** Application for admission pro hac vice forthcoming*