EXHIBIT 19

       

**March 26, 2020**

Joseph V. Cuffari
U.S. Department of Homeland Security
Office of Inspector General / MAIL STOP 0305
245 Murray Lane SW
Washington, DC 20528-0305

Dianne Witte
Interim Field Office Director, New Orleans ERO
U.S. Immigration and Customs Enforcement
Diane.L.Witte@ice.dhs.gov

Lana Khoury
Deputy Director of ERO Custody Programs
U.S. Immigration and Customs Enforcement
Lana.Khoury@ice.dhs.gov

Keith Deville
Warden, Winn Correctional Center
LaSalle Corrections
Winnfield, LA 71483

Chad Wolf
Acting Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Matthew T. Albence
Acting Director
U.S. Immigration and Customs Enforcement
Washington, DC 20536

Dr. Stewart D. Smith
Assistant Director for ICE Health Service Corps.
U.S. Immigration and Customs Enforcement
Washington, DC 20528

Cameron Quinn
Officer for Civil Rights and Civil Liberties

       

DHS Office for Civil Rights and Civil Liberties
Washington, DC 20528

**RE: Detention Conditions Impacting the Health and Safety of LGBTQI/HIV+ Immigrants Detained at the Winn Correctional Center in Winnfield, LA**

Dear Field Office Director Witte, Deputy Director Khoury, and Warden Deville:

We, the undersigned organizations,[1] believe in protecting the livelihood, health, and overall well-being of LGBTQI/HIV+ immigrants.[2] Accordingly, we write this letter to express our urgent concerns regarding the ongoing detention and civil rights violations of a group of LGBTQI/HIV+ immigrants who are being detained at the Winn Correctional Center ("Winn") in Winnfield, LA. Many of these individuals are transgender women. We are alarmed by the COVID-19 pandemic and the potential for irreparable harm including death for migrant detainees, especially for LGBTQI/HIV+ immigrants detained at Winn. **We request a response to this letter by 5 PM on Friday, March 27, 2020, with specific information detailing: 1) when ICE officials and the Warden at Winn will meet with us to discuss these conditions; and 2) when DHS officials will begin the necessary investigations.**

For over 9 months, representatives of the Santa Fe Dreamers Project ("SFDP") and Immigration Equality have visited and/or provided limited legal services to those LGBTQI/HIV+ immigrants detained at Winn. SFDP has been working with these individuals primarily through its El Paso office, as their cases were all initially handled through video-teleconference by the Otero Immigration Court. All of the individuals SFDP and Immigration Equality have spoken with are (or were) seeking asylum in the United States because of the persecution they survived in their countries of origin—in most cases, because of their gender identity, sexual orientation, or political beliefs. The majority of these individuals were detained for 5-6 months before ever seeing an Immigration Judge.

We begin with the following four premises:

- The safest and best place for all asylum-seekers is with their communities and families, not in immigration detention. We support the abolition of immigration detention. Detention of asylum-seekers should not be a part of the asylum process.

---

[1] We write jointly from: Immigration Equality, Al Otro Lado, Detained Migrant Solidarity Committee, Gender Justice, Trans Latin@ Coalition, VisibiliT, and Santa Fe Dreamers Project.

[2] LGBTQUI/HIV+ refers to individuals who identify as lesbian, gay, bi-sexual, transgender, queer, or intersex and those who have the human immunodeficiency virus.

2

       

- This is especially true for LGBTQI/HIV+ individuals who the Department of Homeland Security (DHS) has previously determined to be especially vulnerable to the conditions of immigration detention. We condemn the prolonged detention of LGBTQI/HIV+ immigrants. We also urge ICE to immediately release all LGBTQI/HIV+ people from civil immigration detention.

- When the government exercises its discretion to detain an individual, it takes on a legal obligation to ensure that the person is safe and receives all medically necessary care.[3] ICE should not expose LGBTQI/HIV+ immigrants to more harm by placing them in detention facilities that do not take into consideration the specific needs of these communities and restrict their access to care.

- The COVID-19 pandemic will expose already vulnerable migrant detainees to a currently untreatable and potentially deadly disease. Protective public health measures such as social distancing and self-quarantining are impossible in detained settings. LGBTQI/HIV+ immigrants are especially vulnerable in detention settings. Releasing detained LGBTQI/HIV+ migrants is the only viable option for improving their COVID-19 pandemic health outcomes.

Per the 2015 ICE Transgender Care Memorandum, ICE must determine *a respectful, safe, and secure environment for transgender individuals in ICE custody.* This is identified in the Memo as: appropriate medical care; presence of staff with special training to work with identified transgender individuals in ICE custody; a tailored detention plan as developed by a Transgender Classification and Care Committee; and provisions that ensure transgender individuals detained by ICE have access to safety, security, and the ability to meet their hygienic needs.[4] The memorandum additionally mandates the consideration of an immigrant's transgender status upon initial detention—with placement preference given to facilities that operate a protective custody unit for transgender individuals—as well as when any subsequent transfer is requested. Finally, the Transgender Care memo sets standards for safety, privacy, and medical care of transgender individuals detained by ICE.

---

[3] United Nations General Assembly, *International Covenant on Economic, Social, and Cultural Rights*, Art. 12, December 16, 1966, https://www.ohchr.org/en/professionalinterest/pages/cescr.aspx; *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001) (acknowledging that immigration detention is civil); *Youngberg v. Romero*, 457 U.S. 307, 315-16, 324 (1982) (finding civil detainee was entitled to adequate food, shelter, clothing, medical care, and reasonable safety under the Fourteenth Amendment).

[4] For standards of care *see also,* U.S. ICE, Detention Operations Manual: Medical Care (2000), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical.pdf; U.S. ICE, Performance-Based National Detention Standards 2011, https://www.ice.gov/detention-standards/2011.



**Nationally, these minimal standards to ensure the health and safety of LGBTQI/HIV+ individuals in immigration detention are not being met**. For example:

- In May 2018, the Center for American Progress published a study concluding that "LGBT people in ICE custody are 97 times more likely to be sexually victimized than non-LGBT people in [immigration] detention.[5]"

- On March 25, 2019, the ACLU of New Mexico wrote a joint letter with Las Americas and the Santa Fe Dreamers Project detailing the grave conditions faced by gay men and transgender women detained at the Otero County Processing Center.[6]

- On July 9, 2019, twenty-nine transgender women and gender non-conforming immigrants held at Cibola County Correctional Center in New Mexico called for an investigation into poor medical services - including HIV care-- and mistreatment at the facility.[7] This prompted an investigation by the DHS Office of Civil Rights and Civil Liberties, which ultimately substantiated the claims of dangerously inadequate medical care and ordered the transfer of all "medically vulnerable individuals" from the facility—including all 26 transgender women detained at Cibola at the time.

- On September 25, 2019, the Transgender Law Center, along with a number of concerned organizations, wrote to ICE regarding the agency's failure to provide adequate medical

---

[5] Sharita Gruberg, "ICE's Rejection of Its Own Rules Is Placing LGBT Immigrants at Severe Risk of Sexual Abuse," Center for American Progress, https://www.americanprogress.org/issues/LGBTQI-rights/news/2018/05/30/451294/ices-rejection-rules-placing-lgbt-immigrants-severe-risk-sexual-abuse/

[6] Letter Kristin Greer-Love et al, to Wayne Cox, Acting Field Office Director of El Paso ERO (March 25, 2019), https://www.aclu-nm.org/sites/default/files/field_documents/advance_copy_of_3.25.2019_las_americas_santa_fe_dreamers_project_aclu-nm_letter_to_dhs_re_otero.pdf; see also Robert Moore, "Gay, transgender detainees allege abuse at ICE Facility in NM," The Washington Post, (March 25, 2019), https://www.washingtonpost.com/immigration/gay-transgender-detainees-allege-abuse-at-ice-facility-in-new-mexico/2019/03/25/e33ad6b6-4f10-11e9-a3f7-78b7525a8d5f_story.html

[7] Laura Gomez, "Migrants held in ICE's only transgender unit plead for help, investigation in letter," *AZ Mirror*, July 9, 2019 https://www.azmirror.com/2019/07/09/migrants-held-in-ices-only-transgender-unit-plea-for-help-investigation-in-letter/.

      

and mental health care to LGBTQI people and people living with HIV in immigration detention.[8]

- On January 14, 2020, members of Congress wrote to ICE demanding that the agency stop placing transgender migrants at risk of sexual abuse and assault in ICE custody.[9]

**We now write to give you a brief summary of the on-going civil rights and civil liberties violations that have been documented at the <u>Winn Correctional Center</u>.** This information comes from in-person conversations, telephone communications, and written statements from dozens of LGBTQI/HIV+ individuals detained at Winn over the past year. Our clients and friends report the following:

**Widespread Abuse and Mistreatment of LGBTQI/HIV+ individuals.** LGBTQI/HIV+ individuals detained at Winn are not housed in an insulated unit that offers them additional protection from other detained individuals. Even self-identified transgender women are held with large cisgender male populations, where they face elevated risks of sexual assault, discrimination, and abuse.

- P. is one of two transgender women forced to share shower and bathroom facilities with nearly 50 cisgender men. The cisgender males detained in her unit regularly watch P. and other transgender women while they use the restroom and shower. She reports that men sometimes become aroused while watching her. P. tries to shower in the middle of the night to avoid being watched.

- Other women report having developed urinary tract infections because, out of fear of assault, they are forced to hold off from urinating for prolonged periods of time.

- M. is another transgender woman incorrectly housed amongst the all cisgender male population at Winn. M. reports that cisgender men detained at Winn often threaten her with violence and use homophobic and transphobic slurs toward her, such as "faggot."

---

[8] Letter from Transgender Law Center et al., to Dr. Stewart Smith, Assistant Director for ICE Health Services Corps et al. (Sept. 25, 2019), https://www.cvt.org/sites/default/files/attachments/u101/downloads/complaint_on_LGBTQ_detention_final_.pdf

[9] Letter Mike Quigley et al, to Chad Wolf, Acting Secretary DHS and Matthew Albence, Acting Director ICE (Jan 14, 2020), https://quigley.house.gov/sites/quigley.house.gov/files/01.14.20%20ICE%20Letter.pdf

       

- D. reports that one cisgender man threatened to fight her for being LGBTQI/HIV+. After that she did not go outside for recreation for fears she would be assaulted. On August 17, 2019, Winn staff forced her to go outside to play soccer with the cisgender men. Once on the field, and far removed from the play, the same man tackled D., breaking her leg. The officer refused to take a report of how D.'s leg was broken.

- J. reports severe verbal harassment and threats from cisgender men detained at Winn. One man called her "the plague of the earth" and threatened to insert a stick into her anus to "make her a man."

- Many of the transgender women report attempts by cisgender men detained at Winn to force them to engage in sexual acts. When women refuse, the men threaten to kill them and call the women "faggots" or "whores."

- LGBTQI/HIV+ individuals at Winn report a fear of humiliation or retaliation from Winn staff if they submit a PREA report to the facility.

**Failure to Provide Access to Adequate Medical and Mental Health Care.** Winn medical staff fails to provide timely and adequate medical care. This includes access to medically necessary hormone therapy and other gendering affirming care. The problem of inadequate medical care is particularly significant for people living with life-threatening illnesses like HIV, tuberculosis, and syphilis. HIV care is woefully inadequate at Winn, and HIV positive individuals are subjected to conditions and practices that put their life and health in serious jeopardy.

- After months of intense physical and verbal harassment by cisgender males detained at Winn, J., a transgender woman, attempted to take her life. She survived and was subsequently held in solitary confinement for a prolonged period of time. She reports being held naked for several days. She also reports Winn staff regularly passing by her cell to laugh at her and call her "crazy."

- G., an individual living with HIV, reports a variety of serious issues with his care. G. has experienced numerous interruptions to his antiretroviral regime in detention, including going for days at a time without receiving his HIV medication. His medication is also given to him at inconsistent times each day potentially leading to serious side effects, including the kidney problems he is now experiencing. G.'s most recent urine analysis showed that his urine contained blood. G.'s HIV medication was changed while in detention, but there is no indication that the proper resistance testing was done before



making the switch. G was not told what his new medication is, nor was he administered the proper blood work to track his "CD4" count, which is the essential indicator to track HIV health. Health care staff at Winn mistakenly measured his C4 count – a test that has nothing to do with HIV monitoring rather than his CD4 count. G. had to point this out to Winn staff and request that the appropriate blood test be provided. G. waited months to be seen by an HIV specialist, and when he final saw the specialist, he was not provided an interpreter and so could not communicate with the provider. G. has no way to monitor his own HIV care because ICE refuses to provide him with copies of his own medical records.

- M. has severe spinal issues. She reports only being allowed to see a doctor three times over the course of eight months in detention. She often experiences acute pain, but when she asks to see the doctor the request is delayed or denied.

- P. reported that she started experiencing pain in a tooth in December 2019. P. was told that because Winn does not have a dentist on-site, she would have to wait for medical attention and was given ibuprofen for pain. Two months later, she saw a dentist who extracted her tooth. During the two months, she lost a significant amount of weight and suffered intense pain.

- After breaking her leg, a doctor told D. that she was losing muscle in her leg and was in danger of losing her ability to walk. D. was prescribed physical therapy and given an elastic band for resistance training. However, officers at Winn confiscated the resistance band, thus denying D. her prescribed treatment.

- M. has also experienced severe tooth pain. She was told she needed to be in custody for six months before she could see a dentist.

- J. suffers from high levels of anxiety and erratic fainting spells. She has fainted on a number of occasions and hit her head in the unit. No changes have been made to her medical regime to reduce or manage her anxiety or incidents of fainting.

- P. receives medication for depression and is administered pills prior to bed at 9:00 pm, and with breakfast around 3:00 am. Overhead lights are kept on throughout the night. On weekends, bedtime is pushed back to midnight while breakfast remains at 3:00 am. This intentionally destabilizes those who are detained so that they cannot achieve an adequate sleep cycle, leaving them cognitively and emotionally impaired.



- H. lost 20 pounds due to an intolerable tooth pain which left her unable to chew food. She was left in pain for over 2 months before she was able to see a dentist.

- The majority of the transgender women detained at Winn have made formal requests to receive medically necessary, gender-affirming care, including hormone replacement therapy. These requests have been denied.[10] Some women report being told that they had "not been detained long enough" to receive hormone replacement therapy.

- One transgender woman reported a doctor at Winn telling her she was not, in fact, a transgender woman because she had not yet undergone surgery altering her genitalia. This was the basis for denying her request to receive hormone replacement therapy.

- Another woman was strongly discouraged from beginning hormone replacement therapy due to a medical provider's stated concern that once the hormones took effect, she would suffer further, more-severe harassment from detained cisgender males due to the changes in her physical appearance.

- Nearly all LGBTQI/HIV+ individuals have submitted multiple formal requests for copies of their medical and mental health records to aid in their legal cases. All of these requests have been either denied or unacknowledged.

**Discrimination and Verbal Abuse by Facility Staff.** At times, Winn staff use homophobic and transphobic slurs against LGBTQI/HIV+ individuals and refuse to use the pronouns for transgender women that correspond with their gender identity. It is apparent that guards at Winn have not received adequate training on how to care for or work with transgender people.

- One transgender woman reports having been forcefully pushed in the middle of her back by guards at least three times, including when she was merely standing and reading her bible. Winn staff do not respect her name or pronouns.

---

[10] Gender affirming care is often medically necessary for transgender individuals, and denial of such care while in custody arguably rises to the level of cruel and unusual. *See Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019); *De'lonta v. Johnson*, 708 F.3d 520 (5th Cir. 2019); *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011)).

       

- Winn Officers regularly threaten transgender women with solitary confinement for arbitrary reasons, such as interpreting for other detained individuals.

- D., a gay male, reports being subject to regular homophobic verbal harassment from guards, as well as intimidation. On one instance, D. approached a guard in a crowded dining hall to make a request. Because D. was timid in his approach, the guard shouted at him: "Why don't you go look for your boyfriend's balls so you will have the courage to speak to me." After his sexual orientation was exposed so publicly, D. reported an increased fear to use public spaces or bathroom facilities.

- One officer threatened a transgender woman detained at Winn with physical harm, going as far as to say he would beat to death any detained individuals who made him angry.

- Winn Officers regularly order the transgender women to "walk like men, not faggots" when they are escorted around the detention center. A cisgender female officer once walked pass a group of transgender women, instructed them to look at her buttocks, and stated "this is how a real woman walks."

- H. reports that Winn staff enforce rules more harshly for LGBTQI/HIV+ individuals while cisgender individuals are allowed to break the same rules.

- Reports indicate that few, if any, of the Winn staff are fluent Spanish-speakers. Staff rely on a limited group of bilingual detained individuals to interpret and translate instructions, grievances, legal documents, and general procedures.

- The LGBTQI/HIV+ individuals at Winn report that they know of guards laughing at and destroying written grievances and requests they submit to the facility.

**Failure to Timely Adjudicate Parole Requests or Consider Transfer Requests.** Deportation Officers overseeing the cases of LGBTQI/HIV+ individuals routinely ignore parole requests submitted by the individuals or their legal counsel. The requests which are acknowledged, first remain pending for weeks, even months before a determination is made. This results in the prolonged detention of parole eligible individuals, who unnecessarily suffer irreparable harm in the interim.

- On January 21, 2020, counsel from Immigration Equality submitted a parole request on behalf of J. Counsel followed up with the client's Deportation Officer (DO) by phone at



    least a dozen times and left numerous messages but DO never answered or returned their phone calls. On or around February 15, DO interviewed J. to determine his parole eligibility. During the interview, J. filled out a questionnaire provided to him by ICE, where J indicated that he was HIV-positive and needed immediate medical attention. J. also stated he did not feel comfortable in the dorm because he is gay. On or around February 22, DO denied J.'s parole request. He refused to provide J. a copy of Notification Declining to Grant Parole. J. made at least three requests for the copy of the Notification, but he did not receive a response.

- K. applied for parole without legal counsel on or around November 11, 2020. No response was received. On February 13, 2020, counsel from Immigration Equality submitted a comprehensive parole request on behalf of K, indicating that she was a medically vulnerable individual. The DO conducted a parole interview with K. but gave no indication that he had reviewed the parole request from Immigration Equality. On or around February 18, 2020, the DO denied K.'s parole without justification. On March 5, 2020, K. reported to the medical department that there was blood in her urine due to a severe kidney issue, which had been explained in her prior parole request. It was only then her parole was approved.

- Attorneys from Santa Fe Dreamers Project have submitted multiple individual and group transfer requests on behalf of the LGBTQI/HIV+ individuals at Winn—in October 2019, December 2019, January 2020 and February 2020. Few of these requests were answered, let alone acknowledged. Requests that were responded to were denied without explanation or justification. When legal counsel requested written determinations, including the factors considered and how current conditions are in compliance with the Transgender Care memo, no response was received.

The above information reflects the egregious conditions at the Winn Correctional Center and reveals blatant homophobia, transphobia, and a disregard for basic human safety. The above-mentioned individuals have submitted regular complaints to DHS, all of which remain unaddressed. In essence, these LGBTQI/HIV+ asylum-seekers are indefinitely trapped in a detention center where they are at a heightened risk of medical negligence, sexual harassment and disproportionate systemic violence.

**COVID-19:**

On March 11, 2020, World Health Organization (WHO) Director-General Dr. Tedros Adhanom said that, "COVID-19 can be characterized as a pandemic." The CDC notes that pandemics



happen when new "viruses emerge which are able to infect people easily and spread from person to person in an efficient and sustained way." The WHO says that "there is no evidence that current medicine can prevent or cure" COVID-19.

Detained individuals face an elevated risk of contracting COVID-19. According to Dr. Homer Venters, "When COVID-19 arrives in a community, it will show up in jails and prisons. This has already happened in China, which has a lower rate of incarceration than the U.S."[11] Or, as Dr. Anne Spaulding put it in a presentation to Correctional facility employees, "a prison or jail is a self-contained environment, both those incarcerated and those who watch over them are at risk for airborne infections. Some make an analogy with a cruise ship. Cautionary tale #1: think of the spread of COVID-19 on the Diamond Princess Cruise Ship, January 2020. Cautionary tale #2: Hundreds of cases diagnosed in Chinese prisons."[12]

According to Dr. Chauolin Huang, "2019-nCoV caused clusters of fatal pneumonia with clinical presentation greatly resembling SARS-CoV. Patients infected with 2019-nCoV might develop acute respiratory distress syndrome, have a high likelihood of admission to intensive care, and might die"[13] The CDC recently reported that, "Older people and people of all ages with severe underlying health conditions — like heart disease, lung disease and diabetes, for example — seem to be at higher risk of developing serious COVID-19 illness."[14] According to another source, Jialieng Chen, "[M]ost of those who have died had underlying health conditions such as hypertension, diabetes or cardiovascular disease that compromised their immune systems." [15]

---

[11] Dr. Homer Venters, *Four Ways to Protect Our Jails and Prisons from Coronavirus*, The Hill, Feb. 29, 2020, https://thehill.com/opinion/criminal-justice/485236-4-ways-to-protect-our-jails-and-prisons-from-coronavirus?rnd=1582932792.

[12] Dr. Anne Spaulding, *Coronavirus and the Correctional Facility: for Correctional Staff Leadership*, Mar. 9, 2020, https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf.

[13] Chaolin Huang, et al., *Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China*, 395 The Lancet 497 (2020), https://doi.org/10.1016/S0140-6736(20)30183-5 (also available at https://www.sciencedirect.com/science/article/pii/S0140673620301835).

[14] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), People at Higher Risk and Special Populations*, Mar.7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/index.html.

[15] Jieliang Chen, *Pathogenicity and transmissibility of 2019-nCoV—A Quick Overview and Comparison with Other Emerging Viruses*, Microbes and Infection, Feb. 4, 2020, https://doi.org/10.1016/j.micinf.2020.01.004.

       

On March 23, 2020 the CDC released COVID-19 related guidance for detention facilities.[16] This guidance urges detention facilities to:

- Implement social distancing of at least 6 feet between each individual.

- Provide incarcerated/detained persons and staff no-cost access to: soap, running water, hand drying machines or paper towels, and tissues, and hand sanitizer.

- Several times per day, clean and disinfect surfaces and objects that are frequently touched.

- Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.

- Restrict incarcerated/detained persons from leaving the facility while under medical isolation precautions, unless released from custody.

- Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.

- Expect shortages of all personal protective equipment including N95 respirators, face mask, eye protection, disposable examination gloves, and medical isolation gowns.

- **Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.**

The CDC recognizes that <u>detained populations are already medically vulnerable</u>.[17]

Our LGBTQI/HIV+ clients at Winn are reporting troubling conditions specific to the COVID-19

---

[16] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, March 23, 20202. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[17] *Id*.



pandemic. They include lack of medical attention for a detainee who had a days long fever, a sympton of COVID-19, crowded conditions, and a lack of sanitation supplies for detainees and staff alike.

- K. reports that as of March 20th Winn Officials had not addressed COVID-19 concerns with immigrant detainees, including failing to instruct detainees on handwashing and social distancing.

- Hand sanitizer is not available.

- During the week of March 16-20, thirty to thirty-five new detainees arrived at Winn and were immediately housed with the preexisting detained population.

- Dormitories are not being cleaned or sanitized.

- Some dormitories have 50 people in the same room sharing one sink, one toilet, and no meaningful access to medical attention or sanitation.

- A experienced a week long fever without being quarantined or tested for COVID-19.

These reports, taken with the above mentioned civil rights violations and existing lack of adaquate medical care, are alarming. Social distancing at Winn is virtually impossible. Winn is primed to have COVID-19 spread through the detained population like wildfire. It will be devastating and deadly. This is especially true for the already vulnerable LGBTQI/HIV+ immigrant population. Medically vulnerable detainees, especially LGBTQI/HIV+ migrants and those who are otherwise immunocompromised, should be released immediately.

**Winn and ICE's Legal Obligations:**

Over the past year, ICE and Winn have repeatedly failed to meet their most basic legal obligations to care for LGBTQI/HIV+ individuals in detention, raising serious questions about their compliance with the Prison Rape Elimination Act ("PREA"), ICE Performance-Based National Detention Standards ("PBNDS"[18]), and the U.S. Constitution.

---

[18] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011 (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.



The most comprehensive of these standards, the 2011 Performance-Based National Detention Standards (2011 PBNDS), updated in 2016, set forth extensive medical care requirements for ICE.  For instance, the 2011 PBNDS require appropriate physical, dental, and mental health care as well as pharmaceutical services, 24-hour access to emergency care, and timely responses to medical complaints for all detained people.[19] They also require language services for individuals with limited English proficiency during any physical or mental health appointment, treatment, or consultation.[20]

The 2011 PBNDS also mandates that special consideration be given to people at risk of sexual assault, including individuals who have self-identified as members of the LGBTQI community.[21] With specific regard to transgender individuals, the 2011 PBNDS require that those individuals who have been receiving hormone therapy when taken into ICE custody, maintain continued access to such therapy.[22] The guidelines further demand that detained transgender people have access to "mental health care, and other transgender-related health care and medication based on medical need."[23] Once again, this complaint and others demonstrate that the DHS is failing to meet these standards and LGBTQI/HIV+ people are experiencing immense suffering as a result.

In addition to these generalized detention standards, ICE also issued a 2015 Memorandum concerning the care and safety of transgender immigrants in ICE custody. More specifically, the memorandum includes contract modifications for facilities to ensure access to adequate healthcare, including access to hormone therapy.  The memorandum also states that during initial processing or risk classification assessment of an individual, the detention facility staff should inquire about a person's gender identity[24] and make individualized placement determination to ensure the person's safety, including whether detention is warranted. Where feasible and appropriate, ICE should house transgender immigrants in facilities that are equipped to care for transgender people.[25]

---

[19] U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011, 257-81 (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.
[20] *Id.* at 264.
[21] *Id.* at 135.
[22] *Id.* at 273.
[23] *Id.* at 274.
[24] U.S. Dep't. of Homeland Security, *Further Guidance Regarding the Care of Transgender Detainees*, 2 (June 19, 2015) https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.
[25] *Id.*

       

Our position is that ICE and its contractors blatantly disregard the health and safety of LGBTQI/HIV+ individuals in its custody and repeatedly fail to meet not only the federally required standards of care, but even its own internal detention standards. The countless reports of outright denial of medical treatment, combined with the continuous mistreatment and abuse of LGBTQI/HIV+ individuals, clearly demonstrates that DHS cannot house LGBTQI/HIV+ migrants safely.

Accordingly, we the undersigned organizations, **demand the following actions be immediately taken to ensure the health, safety, dignity, and due process** of the LGBTQI/HIV+ individuals presently detained at the Winn Correctional Center.

1. Grant all LGBTQI/HIV+ individuals detained at Winn immediate humanitarian parole and release them to family or community members who can properly care for them.

2. Schedule a meeting within one (1) week of receipt of this letter between U.S. Immigration and Customs Enforcement ("ICE"), the acting Warden at the Winn Correctional Center, and representatives of the undersigned organizations to discuss our concerns about the conditions in which ICE is confining LGBTQI/HIV+ individuals at the Winn Correctional Center.

3. Finally, we urge CRCL to use its authority under federal law[26] to schedule a visit to Winn to fully investigate the civil rights and civil liberties violations outlined in this letter; recommend policy changes to address these violations; and oversee Winn and ICE's implementation of policy changes.

In ordinary times it would be appropriate to suggest that an alternative to immediate release would be the immediate transfer of all LGBTQI/HIV+ individuals detained at Winn to Protective Care Units for LGBTQI/HIV+ individuals. However, the CDC recommends against transfers at this time to limit the spread of COVID-19.[27] Therefore, the only responsible course of action is the immediate granting of humanitarian parole to all LGBTQI/HIV+ migrants detained at Winn.

We are willing to discuss in detail the conditions described in this letter, with any individuals, agencies, or representatives willing to recommend and advocate for policy changes in line with the above recommendations. We urge ICE and those in charge of the Winn Correctional Center to make immediate changes to comply with the law, provide on-going oversight to ensure its

---

[26] 6 U.S.C. § 345(a).
[27] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, March 23, 20202. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.










facilities and contractors do not fall out of compliance in the future, and immediately grant humanitarian parole to all LGBTQI/HIV+ migrants detained at Winn.

If you have any questions about the above information please contact attorney, Héctor Ruiz, at hector@santafedreamersproject.org or Executive Director, Allegra Love, at allegra@santafedreamersproject.org.

**Dated**: March 25, 2020

Sincerely,

    Santa Fe Dreamers Project

Immigration Equality

Al Otro Lado

    Detained Migrant Solidarity Committee

Familia: Trans Queer Liberation Movement

    Gender Justice LA

    Trans Latin@ Coalition

    VisibiliT

**CC'd:**

       

Members of the House Appropriations Subcommittee on Homeland Security
Members of the House Subcommittee on Border Security, Facilitation, and Operations
Members of the Senate Appropriations Subcommittee on Homeland Security
Members of Senate Subcommittee on Homeland Security and Governmental Affairs
Members of Congressional LGBTQ Equality Caucus
Members of Congressional Transgender Equality Task Force