# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C.G.B.[1], *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 20-cv-1072 (CRC) |
| CHAD WOLF, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiffs, ten transgender women in the custody of Immigration and Customs Enforcement ("ICE"), have sued the Secretary of Homeland Security and the Attorney General of the United States based on their roles in overseeing the nation's civil immigration detention system. Asserting that their continued detention during the COVID-19 pandemic violates the Constitution and the Administrative Procedure Act ("APA"), Plaintiffs seek an order directing ICE to immediately release all transgender civil detainees across the country and not to detain any additional transgender immigrants until the pandemic ends. Before the Court are: (1) a motion to certify a class of all transgender detainees held in ICE custody, now and in the future; (2) a motion to join two new named Plaintiffs; and (3) an emergency motion for a temporary restraining order. For the reasons that follow, the Court denies all three motions.

---

[1] In order to protect Plaintiffs' privacy, the Court will refer to all named plaintiffs by their preferred acronyms.

I.      **Background**

    A.  COVID-19 Pandemic

The details of the COVID-19 pandemic are by this point well-known.  COVID-19 is a contagious disease caused by the novel coronavirus SARS-CoV-2.  Decl. of R. Nick Gorton ("Gorton Decl.") ¶ 3, Pl. Mot. for Temporary Restraining Order ("TRO Mot."), Exh. 14. Although the virus only emerged in early 2020, by March the President of the United States had declared a national state of emergency and the World Health Organization had declared a global pandemic.  As of June 1, 2020, there have been 1,761,503 diagnosed cases of COVID-19 and 103,700 deaths in the United States alone.  Centers for Disease Control and Prevention ("CDC"), Cases in the U.S. (June 1, 2020).[2]

Symptoms of COVID-19 vary considerably between individuals.  Some who are infected do not display any noticeable symptoms.  Gorton Decl. ¶ 6.  Others experience fevers, coughs, difficulty breathing, and body aches, although the severity of those symptoms varies.  Id. ¶ 4.  In a minority of individuals, however, COVID-19 results in serious illness or death.  Id.  The CDC has identified certain factors that are associated with an increased risk of becoming severely ill: being 65 years old or older, having an underlying medical condition such as a chronic lung disease or serious heart condition, and having a compromised immune system.  CDC, People Who Are at Higher Risk for Severe Illness (Apr. 15, 2020).[3]  Relevant here, being transgender is

---

[2]  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[3]  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

not one of the CDC-recognized risk factors.  See id.; Decl. of Captain Edith Lederman, M.D. ("Lederman Decl.") ¶ 10, TRO Opp., Exh. 8.

COVID-19 is highly contagious.  It spreads primarily through person-to-person contact, when people are within six feet of one another.  See CDC, How to Protect Yourself & Others (Apr. 15, 2020).[4]  When infected people cough, sneeze, or talk, they produce airborne respiratory droplets that may be inhaled by others standing nearby.  Id.  People may also contract the virus through contact with contaminated surfaces.  See CDC, Cleaning & Disinfection for Households (May 7, 2020).[5]  Symptoms, such as fever, cough, and shortness of breath, typically appear two to fourteen days after exposure.  Even those who are asymptomatic are capable of spreading the disease.  Gorton Decl. ¶¶ 4, 6.  The most effective ways to prevent contracting the virus are to employ social distancing (staying at least six feet away from other people), to wash one's hands frequently, and to cover one's mouth and nose with a mask when around others.  See CDC, How to Protect Yourself & Others (Apr. 15, 2020).  To date, there is no vaccine or cure for COVID-19.

**B.  ICE's Response to COVID-19 in Detention Centers**

Civil immigration detention centers, which typically house highly transient populations in close quarters, are difficult environments in which to prevent the spread of a dangerous contagion like COVID-19.  Recognizing this, ICE and the CDC have taken several steps to contain the virus in detention facilities.

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[5] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

First, ICE has reduced the number of detainees in each of its facilities.  On March 18, 2020, ICE announced that its Enforcement and Removal Operations ("ERO") section, which oversees the departure of removable immigrants from the United States, would exercise its discretion to focus enforcement on individuals subject to mandatory detention based on criminal convictions.  ICE, Updated ICE Statement on COVID-19 (Mar. 18, 2020).[6]  For other categories of immigrants, ERO would exercise its "discretion to delay enforcement actions until after the crisis or utilize alternatives to detention, as appropriate." Id.  About two weeks later, ICE released guidance instructing the directors of its various field offices to identify detainees held in their facilities who fell within the CDC-recognized high-risk categories and to make individualized determinations regarding their continued custody.  ICE, Docket Review Guidance (Apr. 4, 2020).

ICE, in conjunction with the CDC, has also taken measures to prevent the spread of COVID-19 at detention facilities.  On March 27, 2020, the CDC published advisory guidance on best practices for correctional and detention facilities ("CDC Detention Facility Guidelines"). CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities (Mar. 27, 2020).  That guidance recommends that facilities reduce transfers of detainees; perform pre-intake screening for all new entrants; eliminate in-person visits; clean commonly touched areas multiple times a day; provide detainees with free access to soap, running water, paper towels, and tissues; and implement social distancing strategies, such as reassigning bunks to provide more space between detainees and staggering meals.  See id.  The CDC guidance recognizes, however, that not all of its recommended

---

[6]  https://www.ice.gov/news/releases/updated-ice-statement-covid-19.

strategies would be feasible in every facility, as facilities vary in physical layout and available resources.  Id.

The same day that the CDC released its Detention Facility Guidelines, ICE issued an "Action Plan" for containing COVID-19.  ICE, Mem. on Coronavirus 2019 (COVID-19) Action Plan, Revision 1 (Mar. 27, 2020).  The plan drew heavily from the CDC guidance, affirming that "[t]he CDC remains the authoritative source for information on how to protect individuals and reduce exposure to COVID-19."  Id.

Building on its Action Plan, on April 10, 2020, ICE released a document entitled COVID-19 Pandemic Response Requirements ("PRR"), which includes more definitive measures designed to prevent the spread of COVID-19 in detention facilities.  ICE, Pandemic Response Requirements (Apr. 10, 2020).  Developed in consultation with the CDC, the PRR "set[] forth specific mandatory requirements expected to be adopted by *all* detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented[.]"  Id. at 3 (emphasis in original).  The PRR provide that "all detention facilities housing ICE detainees *must* . . . comply with the following" preventative measures:

- **Personal Protective Equipment:**

  o "Cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19."

- **Hygiene:**

  o "Require all persons within the facility to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds[.]"

  o "Provide detainees and staff no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles."

- o "Post signage throughout the facility reminding detained persons and staff to practice good hand hygiene and cough etiquette[.]"

- **Cleaning Practices**

  - o "Adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response[.]"

  - o "Several times a day using household cleaners and Environmental Protection Agency-registered disinfectants, clean and disinfect surfaces and objects that are frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment)."

- **Intake Procedures:**

  - o "Perform pre-intake screening for all staff and new entrants for symptoms of COVID-19."

  - o "If staff have symptoms of COVID-19 (fever, cough, shortness of breath): they must be denied access to the facility."

  - o "If any new intake has symptoms of COVID-19:

    - ▪ Require the individual to wear a face mask.

    - ▪ Ensure that staff interacting with the symptomatic individual wears recommended PPE.

    - ▪ Isolate the individual and refer to healthcare staff for further evaluation.

    - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective isolation and necessary medical care."

- **Social Distancing:**

  - o "Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable:

  - o Efforts should be made to reduce the population to approximately 75% of capacity.

  - o Where detainee populations are such that such cells are available, to the extent possible, house detainees in individual rooms.

- o   Recommend that detainees sharing sleeping quarters sleep 'head-to-foot.'

- o   Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

- o   Staff and detainees should be directed to avoid congregating in groups of 10 or more, employing social distancing strategies at all times.

- o   Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

- o   If practicable, beds in housing units should be rearranged to allow for sufficient separation during sleeping hours."

- **For suspected or confirmed COVID-19 cases:**

  - o   "Isolate the individual immediately in a separate environment from other individuals.  Facilities should make every possible effort to isolate persons individually.  Each isolated individual should be assigned his or her own housing space and bathroom where possible.  Cohorting should only be practiced if there are no other available options.  *Only individuals who are laboratory-confirmed COVID-19 cases should be isolated as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.*"

  - o   "If the number of confirmed cases exceeds the number of individual isolation spaces available in the facility, then ICE must be promptly notified so that transfer to other facilities, transfers to hospitals, or release can be coordinated immediately.  Until such time as transfer or release is arranged, the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19.  Ideally, ill detainees should not be cohorted with other infected individuals.  If cohorting of ill detainees is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (For example, allocate more space for a higher-risk individual within a shared isolation room)."

Id. at 7–15 (emphases in original).  While the PRR impose these "mandatory" requirements at all detention centers, they also indicate that the requirements are "dynamic" and "will be updated as additional/revised information and best practices become available."  Id. at 3.

C.   Injunctions Entered Against ICE

Plaintiffs' challenge arises in the context of other requests for injunctive relief against ICE in connection with the ongoing pandemic.  Most importantly here, in Fraihat v. ICE, Judge Bernal in the Central District of California certified a class of "[a]ll people who are detained in ICE custody who have one of the [CDC-recognized] Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus."  No. 5:19-cv-1546-JGB (SHKx), 2020 WL 1932570, at *16 (C.D. Cal. Apr. 20, 2020).[7]  The court proceeded to issue a preliminary injunction that, *inter alia*, ordered ICE to identify and track all ICE detainees with CDC-designated risk factors; to "make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance"; to "promptly issue a performance standard or a supplement to their Pandemic Response Requirements . . . defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic"; and to "monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard."  Id. at *29.

Since the issuance of the Fraihat injunction, the Government has identified more than 4,400 noncitizens in custody who possess CDC-designated risk factors.  Joint Meet & Confer Statement 11, Fraihat v. ICE, No. 5:19-cv-1546-JGB-SHK (C.D. Cal. May 8, 2020), ECF No. 147.  The agency's identification process is ongoing: "ICE reports that the agency continues to

---

[7] Judge Bernal also certified a second subclass, covering detainees whose disabilities place them at heightened risk of severe illness upon contracting COVID-19, that is not relevant to this case.  Fraihat, 2020 WL 1932570, at *16.

identify and track existing and new detainees with risk factors and disabilities that qualify them as subclass members."  Id.  Those determinations—of whether a detainee has a health condition that places her in the Fraihat class—are made by medical professionals who evaluate detainees' health records and then flag each high-risk detainee as a member of the Fraihat class, so that he or she can be further tracked.  Id.  Once identified as a member of the Fraihat class, each detainee is then evaluated by an ERO officer, who determines whether continued custody is appropriate. Id. at 11–12.

In addition to the nationwide Fraihat injunction, several district courts have entered preliminary injunctions requiring specific ICE facilities within their jurisdictions to evaluate whether high-risk detainees should be released and to comply with ICE's PRR and the CDC Detention Facility Guidelines.  See, e.g., Rodriguez Alcantara v. Archambeault, No. 20-cv-0756 DMS (AHG), 2020 WL 2315777, at *7–10 (S.D. Cal. May 1, 2020); Gayle v. Meade, No. 20-21553-CIV, 2020 WL 2086482, at *7 (S.D. Fla. Apr. 30, 2020); Roman v. Wolf, No. 5:20-cv-00768-TJH (PVCx), 2020 WL 1952656, at *8 (C.D. Cal. Apr. 23, 2020).

One of these facility-specific injunctions requiring the release of detainees has been stayed on appeal.  In Roman, the district court entered an injunction requiring ICE to fully implement CDC Detention Facility Guidelines and to release a certain number of detainees at California's Adelanto Processing Center.  2020 WL 1952656, at *8.  After the government filed an emergency appeal, the Ninth Circuit stayed the district court's order to release detainees but let stand the part of the injunction requiring ICE's "substantial compliance with guidelines issued

by the [CDC] for correctional and detention facilities to follow in managing COVID-19."

Roman v. Wolf, No. 20-55436, 2020 WL 2188048, at *1 (9th Cir. May 5, 2020) (per curiam).[8]

    D.  Plaintiffs' Detention

    The named Plaintiffs are ten transgender women who are detained at five detention

centers that are all managed by private contractors: the Florence Correctional Center

("Florence") and La Palma Correctional Center ("La Palma") in Arizona; the Nevada Southern

Detention Center ("Nevada Southern") in Nevada; the Aurora Detention Center ("Aurora") in

Colorado; and the El Paso Processing Center ("El Paso") in Texas.[9]  Plaintiffs are held pursuant

to various provisions of the Immigration and Nationality Act ("INA"):  Some are mandatorily

detained as required by 8 U.S.C. §§ 1225(b), 1226(c), or 1231(a)(2), while others are detained

pursuant to the Government's exercise of discretion under § 1226(a).  Plaintiffs vary in age from

19- to 37-years-old.  Some Plaintiffs suffer from serious health conditions, including HIV, while

---

   [8]  In analogous litigation involving criminal defendants, other courts of appeals have stayed district court injunctions that required prison administrators to take specific steps to address COVID-19.  In Valentine v. Collier, 956 F.3d 797 (5th Cir. 2020) (per curiam), the Fifth Circuit stayed an injunction granting relief to a class of "disabled and high-risk" inmates held in a "prison for the elderly and infirm" that had experienced an outbreak of COVID-19 and several related deaths, id. at 799, and the Supreme Court denied a motion to vacate that stay (over a statement respecting the denial of an application to vacate the stay from Justices Sotomayor and Ginsburg), No. 19A1034, 2020 WL 2497541 (U.S. May 14, 2020).  Similarly, the Eleventh Circuit stayed a COVID-19-related district court injunction obtained by "medically vulnerable" inmates that required the prison's administrators to "employ numerous safety measures to prevent the spread of COVID-19 and impose[d] extensive reporting requirements."  Swain v. Junior, 958 F.3d 1081, 1085 (11th Cir. 2020).

   [9]  The original complaint named thirteen plaintiffs, but three (R.H., L.R.A.P., and G.P.) have been released since the start of this litigation.  As Plaintiffs' counsel acknowledged at the motion hearing, the release of those plaintiffs moots their claims.  Transcript of Hearing on TRO Mot. ("TRO. Tr.") 3:14–4:4 (May 6, 2020).  Additionally, while M.M.S-M. was at one time held at the Winn Detention Facility in Louisiana, she is now held at Aurora in Colorado.  2d Decl. of Greg Davies ¶ 66, Supp. TRO Opp., Exh. 32.  Accordingly, the conditions at Winn are no longer relevant to this litigation.

others describe themselves as in good health.  The Court will first describe facts that are common

to all five facilities where the Plaintiffs are held before turning to facts specific to the individual

facilities and Plaintiffs.  All five facilities where named Plaintiffs are held (collectively,

"Detention Centers") have ramped up their responses to COVID-19 since the start of this

litigation.  The Court will describe only the current state of affairs at each facility.

1.     *Facts Common to All Five Detention Centers*

The Government has provided the Court with evidence supporting the following facts.

This evidence consists of documents reflecting ICE's guidelines and policies as well as

declarations from ICE officials and personnel with knowledge of the conditions at the relevant

facilities.  These agency declarations carry a presumption of good faith and are thus entitled to a

degree of deference.  See California v. Trump, No. 19-cv-960 (RDM), 2020 WL 1643858, at *11

(D.D.C. Apr. 2, 2020) (applying the "'presumption of good faith' that the courts typically accord

agency declarations and affidavits") (quoting SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200

(D.C. Cir. 1991)); cf. United States v. Armstrong, 517 U.S. 456, 464 (1996) ("[I]n the absence of

clear evidence to the contrary, courts presume that [public officers] have properly discharged

their official duties." (quoting United States v. Chem. Found., Inc., 272 U.S. 1, 14–15 (1926));

U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to

the actions of Government agencies[.]").  While Plaintiffs dispute some of the Government's

assertions, those disputes will be discussed as part of the Court's evaluation of Plaintiffs' claims.

The Court will begin with the Government's account only for the sake of organizational clarity.

The Detention Centers have worked to comply with ICE's PRR and the CDC's Detention

Facility Guidelines.  2d Decl. of Sheri Malakhova ("2d Malakhova Decl.") ¶¶ 9–10, Supp. TRO

Opp., Exh. 10; 2d Decl. of Jason Ciliberti ("2d Ciliberti Decl.") ¶¶ 8–9, Supp. TRO Opp., Exh. 6;

2d Decl. of Matthew Cantrell ("2d Cantrell Decl.") ¶¶ 10, 23, Supp. TRO Opp., Exh. 5; 2d Decl.

of Greg Davies ("2d Davies Decl.") ¶¶ 21–22, Supp. TRO Opp., Exh. 3; 2d Decl. of Juan L.

Acosta ("2d Acosta Decl.") ¶ 38, Supp. TRO Opp., Exh. 1.  All facilities have reduced their

detainee populations to levels significantly below capacity.  Decl. of John Cantú ("Cantú Decl.")

¶ 5, Supp. TRO Opp., Exh. 11; 2d Ciliberti Decl. ¶ 11; 2d Cantrell Decl. ¶ 27; 2d. Davies Decl.

¶ 6; 2d Acosta Decl. ¶¶ 7, 9.  And the Detention Centers try to facilitate social distancing among

the remaining detainees as much as possible.  Cantú Decl. ¶ 8; 2d Ciliberti Decl. ¶¶ 21–22; 2d

Cantrell Decl. ¶¶23–24; 2d Davies Decl. ¶¶ 34–35; 2d Acosta Decl. ¶ 14.  Sleeping

configurations have been modified in order to promote social distancing.  Because Detention

Centers are operating significantly under capacity, beds are now apportioned in a manner that

maximizes space between detainees, such as by assigning one detainee per bunk bed or requiring

them to sleep head-to-foot.  Cantú Decl. ¶ 15; 2d Ciliberti Decl. ¶ 13; 2d Cantrell Decl. ¶ 30; 2d

Davies Decl. ¶ 30; 2d Acosta Decl. ¶ 12.  The Detention Centers have also altered dining

arrangements, by bringing meals to detainees in their units instead of having them congregate at

the cafeteria (so-called "satellite feeding") or by staggering use of the cafeteria so that only one

or two detainees eat at each table.  Cantú Decl. ¶ 8; 2d Ciliberti Decl. ¶¶ 17, 22; 2d Cantrell Decl.

¶ 34; 2d Davies Decl. ¶¶ 41, 50, 59; 2d Acosta Decl. ¶ 54.  Additionally, Detention Centers

display posters throughout the housing units and common areas, in both Spanish and English,

that explain social distancing and proper hygiene.  Cantú Decl. ¶ 21; 2d Ciliberti Decl. ¶ 41; 2d

Cantrell Decl. ¶ 43; 2d Davies Decl. ¶¶ 31, 34; 2d Acosta Decl. ¶ 17.

Further, in line with the requirements of the PRR and the CDC Detention Facility

Guidelines, Detention Centers ensure that detainees have free access to PPE and cleaning

supplies.  Every detainee is given soap, which is replaced according to a set schedule or when a

detainee requests more, and access to bathrooms that are always open.  Cantú Decl. ¶ 20; 2d

Ciliberti Decl. ¶ 37; 2d Cantrell Decl. ¶ 39; 2d Davies Decl. ¶ 31; 2d Acosta Decl. ¶ 30.  Every

detainee also receives a mask, which is replaced according to a set schedule or upon request.

Cantú Decl. ¶ 20; 2d Ciliberti Decl. ¶ 37; 2d Cantrell Decl. ¶ 39; 2d Davies Decl. ¶ 31; 2d Acosta

Decl. ¶ 37.  Staff at Detention Centers are also provided PPE, including masks and gloves, which

they are required to wear when in contact with detainees.  Cantú Decl. ¶ 20; 2d Ciliberti Decl.

¶ 36; 2d Cantrell Decl. ¶ 37; 2d Davies Decl. ¶ 16; 2d Acosta Decl. ¶¶ 44, 57–58.

Detention Centers have also enhanced cleaning practices to combat the virus.  Commonly

used objects, like phones, tablets, dining tables, door handles, and faucets, are cleaned multiple

times a day.  Cantú Decl. ¶ 20; 2d Ciliberti Decl. ¶ 37; 2d Cantrell Decl. ¶ 36; 2d Davies Decl.

¶ 31; 2d Acosta Decl. ¶¶ 33–35.

Detainees are provided continual access to medical care and, if requested, can see a

medical provider within 24 hours of requesting care.  2d Malakhova Decl. ¶ 17; 2d Ciliberti

Decl. ¶ 34; 2d Cantrell Decl. ¶ 20; 2d Davies Decl. ¶ 28; 2d Acosta Decl. ¶¶ 18, 29.  Detainees

who present COVID-19 symptoms are referred to medical care, isolated, and tested.  2d

Malakhova Decl. ¶ 14; 2d Ciliberti Decl. ¶¶ 28–29; 2d Cantrell Decl. ¶¶ 16, 19–20; 2d Davies

Decl. ¶ 24; 2d Acosta Decl. ¶ 27.  If detainees are known to have been exposed to someone with

COVID-19, they are placed in "cohorts" with restricted movement for fourteen days, during

which time they are monitored daily for fever and symptoms of respiratory illness.  2d

Malakhova Decl. ¶ 15; 2d Ciliberti Decl. ¶ 32; 2d Cantrell Decl. ¶ 16; 2d Davies Decl. ¶ 27; 2d

Acosta Decl. ¶ 28.

All staff and vendors are temperature screened before they are allowed to enter the

facilities.  Cantú Decl. ¶ 10; 2d Ciliberti Decl. ¶ 35; 2d Cantrell Decl. ¶ 42; 2d Davies Decl. ¶ 33;

2d Acosta Decl. ¶ 46.  Similarly, upon arrival at any facility, each detainee is screened for the signs and symptoms of COVID-19.  2d Malakhova Decl. ¶ 11; 2d Ciliberti Decl. ¶ 40; 2d Cantrell Decl. ¶¶ 14–15; 2d Davies Decl. ¶ 23; 2d Acosta Decl. ¶ 22.  Further, all new detainees are assigned to a staggered housing location for a fourteen-day medical observation, in order to keep newly admitted detainees from potentially infecting the general population.  2d Malakhova Decl. ¶ 14; 2d Ciliberti Decl. ¶ 40; 2d Cantrell Decl. ¶ 16; 2d Davies Decl. ¶ 25; 2d Acosta Decl. ¶ 25.  After fourteen days, if everyone in that cohort is symptom-free, they can join the general population.

The Court now turns to the conditions at the relevant Detention Centers.

### 2.    *Florence (Arizona) Correctional Center*

Florence currently houses 216 detainees, out of a total capacity of 392 detainees (55% capacity).  Cantú Decl. ¶ 5.  Ten detainees have tested positive for COVID-19.  (The Government has not indicated how many detainees have been tested).  2d Malakhova Decl. ¶ 18.  Additionally, two detainees (including Plaintiff C.G.B.) displayed COVID-19 symptoms, although both tested negative.  Id.  All twelve detainees have recovered and no longer show symptoms of COVID-19.  Id.

The only named Plaintiff held at Florence is C.G.B., a 31-year-old Mexican national detained under 8 U.S.C. § 1226(a), which permits ICE, at its discretion, to detain noncitizens who are awaiting final removal decisions.  Decl. of Kevin Bourne ("Bourne Decl.") ¶¶ 5, 7, 10–11, TRO Opp., Exh. 3.  She came into ICE custody following her arrest in Arizona for identity theft, possession of dangerous drugs, and possession of drug paraphernalia.  Id. ¶¶ 7, 10.[10]  She is

---

[10]  Those criminal charges remain pending.  Bourne Decl. ¶¶ 7, 10.

currently in removal proceedings and is charged with overstaying a visa, in violation of 8 U.S.C.

§ 1227(a)(1)(B).  Id. ¶ 8.  C.G.B. has not been diagnosed with any high-risk medical condition

and does not take any medication.  2d Malakhova Decl. ¶ 19.  ICE therefore determined that she

is not part of the Fraihat class of higher-risk detainees.  Cantú Decl. ¶ 23.

In early April 2020, C.G.B. reported that the man sleeping in the bunk above her began to

display symptoms of COVID-19.  Decl. of C.G.B. ("C.G.B. Decl.") ¶ 7, TRO Mot., Exh. 1.

Several days later, C.G.B. also began to experience COVID-19 symptoms.  She then went to a

medical appointment, where she was given a test for COVID-19.  Id. ¶ 8.  Thereafter, she was

cohorted with other detainees suspected of having COVID-19; however, her test came back

negative.  Id. ¶¶ 9–10.  She has since recovered from whatever illness she may have had and

returned to the general population.  Cantú Decl. ¶ 14.

C.G.B. is housed with 35 other detainees in a unit that has a maximum capacity of 64

detainees (55% capacity).  Id.  Her unit has 32 bunk beds.  Given the reduced number of

detainees in her unit, officers have encouraged detainees to relocate to empty beds to promote

social distancing.  Id. ¶ 15.  Detainees are also encouraged to spread out and eat their meals at

dining tables or benches or in their living quarters.  Id. ¶ 18.

### 3.    La Palma (Arizona) Correctional Center

La Palma has a maximum capacity of 3,240 detainees and is currently at 47% capacity,

housing 1,531 detainees.  2d Ciliberti Decl. ¶ 11.  Of the 66 detainees who have been tested for

COVID-19, 53 have tested positive.   Id. ¶ 35.  Of those 53 detainees, 19 are currently receiving

treatment and 34 have recovered.  Id.  In addition, 13 staff members have tested positive for

COVID-19, of which three have recovered.  Id.  Two named plaintiffs, A.F. and K.R.H., are

housed at La Palma.

a. <u>A.F.</u>

A.F. is a 25-year-old native and citizen of Nicaragua detained at ICE's discretion pursuant to 8 U.S.C. § 1226(a). She is in removal proceedings and is charged as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (being present in the United States without being admitted or paroled) and § 1182(a)(7)(A)(i)(I) (being present in the United States without a valid entry document). Decl. of Javier Lopez ("Lopez Decl.") ¶ 4, TRO Opp., Exh. 9. An immigration judge ("IJ") set bond, but A.F. has not posted it. <u>Id.</u> ¶ 6. A.F. reports that she was born with one kidney and therefore is at a higher risk for kidney failure. Decl. of A.F. ("A.F. Decl.") ¶ 8, TRO Mot., Exh. 2. Although A.F. previously took hormone therapy and has requested to continue that therapy at La Palma, she has not received the medication. <u>Id.</u> ¶ 18. She has not been diagnosed with a CDC-recognized medical condition that would increase her risk to COVID-19. Consequently, ICE concluded that A.F. is not part of the <u>Fraihat</u> class of higher-risk detainees. 2d Ciliberti Decl. ¶ 47.

A.F. sleeps alone in an individual cell, which is in a unit that has 60 two-person cells. <u>Id.</u> ¶¶ 12, 14. In order to encourage social distancing, meals are prepared at a central location and then brought to her housing unit. <u>Id.</u> ¶¶ 17, 22.

b. <u>K.R.H.</u>

K.R.H. is a 27-year-old citizen of Guatemala also detained pursuant to 8 U.S.C. § 1226(a). She is in removal proceedings and is charged as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (being present in the United States without being admitted or paroled). Lopez Decl. ¶ 15. An IJ set bond, which she unsuccessfully appealed to the Board of Immigration Appeals ("BIA"). <u>Id.</u> ¶ 18. She has not posted bond. An IJ has ordered K.R.H. removed to Guatemala and her appeal of that decision is pending. <u>Id.</u> ¶¶ 21–22. She has a history of mild

asthma, as well as tachycardia (rapid heartbeat).  She takes medication for her tachycardia, but no hormone therapy.  Decl. of K.R.H. ("K.R.H. Decl.") ¶ 49, TRO Mot., Exh. 11.  She has not been diagnosed with a CDC-recognized medical condition that would make her more vulnerable to COVID-19.  Id.  Accordingly, ICE concluded that she is not a member of the Fraihat class.  Id. ¶ 47.

K.R.H. is housed in a unit that has 93 detainees and is at 77% capacity.  2d Ciliberti Decl. ¶ 15.  At her request, she shares a cell—which includes two beds, a seating area, a sink, and a toilet—with one other transgender detainee.  Id.  Like A.F., K.R.H. receives her meals in her housing unit.  Id. ¶¶ 17, 22.

    4.    Nevada Southern Detention Center

Nevada Southern houses both ICE civil immigration detainees and U.S. Marshals Service detainees.  There are currently 152 detainees in the 250-detainee facility (61% capacity).  2d Cantrell Decl. ¶ 27.  No ICE detainees have been tested for COVID-19.  Id. ¶ 40.  Two U.S. Marshals Service inmates have been tested; one tested positive and has been placed in isolation, where he is receiving medical treatment.  Id.

Two named plaintiffs, K.M. and K.S., are held at Nevada Southern.  K.M. and K.S. are held in a unit with 48 bunk beds that is currently operating at 39% capacity.  Id. ¶ 31.  They are able to keep six feet apart by sleeping head-to-toe in adjacent beds that are a few feet apart.  Id. ¶ 33.  Meals are delivered to their dormitory, which has 24 tables with four seats each, and detainees are monitored to ensure that they spread out among the tables.  Id. ¶ 34.

    a.    K.M.

K.M. is a 37-year-old citizen of Haiti who is detained pursuant to 8 U.S.C. § 1226(c), which mandates detention for noncitizens convicted of offenses carrying a sentence of a term of

imprisonment of at least one year.  K.M.'s conviction was for battery with use of a deadly weapon.  2d Cantrell Decl. ¶¶ 53–55.  In 2019, an IJ denied K.M.'s application for asylum and ordered her removed to Haiti.  Id. ¶ 56.  Thereafter, the IJ *sua sponte* reconsidered his decision, found her to be not removable, and terminated proceedings.[11]  Id.  The Government's appeal of that decision is pending with the BIA.  Id.  K.M. takes hormone therapy.  Decl. of K.M. ("K.M. Decl.") ¶ 13, TRO Mot., Exh. 6.  She has several medical conditions, including HIV.  2d Cantrell Decl. ¶ 59.  In accordance with Fraihat, ICE medical personnel identified K.M. as being part of the class due to her HIV status.  However, an ERO officer determined that she was not suitable for release.  Id. ¶ 62.

> b.  K.S.

K.S. is a 34-year-old citizen of Jamaica subject to detention under 8 U.S.C. § 1231(a)(2), which requires detention of noncitizens following the completion of removal proceedings.  2d Cantrell Decl. ¶ 53.  A legal permanent resident since 2002, she was placed into removal proceedings in 2013 following a criminal conviction.  Id. ¶ 49.  Thereafter, K.S. failed to appear at a scheduled removal hearing and was ordered removed in absentia.  Id. ¶ 50.  Subsequently, removal proceedings were reopened, but she again failed to appear and therefore was again ordered removed in absentia.  Id.  K.S.'s request to reopen removal proceedings a second time was denied, and the BIA recently dismissed her appeal.  Id.  Consequently, K.S. is now subject

---

[11]  Although the record is not perfectly clear on this point, the Government's declarant states that the IJ "reconsidered his decision finding K.M. removable and terminated proceedings."  2d Cantrell Decl. ¶ 56.  The Court infers that the IJ found K.M. to be "not deportable or inadmissible under immigration laws."  8 C.F.R. § 239.2(a)(2).

to a final order of removal, and ICE is actively working to effect her removal to Jamaica.  Id. ¶ 52.

K.S. too takes hormone therapy, Decl. of K.S. ("K.S. Decl.") ¶ 12, TRO Mot., Exh. 5, and has several medical conditions, including HIV, 2d Cantrell Decl. ¶ 58.  K.S. was determined to be part of the Fraihat class, but an ERO officer determined that she was not suitable for release.  Id. ¶ 61.

5.      *Aurora (Colorado) Detention Center*

Aurora is currently operating at 41% capacity, with 527 detainees held in the 1280-person facility.  2d Davies Decl. ¶ 6.  Of the ten detainees who have been tested for COVID-19, one tested positive and is currently in medical isolation.  Id. ¶ 18.  Additionally, two Denver ICE employees tested positive for COVID-19.  Neither employee had direct contact with detainees, though they interacted with other government employees who did interact with detainees.  Id. Six employees of the private contractor that operates Aurora have tested positive for COVID-19, and the detainees who interacted with those employees were cohorted to prevent spread of the virus.  Id. ¶ 29.

Four named plaintiffs, D.B.M.U., M.J.J., M.M.S-M., and L.M., are detained at Aurora. All but L.M., who is in segregation, are housed in the same unit.  That unit, currently at 33% capacity, has an open sleeping arrangement with twelve bunkbeds that are between four and six feet apart.  Id. ¶¶ 48, 57, 66.  The detainees eat in their dorm.  Id. ¶ 59.

a.   D.B.M.U.

D.B.M.U. is a 19-year-old Honduran native detained at Aurora pursuant to mandatory detention under 8 U.S.C. § 1225(b), which provides for mandatory detention of noncitizens until removal.  Decl. of Greg Davies ("Davies Decl.") ¶¶ 67–68, 70, TRO Opp., Exh. 6.  She is in

removal proceedings and is charged as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) (being present in the United States without a valid entry document).  Id. ¶ 69.  She has been detained at Aurora since March 24, 2020 and has not yet had a bond hearing.  Id. ¶ 68.  She takes gender-affirming hormones but no other medication.  Decl. of D.B.M.U. ("D.B.M.U. Decl.") ¶ 9, TRO Mot., Exh. 10.  She has not been diagnosed with a CDC-recognized underlying medical condition that would increase her risk to COVID-19.  Davies Decl. ¶ 76.  On April 29, 2020, the Government reviewed D.B.M.U.'s custody pursuant to the order in Fraihat and declined to release her.  Id. ¶ 81.[12]

> b.  M.J.J.

M.J.J. is a 21-year-old Honduran native mandatorily detained pursuant to 8 U.S.C. § 1225(b).  She is in removal proceedings and is charged as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) (being present in the United States without a valid entry document).  Davies Decl. ¶¶ ¶ 53.  She has been detained at Aurora since March 2020 and has not yet had a bond hearing.  M.J.J. takes hormone therapy but no other medication.  Decl. of M.J.J. ("M.J.J. Decl.") ¶¶ 8–9, TRO Mot., Exh. 9.  She has not been diagnosed with a CDC-recognized preexisting medical condition that would increase her vulnerability to COVID-19.  Davies Decl. ¶ 60.  On April 29, 2020, ERO reviewed M.J.J.'s custody pursuant to Fraihat and declined to release her.  Id. ¶ 63.

---

[12]  Although the Government's declarant attests that "ERO reviewed D.B.M.U.'s. custody pursuant to Fraihat and declined to release her," Davies Decl. ¶ 81, it is unclear what precisely occurred.  Given that D.B.M.U. does not have a CDC-designated medical condition, id. ¶ 76, it is not apparent why she would have received a full Fraihat evaluation.  The Court infers that D.B.M.U.—and the other similarly healthy named Plaintiffs detained at Aurora—were simply evaluated for inclusion in the Fraihat class.

c. <u>M.M.S-M.</u>

M.M.S-M. is a 22-year-old native and citizen of El Salvador who has been detained at

under 8 U.S.C. § 1226(a) since May 2019.  Davies Decl. ¶¶ 85–86, 88.  She was convicted of

illegal entry in the U.S. District Court for the Southern District of Texas and has been charged by

ICE with being inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) (being present in the United

States without a valid entry document).  <u>Id.</u> ¶ 87.  An IJ denied M.M.S-M.'s request to be

released on bond and subsequently denied her application for relief from removal.  <u>Id.</u> ¶¶ 90–91.

Her appeal of the IJ's determination that she is not entitled to relief is pending before the BIA.

<u>Id.</u> ¶ 91.  She has not been diagnosed with a CDC-recognized underlying medical condition that

would increase her risk to COVID-19.  <u>Id.</u> ¶ 96.  On April 29, 2020, ERO reviewed M.M.S-M.'s

custody pursuant to <u>Fraihat</u> and declined to release her.  <u>Id.</u> ¶ 98.

d. <u>L.M.</u>

L.M. is a 23-year-old citizen of Jamaica detained under mandatory detention pursuant to

8 U.S.C. § 1225(b).  Davies Decl. ¶¶ 33–36.  She is in removal proceedings and is charged as

inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) (being present in the United States without a

valid entry document).  <u>Id.</u> ¶ 35.  She has been detained at Aurora since March 2020 and not yet

had a bond hearing.  <u>Id.</u> ¶¶ 34, 37.  Since April 3, 2020, L.M. has been held in segregation as a

result of ignoring detention officers.  Decl. of L.M. ("L.M. Decl.") ¶ 43, TRO Mot., Exh. 7; 2d

Davies Decl. ¶ 39.  Consequently, she sleeps and eats alone.  <u>Id.</u> ¶¶ 40–41.  She does, however,

continue to have access to shared dayrooms and outside recreation areas.  <u>Id.</u> ¶ 44.  L.M. reports

that her physical health is fine.  L.M. Decl. ¶¶ 13, 25.  She takes hormone replacement therapy

but no other medication.  <u>Id.</u> ¶¶ 15–19.  On April 29, 2020, ERO reviewed L.M.'s custody

pursuant to <u>Fraihat</u> and declined to release her.  Davies Decl. ¶ 47.

6.      *El Paso Processing Center*

As of May 11, 2020, El Paso is operating at 39% of its normal capacity, with 165 detainees in the 840-detainee-capacity facility.  2d Acosta Decl. ¶¶ 7, 9.  Of the 41 detainees who have been tested for COVID-19, ten tested positive, of which nine are currently receiving medical care.  Id. ¶ 62.  One staff member tested positive for COVID-19 but has since recovered and returned to work.  Id.  The 105 detainees who were exposed to other detainees or staff who tested positive for COVID-19 have been placed in cohorts in order to minimize the spread.  Id.

The only named plaintiff held at El Paso is M.R.P., a 22-year-old native of El Salvador detained pursuant to 8 U.S.C. § 1225(b) since June 2019.  Id. ¶¶ 63–64, 73.  She is in removal proceedings and is charged with being inadmissible under U.S.C. § 1182(a)(6)(A)(i) (being present in the United States without being admitted or paroled).  Decl. of Juan Acosta ("Acosta Decl.") ¶ 61, TRO Opp., Exh. 1.  An IJ denied M.R.P. bond, citing flight risk, lack of ties in the United States, and manner of entry.  Id. ¶ 66.  M.R.P. is currently housed in an open-bay dormitory with twelve male detainees.  Her unit ordinarily houses 64 detainees so is at only 19% capacity.  2d Acosta Decl. ¶ 11. Detainees have been assigned to beds that are separated by at least four feet and sleep feet-to-head if assigned to the same bunk.  Id. ¶ 10.  M.R.P. receives her meals at the El Paso dining hall, which has a capacity of 230 and 38 tables that typically seat six people apiece.  Meal times have been staggered to allow for one detainee per table.  Id. ¶ 54.

The only medication that M.R.P. receives is hormone therapy.  Id. ¶ 75.  Although she has abnormal thyroid function, an active Hepatitis A infection, and a high hemoglobin count, she is not currently receiving any medical treatment because she is not symptomatic for thyroid disease and has normal liver enzymes.  Id.  Medical staff at El Paso continue to monitor those

conditions.  Id.  ICE health professionals determined that M.R.P. is not a member of the Fraihat

class.  Id. ¶ 77.

    E.  Procedural Background

On April 23, 2020, Plaintiffs filed suit against Chad Wolf, acting Secretary of the U.S.

Department of Homeland Security ("DHS"), and William Barr, Attorney General of United

States.  Plaintiffs allege that ICE, the DHS component that oversees the civil detention of

immigrants, has violated the Due Process Clause of the Constitution by failing to sufficiently

protect transgender immigrant detainees from COVID-19 and the APA by failing to follow its

internal guidelines.  Simultaneously, Plaintiffs filed a motion for a temporary restraining order

("TRO") compelling ICE to immediately release the named Plaintiffs and all other transgender

detainees in ICE custody; declaring that ICE is violating the Constitution and the APA; directing

Defendants to implement all CDC and World Health Organization (WHO) protocols designed to

combat COVID-19; and prohibiting ICE from placing any additional transgender detainees in

ICE custody until it has implemented sufficient protocols to prevent the transmission of COVID-

19.

On May 5, 2020, Plaintiffs moved to certify a class consisting of all transgender people in

civil immigration detention who are held, or who will be held, in any ICE detention center or

facility across the country during the pendency of the COVID-19 pandemic.  On May 11, 2020,

Plaintiffs moved to join two new named plaintiffs—M.I.M.M., who is housed at the Otay Mesa

Detention Center in San Diego, California, and Y.Z., who is housed at the Imperial Regional

Detention Facility in Calexico, California.

The Court held a telephonic hearing on the motion for temporary restraining order (but

not on the Plaintiffs' motions for class certification or joinder, which had not yet been fully

briefed) on May 6, 2020.  Thereafter, the Court held the hearing record open and requested

additional, more recent evidence.  In response to the Court's order, the parties filed supplemental

declarations under seal.  All three motions are now ripe for resolution.

## II.  Legal Standards

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary

restraining order or a preliminary injunction is very high, and by now very well established."

RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC, 502 F. Supp. 2d 70, 72–73 (D.D.C. 2007)

(quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).  The party seeking a temporary

restraining order bears the burden of making a "clear showing that [she] is entitled to such

relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  To make such a showing,

the party must establish: "(1) that [she] is likely to succeed on the merits, (2) that [she] is likely

to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips

in [her] favor, and (4) that an injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d

388, 392 (D.C. Cir. 2011) (quoting Winter, 555 U.S. at 20).[13]

## III.  Analysis

At the heart of Plaintiffs' suit is their request for the immediate release of all transgender

civil detainees in ICE custody.  According to Plaintiffs, that extraordinary relief is warranted

---

[13] "Before the Supreme Court's decision in Winter, courts weighed these factors on a 'sliding scale,' allowing 'an unusually strong showing on one of the factors' to overcome a weaker showing on another." Damus v. Nielsen, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting Davis v. PBGC, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)).  The D.C. Circuit has since suggested that Winter establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'" Sherley, 644 F.3d at 392–93 (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)).  It is clear, however, that "where the plaintiff can show *neither* harm nor success, no relief is warranted." Damus, 313 F. Supp. 3d at 326 (citing Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016)) (emphasis in original).

because ICE has failed to implement the protective measures in the PRR across all of its detention facilities.  This failure, Plaintiffs maintain, puts transgender detainees at an unacceptably high risk of harm from COVID-19 and, as a consequence, violates both the Fifth Amendment's Due Process Clause and the APA and warrants a writ of mandamus.  Before turning to the merits of injunctive relief for these claims, however, the Court must first address two threshold issues: Plaintiffs' motion for class certification and their motion to join two additional named plaintiffs.  Finding that the current Plaintiffs have not established grounds to certify a class or to add additional parties to the litigation, the Court will limit its consideration of the merits of injunctive relief to the named Plaintiffs.

A.  Class Certification

Plaintiffs move to certify a class of "all transgender people in civil immigration detention who are held, or who will be held, by [ICE] in any U.S. detention center or facility during the pendency of the COVID-19 pandemic."  Class. Cert. Mot. 1.  The proposed class includes at least seventy transgender people being held in civil immigration detention centers across the country.  Lederman Decl. ¶ 20.  The Government opposes class certification on two grounds: *first*, that the Court lacks jurisdiction under the INA to issue the classwide relief sought; and *second*, that the Plaintiffs' proposed class fails to meet the requirements of Federal Rule of Civil Procedure 23.  The Court considers each ground in turn.

*1.     The INA's Jurisdictional Bar to Classwide Relief*

The Government first argues that the Court may not certify the proposed class because the INA prohibits the Court from issuing the classwide injunctive relief sought by Plaintiffs—the wholesale release of all transgender detainees in ICE custody.  It invokes 8 U.S.C. § 1252(f)(1), which provides that "[r]egardless of the nature of the action or claim . . . no court (other than the

Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8

U.S.C. §§ 1221–32], other than with respect to the application of such provisions to an *individual*

alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis

added). The clear import of § 1252(f)(1), the Supreme Court has held, is that district courts are

"prohibit[ed] . . . from granting classwide injunctive relief against the operation of §§ 1221–

1231." Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC"), 525 U.S. 471, 481 (1999).[14]

    As relevant here, Section 1252(f)(1) bars courts from enjoining "the operation of" the

INA's detention provisions on a classwide basis.[15] 8 U.S.C. § 1252(f)(1); see, e.g., Hamama v.

Adducci, 912 F.3d 869, 877 (6th Cir. 2018) (holding that § 1252(f)(1), in light of AADC, 525

U.S. at 481, "unambiguously strips federal courts of jurisdiction to enter class-wide injunctive

relief for . . . detention-based claims").[16] Numerous courts—including ones in this jurisdiction—

---

[14] Relying on Padilla v. ICE, 953 F.3d 1134 (9th Cir. 2020), Plaintiffs argue that
§ 1252(f)(1) does not preclude classwide relief where each member of a proposed class is "an
individual noncitizen against whom removal proceedings have been initiated." Class Cert. Reply
7 (quoting Padilla, 953 F.3d at 1151). The Sixth Circuit has expressly rejected that reading of
the statute, noting that "[t]here is no way to square the concept of a class action lawsuit with the
wording 'individual' in the statute." Hamama v. Adducci, 912 F.3d 869, 877 (6th Cir. 2018).
The Supreme Court has not yet decided the question. See Jennings v. Rodriguez, 138 S. Ct. 830,
875 (2018) (Breyer, J., dissenting) (noting that "the Court in AADC did not consider, and had no
reason to consider, the application of § 1252(f)(1) to . . . a class" where every member is an
"individual alien against whom proceedings under such part have been initiated" (quoting 8
U.S.C. § 1252(f)(1))).

[15] The provisions covered by § 1252(f)(1) include all those under which named Plaintiffs
are being held.

[16] Plaintiffs invoke Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 2404923 (D.
Mass. May 12, 2020), which held that § 1252(f)(1) did not bar classwide injunctive relief that
consisted of "merely taking one facility off the list of possible detention centers while litigation
ensues . . . . absent some showing that the Attorney General cannot arrange for a detainee to be
housed in another appropriate place." Id. at *4. But even if that interpretation of the phrase
"operation of [§§ 1221–31]" in § 1252(f)(1) is supportable, Plaintiffs are seeking far more here

have held, however, that § 1252(f)(1) "prohibits only injunction of 'the operation of' the

detention statutes, not injunction of *a violation of* the statutes." <u>R.I.L-R v. Johnson</u>, 80 F. Supp.

3d 164, 184 (D.D.C. 2015) (quoting <u>Rodriguez v. Hayes</u>, 591 F.3d 1105, 1120 (9th Cir. 2010))

(emphasis added); <u>see also</u> <u>Abdi v. Duke</u>, 280 F. Supp. 3d 373, 409 (W.D.N.Y. 2017), <u>vacated in</u>

<u>part on other grounds sub nom.</u> <u>Abdi v. McAleenan</u>, 405 F. Supp. 3d 467 (W.D.N.Y. 2019)

("Where, as here, the moving party does not seek to enjoin the operation of §§ 1221–1231, and

instead, seeks to enjoin violations of the statutory and regulatory framework, the class-wide

prohibition on injunctive relief is inapplicable."). The underlying logic of such decisions, the

Supreme Court has observed, is that § 1252(f)(1) "d[oes] not affect . . . jurisdiction

over . . . *statutory claims* because those claims d[o] not 'seek to enjoin the operation of the

immigration detention statutes, but to enjoin conduct . . . not authorized *by the statutes*.'"

<u>Jennings</u>, 138 S. Ct. at 851 (quoting <u>Rodriguez</u>, 591 F.3d at 1120) (first emphasis and fifth

alteration in original).[17]

But, "[t]his reasoning does not seem to apply to an order granting relief on *constitutional*

grounds." <u>Jennings</u>, 138 S. Ct. at 851 (emphasis added).[18] That is precisely the type of

---

than an "injunction simply requir[ing] COVID-19 testing and [the] halt[ing] [of] admissions of
new detainees to a particular facility." <u>Id.</u>

[17] The <u>Jennings</u> Court took no position on the soundness of this logic. Subsequently, in
<u>Nielsen v. Preap</u>, 139 S. Ct. 954 (2019) (plurality op.), a plurality of the Court again declined to
decide whether § 1252(f)(1) categorically bars classwide injunctive relief. <u>Id.</u> at 962.

[18] The <u>Jennings</u> Court remanded to the Ninth Circuit to consider "whether it may issue
classwide injunctive relief based on respondents' constitutional claims." 138 S. Ct. at 851. On
remand, the Ninth Circuit remanded to the district court to "decide in the first instance whether
§ 1252(f)(1) precludes classwide injunctive relief, and if so, whether the availability of
declaratory relief only can sustain the class" and "whether a declaration that the detention
statutes are unconstitutional because they contain no process for seeking bail is an injunction or

injunction that Plaintiffs seek here.[19]  Courts are divided on whether § 1252(f)(1) bars classwide

injunctive relief based on constitutional claims.  Compare Hamama, 912 F.3d at 880 n.8

("Absent an explicit holding otherwise, we see no way to interpret [AADC, 525 U.S. at 481,] to

allow injunctive relief on any basis," including "constitutional claims[.]") and Vazquez Perez v.

Decker, No. 18-CV-10683 (AJN), 2019 WL 4784950, at *8 (S.D.N.Y. Sept. 30, 2019) ("This

Court is stripped of its jurisdiction to grant such relief by Section 1252(f)(1) notwithstanding the

argument that classwide relief is needed to address constitutional violations."), with Padilla v.

ICE, 354 F. Supp. 3d 1218, 1231 (W.D. Wash. 2018) (holding that § 1252(f)(1) does not bar "an

injunction against actions and policies that violate those statutes and *associated constitutional

protections*" (emphasis added)) and Saravia v. Sessions, 280 F. Supp. 3d 1168, 1205 n.19 (N.D.

Cal. 2017), aff'd 905 F.3d 1137 (9th Cir. 2018) (holding that § 1252(f)(1) does not bar an

injunction that "neither enjoins nor restrains the *proper* [(*i.e.*, constitutional)] operation of any

part of Part IV of the immigration statutes" (emphasis added)).

   The Court need not decide at this juncture whether § 1252(f)(1) bars it from issuing

classwide injunctive relief based on Plaintiffs' constitutional claims.  As it will explain, the Court

declines to issue temporary injunctive relief—even as to the individual named Plaintiffs—on this

basis.  In any case, even if § 1252(f)(1) precludes classwide *injunctive* relief, it does not bar the

classwide *declaratory* relief also sought by Plaintiffs.  See Compl. ¶¶ 186–89, Prayer for Relief

¶¶ 2, 6–7.  The plain language of § 1252(f)(1) only strips courts of the "jurisdiction or authority

---

restraint on the operation of the detention statutes."  Rodriguez v. Marin, 909 F.3d 252, 256 (9th
Cir. 2018).  The district court has not yet resolved those questions.

[19] Plaintiffs also bring an APA claim, but they are unlikely to succeed on the merits of
that claim, as the Court will explain later.

to *enjoin* or *restrain* the operation of [8 U.S.C. §§ 1221–32]." 8 U.S.C. § 1252(f)(1) (emphasis added). The word "'[e]njoin' . . . refer[s] to permanent injunctions and the word 'restrain' . . . refer[s] to temporary injunctive relief[.]" Arevalo v. Ashcroft, 344 F.3d 1, 7 (1st Cir. 2003); see also Rodriguez, 591 F.3d at 1119 (adopting the same interpretation); Alli v. Decker, 650 F.3d 1007, 1012–14 (3d Cir. 2011) (same). Neither term encompasses declaratory relief.[20] Because the Court retains jurisdiction to issue classwide declaratory relief, § 1252(f)(1) does not provide a standalone basis for denying Plaintiffs' motion for class certification. The Court therefore proceeds to analyzing Plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23.

### 2. *Federal Rule of Civil Procedure 23*

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–01 (1979)). Rule 23(a) establishes four requirements for class certification: (1) numerosity, that "the class is so numerous that joinder of all members is impracticable"; (2) commonality, that "there are questions of law or fact common to the class"; (3) typicality, that "the claims or defenses of the representative parties are typical

---

[20] The Jennings majority suggested—but did not hold—that classwide declaratory relief is available under § 1252(f)(1). See 138 S. Ct. at 851 ("[I]f the Court of Appeals concludes that it may issue only declaratory relief [under § 1252(f)(1)], then the Court of Appeals should decide whether that remedy can sustain the class on its own." (citing Fed. R. Civ. P. 23(b)(2)) (emphasis added)). The Jennings dissent expressly stated, moreover, that "[r]egardless [of § 1252(f)(1)], a court could order declaratory relief." Id. at 875 (Breyer, J., dissenting). Subsequently, the Preap plurality held that § 1252(f)(1) did not deprive courts of "jurisdiction to entertain the plaintiffs' request for declaratory relief." 139 S. Ct. at 962 (plurality op.). There are thus "six Justices of the current Supreme Court now on record stating that section 1252(f) does not bar declaratory relief." Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 1703844, at *5 (D. Mass. Apr. 8, 2020).

of the claims or defenses of the class"; and (4) adequacy, that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  In addition to satisfying Rule 23(a), a putative class must also meet one of the Rule 23(b) requirements.  Here, Plaintiffs seek to certify the class under Rule 23(b)(2) claiming that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"The party seeking certification bears the burden of persuasion, and must show that the putative class[] meet[s] the requirements of Rule 23 by a preponderance of the evidence." Garnett v. Zeilinger, 301 F. Supp. 3d 199, 204 (D.D.C. 2018) (Cooper, J.) (citing Hoyte v. District of Columbia, 325 F.R.D. 485, 491 (D.D.C. 2017) (Cooper, J.)).  To carry that burden, Plaintiffs must "affirmatively demonstrate . . . compliance with the Rule—that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  The Court must undertake a "rigorous analysis" to confirm that the requirements of Rule 23 have been satisfied. Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147, 161 (1982).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  Wal-Mart, 564 U.S. at 351.  Undertaking that analysis, the Court concludes that the proposed class does not meet the requirements of commonality and adequacy and therefore declines to certify it.[21]

---

[21]  Plaintiffs' proposed class of at least seventy detainees likely meets the numerosity requirement.  Lederman Decl. ¶ 20.  In light of its disposition of commonality, the Court need not address typicality.  See Wal-Mart, 564 U.S. at 350 n.5 ("The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the

a.  Commonality

"The crux of this case is commonality—the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'"  Wal-Mart, 564 U.S. at 349 (quoting Fed. R. Civ. P. 23(a)(2)).[22]  Since any question can be crafted "at a sufficiently abstract level of generalization . . . to display commonality," Love v. Johanns, 439 F.3d 723, 729–30 (D.C. Cir. 2006) (quoting Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998)), the key inquiry is whether "a class-wide proceeding [will] generate common *answers* apt to drive the resolution of the litigation," Wal-Mart, 564 U.S. at 350 (emphasis in original) (citation and internal quotation marks omitted).  In other words, each class member's claim "must depend upon a common contention" and that contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.

Here, Plaintiffs advance as their common contention "whether ICE's failure to protect transgender people in detention from the risks of contracting, suffering, and dying from the COVID-19 pandemic in detention renders class members' confinement a punishment that violates their constitutional due process rights."  Class Cert. Mot. 12; see also Class Cert. Reply 4, 9.  The Court agrees with the Government, however, that there are multiple subsidiary issues

_____

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (quoting Falcon, 457 U.S. at 157 n.13)).

[22]  The Court's commonality analysis encompasses both Rule 23(a)(2) and Rule 23(b)(2). See Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 47 n.17 (D.D.C. 2007) ("An inquiry into whether the defendant acted on grounds generally applicable to the 23(b)(2) class is often considered to be encompassed by the commonality requirement of Rule 23(a).").

*necessarily* involved in resolving that overarching contention that render the case incapable of classwide resolution.

As an initial matter, Plaintiffs struggle to crystallize precisely what discrete actions or policies of ICE constitute its purported failure to protect transgender detainees.  They vaguely allege that the failure is ICE's "lack of any policies or practices sufficient to protect transgender persons in detention."  Class Cert. Reply 9.  But that allegation hardly identifies "a *uniform* policy or practice that affects all class members."  DL v. District of Columbia, 713 F.3d 120, 128 (D.C. Cir. 2013) (emphasis added).  It turns instead on ICE's day-to-day operations in each individual detention facility (and for that matter, in each individual unit in which putative class members are housed).  Assessing the sufficiency of those operations requires the Court to evaluate thousands of "individual, discretionary . . . decisions" by various ICE officials, employees, and contractors across the country.  Wal-Mart, 564 U.S. at 352, 358 (declining to permit a class to "sue about literally millions of employment decisions at once").  "Without some glue holding the alleged reasons for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial [common] question[s][.]"  Id. at 351 (emphasis omitted).

This case can therefore be distinguished from Damus v. Nielsen, 313 F. Supp. 3d 317 (D.D.C. 2018), on which Plaintiffs rely.  There, Judge Boasberg certified a class of asylum applicants who had been denied parole based on the common contention that ICE offices were engaged in a "*system* of de facto parole denial" in contravention of ICE's own Parole Directive. Id. at 332–33 (emphasis added).  Here, Plaintiffs have not offered "significant proof" that ICE has a "general policy" of failing to protect transgender detainees from COVID-19.  Wal-Mart, 564 U.S. at 353, 355 (internal quotation marks omitted) (declining to uphold certification of a

nationwide class of employees where they failed to identify "a uniform . . . practice that would provide the commonality needed for a class action").[23]  Nor do they offer "significant proof" that ICE has a "general policy" with respect to transgender detainees that is constitutionally deficient. Plaintiffs invoke ICE's PRR, but they do not challenge the promulgation of the PRR themselves—only ICE's alleged failure (or inability) to implement the PRR in different detention facilities across the country.  See TRO Tr. 49:21–50:5.  But that purported failure does not stem from a "single or uniform policy or practice that bridges all [Plaintiffs'] claims." DL, 713 F.3d at 127.

Even if ICE's failure to protect transgender detainees from COVID-19 could be boiled down to a manageable set of uniform, discrete policies or practices, whether that failure amounts to punishment in violation of the Due Process Clause is not susceptible to a common classwide answer.  To make that determination, the Court must—as it will later explain—determine whether "the challenged governmental action is not rationally related to a legitimate governmental objective or . . . is excessive in relation to that purpose."  Kingsley v. Hendrickson, 135 S. Ct. 2466, 2373–74 (2015) (relying on Bell v. Wolfish, 441 U.S. 520 (1979)).  As the Supreme Court recently reiterated, due process is a "flexible" concept that "calls for such protections as the particular situation demands."  Jennings, 138 S. Ct. at 852 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)); see also Lujan v. G & G Fire Sprinklers, Inc., 532 U.S.

---

[23]  As this Court has previously noted, "[i]n Wal–Mart, the Supreme Court ostensibly heightened the standard for showing that a defendant's custom, policy, or practice caused a class-wide injury from a 'preponderance of the evidence' to 'significant proof.'"  Hoyte, 325 F.R.D. at 492.  "In other words, the movant must do more than merely allege a common contention that conceivably could give rise to the conclusion that there has been the same classwide injury; he must support that allegation with significant evidence." Id. (quoting Parker v. Bank of Am., N.A., 99 F. Supp. 3d 69, 81 (D.D.C. 2015)) (emphasis in original).

189, 196 (2001) (observing that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation" (quoting <u>Cafeteria & Rest. Workers v. McElroy</u>, 367 U.S. 886, 895 (1961)).  Therefore, due process claims may be difficult to resolve through classwide proceedings.  <u>See Jennings</u>, 138 S. Ct. at 852 (remanding to the Ninth Circuit to consider whether plaintiffs' due process claims could be resolved through a Rule 23(b)(2) class action).  That is not to say that all due process claims are fundamentally incompatible with class actions.  <u>See, e.g.</u>, <u>Hoyte</u>, 325 F.R.D. at 492–94 (certifying a class asserting due process claims outside of the immigration detention context).  Given the differences among the putative class members and the nature of their due process claims here, however, the Court cannot find that "a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve [Plaintiffs'] Due Process Clause claims."  <u>Jennings</u>, 138 S. Ct. at 852.

First, as the Government points out, the putative class members differ in age and have varying medical conditions and consequently varying levels of susceptibility to COVID-19. While some putative class members have conditions that the CDC has identified as high-risk, most do not.  <u>See</u> 2d Malakhova Decl. ¶ 19 (C.G.B.); Davies Decl. ¶ 43 (D.B.M.U.), ¶ 60 (L.M.), ¶ 76 (M.J.J.), ¶ 96 (M.M.S-M.); Acosta Decl. ¶ 75 (M.R.P.).  This case therefore can immediately be distinguished from <u>Fraihat</u>, which certified a nationwide class that includes "[a]ll people who are detained in ICE custody who have one of the [CDC-recognized] Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus."  2020 WL 1932570, at *16.  Arguably, the <u>Fraihat</u> plaintiffs at least all share a similar level of medical vulnerability to COVID-19, even if the underlying medical conditions causing

that vulnerability are different.[24]  The same cannot be said of the proposed class here.  Different

risk levels may very well require different precautions.  See, e.g., Money v. Pritzker, No. 20-CV-

2093, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020) (denying a motion to certify a class of

inmates in state custody seeking release during the COVID-19 pandemic in part because "[e]ach

putative class member comes with a unique situation," including "different . . . age, medical

history, places of incarceration, proximity to infected inmates, availability of a home landing

spot, [and] likelihood of transmitting the virus to someone at home detention"); Derron B. v.

Tsoukaris, No. 20-3679, 2020 WL 2079300, at *8 (D.N.J. Apr. 30, 2020) (noting in denying a

TRO to release ICE detainees that "a petitioner's individual circumstances (that is, his or her

medical condition) are critical to the [due process] analysis").

    Plaintiffs' contention that all transgender detainees are inherently more susceptible to

COVID-19 is unsupported by the record.  The CDC has not recognized being transgender as

inherently raising an individual's risk of contracting or of suffering serious complications from

COVID-19.  Lederman Decl. ¶¶ 11, 13; CDC, People Who Are at Higher Risk for Severe Illness

(Apr. 15, 2020).  And Plaintiffs' allegation that transgender people, on average, are more likely

to have the underlying conditions recognized by the CDC as increasing COVID-19 risk—such as

---

[24]  Plaintiffs also invoke Ferreyra v. Decker, No. 20 CIV 3170 (AT), 2020 WL 1989417
(S.D.N.Y. Apr. 27, 2020).  There, Judge Torres declined to sever a joint habeas petition by four
detainees held across three New York facilities.  Id. at *2.  All four petitioners suffered from
"chronic medical conditions" that put them at "imminent risk of serious injury or death if
exposed to COVID-19."  Id. at *1.  Judge Torres therefore noted that "the health risks posed by
COVID-19 and the constitutional claims presented do not turn on facts unique to each Petitioner
*beyond their having preexisting conditions that make them vulnerable to the virus*."  Id. at *2
(emphasis added).  In any case, Judge Torres's decision was made not under Rule 23, but
pursuant to the court's "inherent authority under the All Writs Act to fashion 'expeditious
methods of procedure in a specific case'" under habeas.  Id. (citations omitted) (quoting United
States ex rel. Sero v. Preiser, 506 F.2d 1115, 1125 (2d Cir. 1974)).

HIV, hepatitis, diabetes, hypertension, and obesity—does not entitle *all* transgender detainees, many of whom are young and healthy, to heightened protection from COVID-19.

Even assuming that Plaintiffs have offered competent evidence to support their contention that transgender people are more likely than the general detainee population to have CDC risk factors, the Supreme Court has held that representative evidence is a "permissible method of proving classwide liability" only where "*each* class member could have relied on that sample to establish liability if he or she had brought an individual action." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1046–47 (2016) (emphasis added).  Here, a plaintiff like C.G.B., who attests to having no underlying high-risk health condition, could not rely on evidence that only applies to those plaintiffs who do have high-risk health conditions to establish higher susceptibility to COVID-19 in an individual action.  See In re Asacol Antitrust Litig., 907 F.3d 42, 56 (1st Cir. 2018) (noting "the core principle that class actions are the aggregation of individual claims, and do not create a class entity or re-apportion substantive claims").  At most, such evidence is only relevant to the claims of those who actually have underlying high-risk conditions.  See generally In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 252 (D.C. Cir. 2013) ("[W]e do expect the common evidence to show *all* class members suffered some injury." (emphasis added)).  And, as Dr. Lederman has attested, "the detention status of any individual with co-morbidities or underlying conditions which present risk factors is already being reviewed [under Fraihat]."  Lederman Decl. ¶ 18.

The same problem afflicts Plaintiffs' contentions that transgender people are more vulnerable to COVID-19 because of an increased proclivity to "minority stress," increased risk of contact through assault, increased interactions with medical staff due to the need to administer hormone therapy, and reduced access to healthcare due to an increased incidence of poverty.

Gorton Decl. ¶ 10.  The CDC does not recognize any of these conditions in and of themselves as risk factors for COVID-19.  Lederman Decl. ¶ 10.[25]  Moreover, the Court is hard-pressed to see how these conditions are unique to transgender detainees: for example, a large proportion of civil immigration detainees—many of whom are asylum applicants who fled their home countries because of gang or domestic violence, discrimination, and other severe hardships—are probably prone to "minority stress."  In any case, evidence that minority stress, increased proclivity to assault, administering hormone therapy, or poverty increases susceptibility to COVID-19 only bears on the claims of the plaintiffs who actually exhibit these conditions.  See Tyson Foods, 139 S. Ct. at 1046–47 (approving of reliance on classwide representative evidence only where "*each* class member could have relied on that sample to establish liability if he or she had brought an individual action" (emphasis added)).  The plaintiffs who do not take hormone therapy, for example, cannot rely on evidence that administering the therapy increases vulnerability to COVID-19.  And, the undisputed record shows that none of these factors are common to named Plaintiffs, let alone the entire putative class.  See, e.g., 2d Malakhova Decl. ¶¶ 14–19 (C.G.B. does not take hormone therapy); A.F. Decl. ¶ 18 (same); K.R.H. Decl. ¶ 49 (same); Decl. of M.M.S-M. ("M.M.S-M. Decl.") ¶ 8, TRO Mot., Exh. 3 (one of the three named Plaintiffs who claims to have been assaulted in ICE custody); 3d Decl. of K.R.H. ("3d K.R.H. Decl.") ¶ 15,

---

[25]  Plaintiffs allege that hypercoagulability, the increased tendency for potentially fatal blood clots to form, is a common side effect of the hormone replacement therapy prescribed to transgender women and that hypercoagulability raises the likelihood of serious complications from COVID-19.  Yet, the CDC does not identify hypercoagulability as a risk factor for complications from COVID-19.  CDC, People Who Are at Higher Risk for Severe Illness (Apr. 15, 2020).  Moreover, that proposition is disputed in the record.  Compare 2d Decl. of R. Nick Gorton ¶ 7, TRO Mot., Exh. 6, with 2d Decl. of Captain Edith Lederman ¶ 4, Supp. TRO Opp., Exh. 9.  The Court is not equipped, particularly given the expedited nature of these proceedings, to evaluate the testimony of dueling medical experts at this juncture.

Joinder Mot., Exh. 9 (same); 2d Decl. of K.S. ("2d K.S. Decl.") ¶ 42, TRO Reply, Exh. 2 (same).[26]

Moreover, the putative class members differ along another dimension: they are widely dispersed across the country at various detention centers.  By contrast, except for <u>Fraihat</u>, the classes provisionally certified by courts in other COVID-19 related cases cited by Plaintiffs contain detainees from only one or two local facilities.  <u>See, e.g.</u>, <u>Savino v. Souza</u> ("<u>Savino I</u>"), No. CV 20-10617-WGY, 2020 WL 1703844, at *8 (D. Mass. Apr. 8, 2020) (provisionally certifying a habeas class action of ICE detainees at one detention center); <u>Zepeda Rivas v. Jennings</u>, No. 20-CV-02731-VC, 2020 WL 2059848, at *1 (N.D. Cal. Apr. 29, 2020) (provisionally certifying a habeas class action of ICE detainees at two facilities); Provisional Class Cert. Order, <u>Roman v. Wolf</u>, No. EDCV-20-00768 (TJH) (PVCX) (C.D. Cal. Apr. 23, 2020) (provisionally certifying a habeas class action of ICE detainees at one detention center); <u>Gomes v. DHS</u>, No. 20-CV-453-LM, 2020 WL 2113642, at *2 (D.N.H. May 4, 2020) (provisionally certifying a habeas class action of ICE detainees at one detention center).  In those cases, the common question whether "*facility-wide* failure or inability to facilitate social distancing at [the one facility] violates the[] [plaintiffs'] Fifth Amendment Due Process rights" might be susceptible to a common answer.  <u>Gomes</u>, 2020 WL 2113642, at *2 (emphasis added).  But here, proof that, say, the La Palma Detention Center is inadequately implementing social

---

[26] The Court does not discount transgender detainees' susceptibility to experiencing verbal abuse and even physical assaults by other detainees, which could come at close quarters. But the Court cannot order classwide release of all transgender detainees in ICE custody on this basis alone, particularly where, by the Court's count, only three of the ten named Plaintiffs even allege to have experienced such assaults. M.M.S-M. Decl. ¶ 8; 3d K.R.H. Decl. ¶ 15; 2d K.S. Decl. ¶ 42.  Further, the Court is confident that every Detention Center forbids physical and sexual assault, and Plaintiffs do not challenge ICE's policies concerning the treatment and protection of transgender detainees in general.

distancing measures sheds little light on the situation at Nevada Southern.  See Walsh v. Ford

Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (noting the lack of "strong indications that

major factual issues in each class member's claim in this lawsuit are identical or virtually so"

(internal quotation marks omitted)).  Cf. Lewis v. Casey, 518 U.S. 343, 358 (1996) (holding that

an illiterate prisoner could not bring claims on behalf of a class seeking injunctions "directed at

special services or special facilities required by non-English speakers, prisoners in lockdown, or

the inmate population at large" because those claims were unrelated to the inability to read legal

materials).  Put simply, Plaintiffs' claims are not "susceptible to generalized, class-wide proof."

Tyson Foods, 136 S. Ct. at 1045 (internal quotation marks omitted).

Finally, as the Government points out, whether the Court has jurisdiction to issue the

primary relief sought—an injunction ordering the release of all transgender detainees in ICE

custody—raises thorny, individualized questions that are not common to the class.  "Rule

23(b)(2) applies only when a *single* injunction or declaratory judgment would provide relief to

*each* member of the class."  Wal-Mart, 564 U.S. at 360 (emphasis added); see Fed. R. Civ. P.

23(b)(2) (requiring that "final injunctive relief or corresponding declaratory relief is appropriate

respecting the class *as a whole*" (emphasis added)).  Here, the putative class members are

detained pursuant to different provisions of the INA, including 8 U.S.C. § 1226(c), which

*mandates* detention of noncitizens who have been convicted of certain crimes.  See, e.g. 2d

Cantrell Decl. ¶¶ 53–55 (K.M. held under § 1226(c)).  The Court's jurisdiction to order release

may depend on each noncitizen's posture "within this statutory scheme," which determines

"whether detention is mandatory or discretionary as well as the process available for contesting

his or her detention." Ramirez v. ICE, 338 F. Supp. 3d 1, 45 (D.D.C. 2018).[27]  The Court's

uncertainty about its authority to issue "an *indivisible* injunction benefiting all its members at

once" is another reason to decline class certification.  Wal-Mart, 564 U.S. at 362 (emphasis

added); see also Jennings, 138 S. Ct. at 852 (directing the Court of Appeals to consider on

remand "whether a Rule 23(b)(2) class action continues to be the appropriate vehicle" in light of

its "acknowledge[ment] that some members of the certified class may not be entitled to bond

hearings as a constitutional matter"); Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 499 (7th

Cir. 2012) (holding that Rule 23(b)(2) is not satisfied where "the relief sought would merely

initiate a process through which highly individualized determinations of liability and remedy are

made"); Money, 2020 WL 1820660, at *15 (declining to certify a class of inmates seeking

release during the COVID-19 pandemic in part "because th[e] standards [for release] largely are

governed by the various state statutes authorizing different forms of release, which then are

subject to wide discretion in their application").

     At bottom, to resolve Plaintiffs' due process claims, the Court must look not just "at each

class member and each facility individually" but "at the intersection of both at an individual

level."  Class Cert. Opp. 17.  Plaintiffs have not identified—and the Court is not aware of—any

authority that granted certification of a nationwide class whose members differ both in levels of

medical susceptibility to COVID-19 and conditions of confinement at various facilities.  In other

---

[27]  The Ramirez class sought an injunction ordering ICE to comply with 8 U.S.C.
§ 1232(c)(2)(B) in determining whether to transfer unaccompanied minor noncitizens to adult
detention facilities.  338 F. Supp. 3d at 17.  Judge Contreras held that differences among the
class "in procedural postures and in the authority under which individuals are detained" did not
defeat commonality because the agency's obligation to comply with § 1232(c)(2)(B) "arises
upon their transfer to DHS custody and does not turn on the statutory authority under which a
particular former unaccompanied minor is detained."  Id. at 45–46.  Here, by contrast, an
injunction ordering Plaintiffs' release certainly implicates the INA's detention provisions.

words, "the permutations here are endless" and "rarely, if ever, will any two plaintiffs be alike on the factors that matter at the point of decision." Money, 2020 WL 1820660, at *15.  The putative class therefore fails to meet the commonality prong of Rule 23.

      b.  Adequacy

These differences among the putative class also implicate another prong of Rule 23(a)—adequacy.  The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." Hoyte, 325 F.R.D. at 490 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)) (internal citation omitted).  Adequacy is particularly important for a Rule 23(b)(2) class because members of such a class have "no opportunity . . . to opt out" and no entitlement to "notice of the action." Wal-Mart, 564 U.S. at 362.  Moreover, certification of a 23(b)(2) class precludes individual suits for the same injunctive or declaratory relief. See, e.g., United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1538 (2018) (noting that unnamed class members "may be 'bound by the judgment'" in a class action (quoting Devlin v. Scardelletti, 536 U.S. 1, 7, 9–10 (2002)); McNeil v. Guthrie, 945 F.2d 1163, 1165–66 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action."); Gillespie v. Crawford, 858 F.2d 1101, 1103 (5th Cir. 1988) ("To allow individual suits would interfere with the orderly administration of the class action and risk inconsistent adjudications.").

Here, certification of the proposed nationwide class would bind all transgender detainees to the Court's resolution of issues arising from a rapidly evolving health crisis.  Given the differences among the named plaintiffs and unnamed plaintiffs (and for that matter, among the named plaintiffs themselves) with respect to their conditions of confinement, health conditions, and suitability for parole, certifying such a broad class poses "potential unfairness to the

[unnamed] class members bound by the judgment." <u>Falcon</u>, 457 U.S. at 161.[28]  As the

Government points out, the merits of *all* class members' claims would necessarily be decided

based on the evidence developed by the named plaintiffs, who are housed only at five detention

centers.  Were the Court to certify a class and conclude, based on evidence presented from those

five facilities alone, that ICE's national response to COVID-19 is constitutionally sufficient, that

judgment would bind transgender detainees held across all detention centers, even those who

may potentially be experiencing far worse conditions of confinement or have a higher level of

susceptibility to COVID-19 than the named plaintiffs.  <u>See, e.g.</u>, <u>Duong v. Jennings</u>, No. 20-CV-

02864-RMI, 2020 WL 2524252, at *1 (N.D. Cal. May 18, 2020) (finding two individual

petitioners' habeas petitions to be "duplicative" of a pending class action challenging ICE's

response to COVID-19); <u>Calderon v. Barr</u>, No. 220CV00891KJMGGH, 2020 WL 2394287, at

*5 (E.D. Cal. May 12, 2020), <u>report and recommendation adopted</u>, No. 2:20-CV-00891-KJM-

GGH-P, 2020 WL 2543805 (E.D. Cal. May 19, 2020) (same).  The Court therefore struggles to

see, given the rapidly changing and varied nature of the COVID-19 pandemic and ICE's

response to it, how the named plaintiffs could be said to adequately represent the interests of

unnamed plaintiffs.  <u>See, e.g.</u>, <u>Califano</u>, 442 U.S. at 702 (noting that "nationwide class actions

may have a detrimental effect by foreclosing adjudication by a number of different courts and

judges" and "[i]t often will be preferable to allow several courts to pass on a given class claim in

---

[28]  The risk of potential unfairness is even greater for the putative class members who are
*future* detainees.  <u>See, e.g.</u>, <u>Savino I</u>, 2020 WL 1703844, at *8 (declining to "include possible
future detainees in th[e] class" because "the situation is rapidly evolving and future detainees
may well be subject to different confinement conditions than those now obtaining" and therefore
"it may be that the named representative cannot 'fairly and adequately protect the interests' of
those future detainees" (quoting Fed. R. Civ. P. 23(a)(4))).

order to gain the benefit of adjudication by different courts in different factual contexts");

Shvartsman v. Apfel, 138 F.3d 1196, 1201 (7th Cir. 1998) (upholding the district court's

decision not to certify a nationwide class in part because of "the range in [the agency's conduct]

across different geographic regions").[29]

   B.  Joinder

      Plaintiffs also move to join two new plaintiffs in this suit: M.I.M.M., a transgender

woman detained at the Otay Mesa Detention Center in San Diego, California, and Y.Z., a

transgender woman detained at the Imperial Regional Detention Facility in Calexico, California.

Federal Rule of Civil Procedure 20(a) permits plaintiffs to join in one action if: "(A) they assert

any right to relief jointly, severally, or in the alternative with respect to or arising out of the same

transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or

fact common to all plaintiffs will arise in the action."  Fed. R. Civ. P. 20(a)(1).

      To satisfy the first prong of Rule 20(a)(1)—that claims arise out of the same "transaction,

occurrence, or series of transactions or occurrences"—the movant must show that the claims are

"logically related."  Montgomery v. STG Int'l, Inc., 532 F. Supp. 2d 29, 35 (D.D.C. 2008).

While the logical relationship test is flexible, it requires that the moving party show that there is

"substantial evidentiary overlap in the facts giving rise to" each plaintiffs' claim.  In re EMC

Corp., 677 F.3d 1351, 1358 (Fed. Cir. 2012).  Stated differently, Plaintiffs' claims "must share

---

[29]  The Government also points out that the "one-size-fits-all" nature of the injunction
sought by Plaintiffs presumes that release would be the safest option for all putative class
members.  Class Cert. Opp. 23–24.  Whether that is in fact the case, however, depends on each
individual's access to space, resources, and healthcare outside of detention, as well as her ability
to travel to her host destination and the conditions she will face there.  It thus cannot be said that
"one [plaintiff's] choice has no necessary effect on the care given to another [plaintiff]."  J.D. v.
Azar, 925 F.3d 1291, 1314 (D.C. Cir. 2019).  "The remedy sought by the class" could in fact
have "a deleterious effect on the care received by absent class members."  Id.

an aggregate of operative facts." Id.  The movant, therefore, "cannot join parties 'who simply engaged in similar types of behavior . . . [but are] otherwise unrelated[.]'" Pinson v. DOJ, 74 F. Supp. 3d 283, 289 (D.D.C. 2014) (quoting Spaeth v. Mich. St. Univ. College of Law, 845 F. Supp. 2d 48, 53 (D.D.C. 2012)) (second alteration in original).  To satisfy the second prong of Rule 20(a), the movant need only show that there is "*some* common question of law or fact as to all of the plaintiffs' claims[.]" Disparte v. Corp. Exec. Bd., 223 F.R.D. 7, 11 (D.D.C. 2004) (emphasis added).  It does not require "that *all* legal and factual issues be common to all the plaintiffs." Id. (emphasis added).

For courts applying Rule 20, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).  "But this application, however liberal, is not a license to join unrelated claims and defendants in one lawsuit." McKinney v. Prosecutor's Office, No. 13-2553, 2014 WL 2574414, at *14 (D.N.J. June 4, 2014) (internal quotation marks omitted).  A district court has broad discretion in deciding whether to join a party pursuant to Rule 20.  "Even if the requirements of Rule 20(a) are met, the final decision to sever [or join] claims remains with the court." Pasem v. U.S. Citizenship & Immigration Servs., No. 20-CV-344 (CRC), 2020 WL 2514749, at *4 (D.D.C. May 15, 2020) (Cooper, J.) (quoting Pinson, 74 F. Supp. 3d at 289).

Applying this framework here, the Court concludes that Plaintiffs fail to satisfy the first prong of Rule 20(a).  M.I.M.M.'s and Y.Z.'s claims fail the logical relationship test because there is not "substantial overlap in the facts" giving rise to their claims and the existing plaintiffs' claims. In re EMC Corp., 677 F.3d at 1358.  As discussed above, the merits of each Plaintiffs' Fifth Amendment and APA claims are context-dependent.  By and large, M.I.M.M. and Y.Z.'s

claims require entirely different proof from each other and from the existing plaintiffs: they are held in different detention centers than the existing plaintiffs (and different detention centers than each other), have experienced different treatment during their time in detention, and have different medical histories.  To be sure, both M.I.M.M. and Y.Z. are transgender women detained by ICE, like the named Plaintiffs.  But—for the same reasons the Court explained in connection in connection with the class certification inquiry—that superficial level of similarity does not satisfy Rule 20(a).  See McKinney, 2014 WL 2574414, at *15 ("The courts . . . have frowned on prisoners' attempts to lump together their multifarious grievances about life in a single prison, let alone multiple prisons."); Jones v. Wexford Health Sources, Inc., Civ. A. No. 19-00386, 2019 WL 6080202, *2 (S.D. Ill. Nov. 15, 2019) (severing claims because "actions taken by different officials at different prisons do not constitute the same series of transactions and occurrences"); Kokinda v. Penn. Dep't of Corr., 663 F. App'x 156, 158–59 (3d Cir. 2016) (affirming severance of claims related to the events occurring at different prisons).  Because Plaintiffs fail to satisfy the first prong of Rule 20(a), they may not join M.I.M.M. and Y.Z. in this action.  The Court need not consider the second prong of the rule.

> C.  Motion for Temporary Restraining Order

Having limited the suit to the ten Plaintiffs named in the complaint, the Court now considers the merits of their motion for a temporary restraining order.  The Complaint presents three distinct legal grounds for ordering Plaintiffs' immediate release and the other declaratory and injunctive relief they seek.  Specifically, Plaintiffs allege that ICE's failures to implement adequate COVID-19 prevention measures: (1) violate their due process rights under the Fifth Amendment; (2) are contrary to law under the APA; and (3) warrant a writ of mandamus.

1.    *Due Process Claim*

The thrust of Plaintiffs' due process claim is that ICE has failed to take constitutionally adequate measures to protect transgender detainees from COVID-19, which has resulted in their continued detention under conditions that violate the Due Process Clause.

a.    Likelihood of Success on the Merits

When the Government "takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being[.]" DeShaney v. Winnebago Cnty. Dep't. of Social Serv., 489 U.S. 189, 199–200 (1989).  Confinement of a person in a way that "renders [her] unable to care for [her]self, and at the same time fails to provide for [her] basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety" violates the Eighth Amendment to the Constitution.  Id.  Accordingly, the Eighth Amendment prohibits the Government from "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness." Helling v. McKinney, 509 U.S. 25, 33 (1993).  While civil immigration detainees are protected by the Fifth Amendment's Due Process Clause, these Eighth Amendment protections nevertheless apply to them "because a [civil] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" Jones v. Wolf, No. 20-CV-361, 2020 WL 1643857, at *3 (W.D.N.Y. Apr. 2, 2020) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

To assess whether conditions of confinement violates due process, courts consider whether the conditions "amount to punishment of the detainee." Bell, 441 U.S. at 535.  Because civil immigration detainees, like pretrial criminal detainees, have not been convicted of any present crime, they "may not be subjected to punishment of any description." Hardy v. District

of Columbia, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting Hill v. Nicodemus, 979 F.2d 987,

991 (4th Cir. 1992)).[30]

In determining whether conditions of confinement amount to punishment, "[a] court must

decide whether the disability is imposed for the purpose of punishment or whether it is but an

incident of some other legitimate governmental purpose." Bell, 441 U.S. at 538.  Plaintiffs do

not make "a showing of an expressed intent to punish on the part of detention facility officials."

Id. (internal quotation marks omitted).  The relevant inquiry, then, is whether the Plaintiffs'

confinement conditions are "rationally related to a legitimate nonpunitive governmental purpose

or . . . appear excessive in relation to that purpose." Kingsley, 135 S. Ct. at 2373–74 (quoting

Bell, 441 U.S. at 538).[31]

---

[30]  The Government contends that noncitizen immigration detainees are entitled to lesser
due process protections than citizens.  TRO Opp. 15.  The Court is deeply skeptical of that
contention.  See, e.g., E.D. v. Sharkey, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that a civil
immigration detainee is entitled to the "same due process protections" as a citizen pretrial
detainee); Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person
detained for deportation to be the equivalent of a pretrial detainee; a pretrial detainee's
constitutional claims are considered under the due process clause instead of the Eighth
Amendment.").  For purposes of this analysis, the Court assumes that Plaintiffs are entitled to the
same substantive due process rights as citizens.

[31]  The parties dispute whether the standard for sustaining a conditions-of-confinement
claim under the Fifth Amendment Due Process Clause is the same as the Eighth Amendment
excessive punishment standard.  The Government maintains that Plaintiffs are required to show
that government officials imposed a punitive conditions of confinement with "deliberate
indifference" to the risks posed by such confinement.  Plaintiffs respond that the standard is
purely objective—i.e., they need only show that the conditions of confinement are not reasonably
related to a legitimate governmental objective or is excessive in relation to the legitimate
governmental objective.

In Kingsley, the Supreme Court construed Bell v. Wolfish in determining the standard
that applies to a pre-trial detainee's claim of excessive force.  Although a post-conviction
detainee is required to show deliberate indifference to the force used against her, a pre-
conviction detainee, who may not be constitutionally subjected to punishment before a

The Government plainly has a legitimate interest in the enforcement of immigration laws, which is furthered by detaining certain noncitizens.  See, e.g., Landon v. Plasencia, 459 U.S. 21, 34 (1982) (characterizing "[t]he government's interest in efficient administration of the immigration laws at the border" as "weighty"); Jorge V.S. v. Green, No. 20-3675, 2020 WL 1921936, at *2–4 (D.N.J. Apr. 21, 2020) ("[I]mmigration detention is clearly reasonably related to a legitimate government interest—the Government's interest in securing those subject to removal proceedings pending the conclusion of those proceedings in order to ensure they do not abscond and that they attend those proceedings while also ensuring they are not a danger to the community in the meantime.").  Congress has recognized that the Government's interest in detaining noncitizens who have been convicted of certain crimes or are subject to certain proceedings is so strong that it has made their detention mandatory.  Compare 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), 1226(c)(1) & 1231(a)(2) (mandating detention), with id. § 1226(a) (committing detention or parole determinations to DHS's discretion).

---

conviction, need only show that the force used was objectively unreasonable.  Does Kingsley apply here?  While the D.C. Circuit has not addressed the issue, "many circuit courts have extended Kingsley's objective standard to apply to . . . due process claims by pre-trial detainees." Banks v. Booth, No. CV 20-cv-849 (CKK), 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020); see, e.g., Darnell v. Pineiro, 849 F.3d 17, 35–36 (2d Cir. 2017) (applying Kingsley to a due process challenge to prison conditions for pre-trial detainees); Hardeman v. Curran, 933 F.3d 816, 822–23 (7th Cir. 2019) (applying Kingsley's objective standard to "Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees"); Castro v. County of Los Angeles, 833 F.3d 1060, 1069–70 (9th Cir. 2016) (applying Kingsley to failure- to-protect claims brought by pre-trial detainees).  At least two district courts in this jurisdiction have extended Kingsley to due process claims brought by pre-trial criminal detainees.  See, e.g., Banks, 2020 WL 1914896, at *5–6; United States v. Moore, Case No. 18-cr-198 (JEB), 2019 WL 2569659, at *2 (D.D.C. June 21, 2019).  The Court is persuaded, both by the language of Kingsley and by its fellow courts, to apply the Kingsley standard here as well.  Accordingly, Plaintiffs need not prove deliberate indifference.

Notwithstanding these substantial interests, several courts outside of this jurisdiction have concluded that the continued detention of medically vulnerable civil immigration detainees during the COVID-19 pandemic can constitute a violation of due process if such confinement is excessive in relation to the Government's interests in protecting the community and ensuring noncitizens' future attendance at immigration proceedings.  See, e.g., Favi v. Kolitwenzew, No. 20-CV-2087, 2020 WL 2114566, at *12 (C.D. Ill. May 4, 2020); Pimentel-Estrada v. Barr, No. C20-495 RSM-BAT, 2020 WL 2092430, at *15–16 (W.D. Wash. Apr. 28, 2020); Bent v. Barr, No. 19-CV-06123-DMR, 2020 WL 1812850, at *6 (N.D. Cal. Apr. 9, 2020); Castillo v. Barr, No. 20-CV-00605-TJH (AFMx), 2020 WL 1502864, at *5–6 (C.D. Cal. Mar. 27, 2020); Valenzuela Arias v. Decker, No. 20-CV-2802 (AT), 2020 WL 1847986, at *6 (S.D.N.Y. Apr. 10, 2020).  This Court concurs in that conclusion.

Even Plaintiffs must acknowledge, however, that "the Constitution does not require that detention facilities reduce the risk of harm to zero." Benavides v. Gartland, Civ. A. No. 20-46, 2020 WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020); see also Dawson v. Asher, Civ. A. No. 20-0409, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020).  If it did, then any detention that does not allow detainees to perfectly practice social distancing would be per se unconstitutional. Rather, due process only requires the Government to provide detainees with "reasonable safety," not perfect safety.  DeShaney, 489 U.S. at 200 (emphasis added).  Plaintiffs do not articulate precisely what "reasonable safety" means in the context of detention during a global pandemic. For the most part, Plaintiffs seem to hold the PRR as the constitutional minimum of "reasonable

safety."[32]  By failing to abide by the PRR, Plaintiffs maintain, ICE has violated the due process

rights of all transgender detainees.  Plaintiffs' argument is based on the Accardi doctrine, which,

as the Court will later explain in more detail, "stand[s] for the proposition that agencies may not

violate their own rules and regulations to the prejudice of others."  Battle v. FAA, 393 F.3d 1330,

1336 (D.C. Cir. 2005) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260

(1954)).  But, Accardi "enunciates[s] principles of federal administrative law rather than of

constitutional law."  Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 92 n.8

(1978); see also Vanover v. Hantman, 77 F. 2d 91, 103 (D.D.C. 1999), aff'd, 38 F. App'x 4

(D.C. Cir. 2002) ("Accardi is based on administrative law principles, not constitutional due

process requirements.").  In other words, "a violation under the Accardi doctrine is not always

equivalent to a constitutional violation of due process."  Id.; see also 1 Admin. L. & Prac. § 4:22

(3d ed.) ("[E]ven though some language in Accardi suggests otherwise, an agency's failure to

follow a rule is not a due process violation.").  Therefore, the fact that ICE may not have

implemented a small measure of the PRR does not automatically establish that the Plaintiffs'

*constitutional* rights have been violated.

In any case, the Court will follow the parties' lead and assess the Plaintiffs' due process

claims in relation to the PRR.  The Court is convinced that ICE's capacity reductions and

substantial compliance with the PRR would suffice to provide most people in civil immigration

---

[32]  At the same time, Plaintiffs seem to suggest that more is required of ICE than mere
compliance with the PRR with respect to transgender detainees.  In Plaintiffs' view, ICE's failure
to implement additional, specific protections for transgender detainees violates their due process
rights.  Yet, Plaintiffs do not specify what those measures are.  As the Court explained in
denying class certification, *supra* pp. 35–38, Plaintiffs have not shown that transgender people
are inherently more vulnerable to contracting or suffering serious symptoms of COVID-19.  It is
therefore unlikely that due process requires additional protections for transgender detainees.

detention—certainly young and healthy ones—with at least a reasonable degree of safety.  See

DeShaney, 489 U.S. at 200.  Developed in consultation with the CDC and tailored to the realities

of congregate facilities, the PRR include all of the presently-known best practices for containing

the spread of COVID-19, including that: detainees and staff should wear face coverings and

maintain good hand hygiene; commonly touched surfaces should be cleaned multiple times a

day; incoming detainees and staff should be screened for symptoms of COVID-19; social

distancing should be practiced to the greatest extent possible; and detainees who exhibit

symptoms of COVID-19 should be isolated and given appropriate medical care.  PRR 7–13.

Detention of individuals in facilities abiding by the PRR would not "amount to punishment" in

most cases.  Bell, 441 U.S. at 535.  Rather, detention under such conditions would simply be

incident to the Government's legitimate interest in detaining certain immigrants in connection

with the enforcement of the immigration laws.

In sum, due process requires evaluation of conditions of confinement on a sliding scale.

In the COVID-19 context, the Court must consider, at a minimum, an individual detainee's age

and specific health conditions, the conditions at her detention facility, and the legal basis and

factual circumstances of her detention.  Under this standard, for example, an elderly detainee

who has serious pre-existing health conditions, is held at a facility that is flagrantly disregarding

the PRR, and has not committed a crime that subjects her to mandatory detention has a much

stronger likelihood of establishing a due process violation than a young detainee who is generally

healthy, is held a facility that is largely complying with the PRR, and is subject to mandatory

detention due to commission of a serious criminal offense.  The Court will therefore consider,

facility-by-facility, the due process claims of each named Plaintiff.

*i.*     *Florence*

C.G.B., the only named Plaintiff at Florence, fails to establish a likelihood of success on the merits of her Fifth Amendment claim.  The Government's declarants, who, again, are entitled to a presumption of good faith, see SafeCard Servs., 926 F.2d at 1200; California, 2020 WL 1643858, at *11, attest that Florence is, by and large, implementing the PRR.  See 2d Malakhova Decl. ¶¶ 9–11, 14–17; Cantú Decl. ¶¶ 8, 12, 15, 20.  Given that both the facility as a whole and C.G.B.'s individual unit are at just 55% capacity, the Court credits the Government's evidence that social distancing is feasible and that ICE officials are doing their best to implement it at Florence.  Cantú Decl. ¶¶ 5, 14.  Moreover, the incidence of COVID-19 at the detention center is low and presently controlled:  Of the 216 detainees, just 12 have contracted COVID-19 and all have recovered.  2d Malakhova Decl. ¶ 18.  Further, although C.G.B. is held pursuant at DHS's discretion under 8 U.S.C. § 1226(a), she has not shown that she is particularly vulnerable to COVID-19, given that she is young and does not have any serious underlying health conditions.  Indeed, pursuant to Fraihat, ICE evaluated C.G.B. and determined that she does not qualify for the class of high-risk detainees in that case.  Cantú Decl. ¶ 23.

That is not to diminish the gravity of certain aspects of C.G.B.'s allegations.  To recap, she contends that on April 2, 2020, the person sleeping above her started experiencing COVID-19-like symptoms.  C.G.B. Decl. ¶ 7.  Her bunkmate, who had not initially been informed about how to request medical care, eventually requested a medical appointment with the help of fellow detainees and received care on April 7.  Id.  At that point, according to C.G.B., her bunkmate met with a doctor, who then sent him back to general population, where he continued to cough for days.  On April 9, C.G.B. developed what she perceived to be symptoms of COVID-19, including a fever, vomiting, and pain in her throat and head.  Id. ¶ 8.  That day, C.G.B. was seen

by a nurse, tested for COVID-19, and then placed in a cohort with other people showing symptoms of COVID-19.  Id. ¶ 9.  On April 29, C.G.B.'s cohort was placed back in the general population—but without first receiving renewed testing.  2d Decl. of C.G.B. ("2d C.G.B. Decl.") ¶ 5, TRO Reply, Exh. 1.

These experiences, which reflect several violations of the PRR, are concerning, but nevertheless are unlikely to establish unconstitutional conditions of confinement.  First, two of the most serious alleged lapses—the delay in treating and testing C.G.B.'s bunkmate and the failure to isolate him—occurred in early April, before the PRR were issued and implemented. Based on the Government's more recent declarations, and the demonstrated containment of COVID-19 at Florence, the Court is persuaded that the officials at Florence have likely remedied these shortcomings.  That explanation cannot, however, account for ICE's alleged failure on April 29 to test those in the suspected COVID-19 cohort before returning them to the general population.  The PRR plainly require facilities to isolate suspected COVID-19 cases.  Florence officials may well have violated that requirement if some members of the suspected COVID-19 cohort had active infections but were allowed to return to the general population without a confirming test.  That singular allegation, however, is insufficient to establish a likelihood of succeeding on the merits given C.G.B.'s generally good health and the Government's declarations detailing ICE's sustained efforts to comply with the PRR, both generally and at Florence.[33]

---

[33]  Plaintiffs urge the Court to disregard the Government's declarations as inadmissible because the declarants purportedly lack factual bases for their testimony regarding the conditions at each facility.  For example, Plaintiffs challenge the competency of Dr. Malakhova's declaration because her testimony is based in part on her review of records and policies rather than on-the-ground, first-hand observations of the facilities.  The Court will consider the

ii.      *La Palma*

The Court next considers the due process claims of A.F. and K.R.H., the two detainees at

La Palma.  Here too, the record is replete with evidence, in the form of declarations from ICE

officials, describing La Palma officials' diligent efforts to implement the PRR.  See 2d Ciliberti

Decl. ¶¶ 11–22, 32, 34, 37.  La Palma is operating at just 47% capacity.  Id. ¶ 11.  While 53

detainees have tested positive for COVID-19, that figure represents just 3.5% of the 1,531

detainees there.  Id. ¶¶ 11, 35.  The majority of those detainees—some 34 people—have

recovered, while another 19 are receiving treatment.  Id.

Against that backdrop, A.F. is unlikely to establish that the conditions of her confinement

at La Palma amount to punishment.  To be sure, A.F.'s declaration from April 21, 2020 identifies

a number of deficiencies in La Palma's implementation of the PRR, including that she was still

eating meals in group of 100 people in the cafeteria, was not given information about COVID-

19, had to wait a week after developing flu-like symptoms to get tested, and was not given free

access to soap.  A.F. Decl. ¶¶ 9, 12, 15–16, 19.  However, the Court credits the more recent

agency declaration proffered by the Government, which attests that A.F. now receives her meals

in her unit, is given relevant information about how to protect herself from COVID-19, has

timely access to medical care, and has free access to soap in the form of an all-in-one, body

wash-shampoo product.  2d Ciliberti Decl. ¶¶ 17, 22, 37, 41.  Moreover, it is undisputed that

---

declarations.  Declarants need not limit their testimony to topics within their direct observation;
they are generally permitted to rely on knowledge gained from their own review of documents.
See generally United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002) (holding that
testimony from agents as to "relevant, readily-understandable INS procedures or operations of
which they had firsthand knowledge" was admissible).  Any gaps in the witness' direct personal
observation, which the Court has considered, go to the weight of their declarations, not their
admissibility.

A.F. sleeps alone in a single cell, which further reduces her risk of exposure.  Id. ¶¶ 12, 14.  A.F.

is held at DHS's discretion under 8 U.S.C. § 1226(a).  Lopez Decl. ¶ 4.  As for health conditions,

A.F. asserts that she was born with a single kidney, although she has not offered evidence to that

effect.  Assuming that is true, however, she is nevertheless not entitled to release as she has not

presented evidence that lack of a kidney is linked to COVID-19 vulnerability (apart, perhaps,

from having to use a communal restroom more frequently) and the condition is not a CDC-

identified risk factor.  She is also young and otherwise healthy.  2d Ciliberti Decl. ¶ 46.  For

those reasons, ICE has determined that she is not part of the Fraihat high-risk class.  Id. ¶ 47.

Accordingly, the Court concludes that based on this record, A.F. has failed to establish a

likelihood of success on the merits.

By contrast, K.R.H., who is housed in a different unit in La Palma than A.F., has

established a likelihood of success on the merits based on the present record before the Court.

Although La Palma overall is operating at 47% overall capacity, K.R.H.'s unit is at 77%—

slightly above the PRR's recommendation of 75%.  Id.  ¶ 15.  Further, unlike A.F., K.R.H. shares

her cell with another transgender detainee.  Id.  Significantly, K.R.H. disputes the Government's

assertions regarding social distancing.  She attests that because everyone in her unit eats at the

same time, she sits at a table with five to eight other people, "with everyone shoulder-to-

shoulder."  3d K.R.H. Decl. ¶ 10.  Along those same lines, she says that anytime she waits in

line, as she does to use the telephone or to receive food, she is forced to stand within six feet of

other detainees.  Id. ¶ 11.  While the Constitution does not demand perfect adherence to the six-

feet rule, K.R.H.'s experiences are concerning, particularly because the overall facility is

operating at 47% capacity.  Based on that figure, the Court infers that it would be possible to

further disperse the detainees in a way that would better enable social distancing, particularly at

meal times.  Indeed, the PRR suggest that detention centers stagger meal times in order to

prevent the exact problem described by K.R.H.  Although these discrepancies may not have been

insufficient for a perfectly healthy detainee, K.R.H. suffers from mild asthma and tachycardia, a

heart condition.  Further strengthening her case, she is detained at DHS's discretion pursuant to 8

U.S.C. § 1226(a).  In light of all of these factors, and while the question is a close one, the Court

concludes on the present record that K.R.H. is likely to establish success on her Fifth

Amendment claim.

*iii.*  *Nevada Southern*

Turning to Nevada Southern, where K.S. and K.M. are detained, the Court finds that both

detainees have established a likelihood of success on the merits of their due process claims.  On

the one hand, the Court notes that both K.M. and K.S. are subject to mandatory detention.

Further, there is considerable evidence from the Government that Nevada Southern is attempting

to implement and comply with the PRR.  Of note, the unit where both plaintiffs are housed is

operating at around 39% capacity and each detainee sleeps alone on a two-person bunk bed,

which K.M. and K.S. corroborate.  3d Decl. of K.M. ("3d K.M. Decl.") ¶¶ 6, 9, Joinder Mot.,

Exh. 6; 3d Decl. of K.S. ("3d K.S. Decl.") ¶ 9, Joinder Mot., Exh. 4.  On the other hand, K.M.

and K.S. are HIV positive and allege that they do not receive their antiretrovirals at the same

time each day, which reduces the efficacy of those medications, making it more likely that their

HIV infections become uncontrolled and therefore experience severe consequences from

COVID-19.  K.M. Decl. ¶¶ 10, 14; K.S. Decl. ¶¶ 9, 13.  Further, although the Court finds the

Government's declarants generally credible, K.M. and K.S. have submitted consistent

declarations that contradict the Government's account of the conditions at Nevada Southern.

Namely, they attest that the detainees continue to eat their meals all together, sitting one foot

56

away from other detainees, 3d K.M. Decl. ¶ 18; 3d K.S. Decl. ¶ 16; that all detainees line up for

meals with just one foot of space between each person, 3d K.M. Decl. ¶ 24; 3d K.S. Decl. ¶ 26;

that the bathroom is shared by some 40 people, but is cleaned just once per day, 3d K.M. Decl.

¶ 19; 3d K.S. Decl. ¶ 18; that the detainees share a single water foundation, which is cleaned

infrequently, 3d K.M. Decl. ¶ 23; 3d K.S. Decl. ¶ 23; and that it takes two to three weeks to

receive medical care, 3d K.M. Decl. ¶ 26; 3d K.S. Decl. ¶ 28.  Further, the agency declarant

admits that not a single detainee at Nevada Southern has been tested for COVID-19.  2d Cantrell

Decl. ¶ 40.  While the lack of testing could indicate that no detainees have displayed symptoms

and the facility is relatively free of the virus, it could just as easily confirm K.M. and K.S.'s

allegation that medical care at Nevada Southern is unduly delayed.  Although the issue is close

and may well come out differently with the benefit of additional evidence, given K.M. and K.S.'s

HIV-positive status, the Court concludes that they have established a likelihood of success on the

merits of their due process claims.

<em>iv. Aurora</em>

The Court next considers the four detainees housed at Aurora—D.B.M.U., M.J.J.,

M.M.S-M., and L.M.  None have established a likelihood of success on the merits of their due

process claims.  To start, Aurora is currently operating far below its total capacity, at 41%.  2d

Davies Decl. ¶ 6.  Of the ten detainees who have been tested for COVID-19, only one has tested

positive and is currently in medical isolation.  Id. ¶ 18.  This suggests that the facility has been

successful in curbing the spread of the disease.  Further, none of the named plaintiffs at Aurora

allege that they have high-risk factors, and two plaintiffs, M.J.J. and D.B.M.U., are subject to

mandatory detention under 8 U.S.C. § 1225(b).  Most significantly, the agency's attestations that

the facility is ardently working to implement the PRR are largely corroborated by Plaintiffs'

most recent declarations. Specifically, D.B.M.U., M.J.J., and M.M.S-M. all live in the same unit, which is at only 33% capacity. 2d Davies Decl. ¶¶ 48, 57, 66. ICE's declarant attests—and Plaintiffs corroborate—that "[i]t is easy [for detainees] to wash [their] hands" and they each "get a small bar of soap every day." 3d Decl. of D.B.M.U. ¶ 10, Joinder Mot., Exh. 8. Further, when the Plaintiffs go to the yard, they "maintain a distance in the hall." Id. ¶ 21. And the detainees "clean the water fountains four times per day." 3d Decl. of M.J.J. ¶ 22, Joinder Mot., Exh. 7. These plaintiffs' declarations largely confirm the Government's account of the conditions at Aurora. Although there are a few aberrations, such as M.J.J.'s contention that the detainees are forced to eat one foot away from each other, those allegations do not rise to the level of unconstitutional conditions of confinement in light of D.B.M.U.'s, M.J.J.'s, and M.M.S-M.'s generally good health and Aurora's substantial compliance with the PRR.

L.M., who has been held in segregation as a result of ignoring detention officers since April 3, 2020, also does not establish a likelihood of success on the merits of her due process claim. She sleeps alone, eats alone, reports that her physical health is fine, and is subject to mandatory detention. 2d Davies Decl. ¶ 44; L.M. Decl. ¶¶ 13, 25, 47, 49.

### v.  El Paso

Lastly, M.R.P., the only detainee housed at El Paso, also fails to establish a likelihood of success on the merits of her due process claim. As of May 11, 2020, El Paso is operating at 39% capacity, and M.R.P.'s unit is at just 19% capacity. 2d Acosta Decl. ¶¶ 7, 9, 11. Of the 41 detainees who have been tested for COVID-19, ten tested positive, of which nine are currently receiving medical care. Id. ¶ 62. Considerable evidence shows that ICE is complying with PRR. To start, M.R.P.'s April 16, 2020 declaration supports the agency declarants' attestations as to the preventative measures taken at El Paso. M.R.P. acknowledges that information about

COVID-19 is distributed to detainees, the dining hall is cleaned, guards wear gloves and face

masks, detainees are given soap, and new entrants are quarantined for fourteen days.  Decl. of

M.R.P. ("M.R.P. Decl.") ¶¶ 22–23, 28–31, TRO Mot., Exh. 13.  While M.R.P. also states that the

bathrooms are cleaned only once a day, that detainees are not given masks, and that social

distancing while sleeping is impossible, id. ¶¶ 27, 30, 37, the Court credits the agency's more

recent and fulsome declarations, which indicate that commonly touched surfaces (including

bathrooms) are cleaned multiple times a day, surgical masks were given to detainees on April 17

(and are replaced on a weekly basis), and that M.R.P. is able to sleep six feet away from others at

night because no one else is assigned to her bunk or to the adjacent bunk given the unit's low

capacity level, 2d Acosta Decl. ¶¶ 12, 35–37.  Although M.R.P. does have several health

conditions, including Hepatitis A, the record indicates that her conditions are well controlled and

the medical staff at El Paso are continuing to monitor them.  Id. ¶ 75.  Given that she is subject to

mandatory detention and that El Paso appears to be substantially complying with the PRR,

M.R.P. fails to establish a likelihood of success on the merits of her due process claim.

> b.  Irreparable Injury

Next, the Court considers whether Plaintiffs have made a showing of irreparable harm.  It

is well established that the deprivation of constitutional rights "unquestionably constitutes

irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976).  Thus, those Plaintiffs who have

shown a likelihood of success on their Fifth Amendment claims—K.R.H., K.M., and K.S.—have

also established irreparable harm.  See Archdiocese of Wash. v. Wash. Metro. Area Transit

Auth., 897 F.3d 314, 334 (D.C. Cir. 2018), cert. denied, 140 S. Ct. 1198 (2020).  Conversely, the

remaining Plaintiffs who have failed to establish a likelihood of success on the merits of their

Fifth Amendment claims—C.G.B., A.F., D.B.M.U., M.J.J., M.M.S-M., L.M., M.R.P.—also fail to establish irreparable injury.

The Government contends that K.R.H., K.M. and K.S. have not established irreparable harm because they have not shown that they are imminently at risk of contracting COVID-19. This argument in unavailing.  "It would be odd to deny an injunction to [detainees] who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  Helling, 509 U.S. at 33.  As many courts have recognized, the "risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm."  Banks v. Booth, No. 20-CV-849(CKK), 2020 WL 1914896, at *11 (D.D.C. Apr. 19, 2020); see also Swain v. Junior, No. 1:20-CV-21457-KMW, 2020 WL 2078580, at *18 (S.D. Fla. Apr. 29, 2020); Barbecho v. Decker, No. 20-CV-2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020); Malam v. Adducci, No. 20-CV-10829, 2020 WL 1672662, at *7 (E.D. Mich. Apr. 5, 2020).  Said otherwise, "a remedy for unsafe conditions need not await a tragic event."  Helling, 509 U.S. at 33.  Accordingly, the Court finds that K.R.H., K.M., and K.S. have established irreparable injury.

c.   Balance of Equities & Public Interest

Finally, Plaintiffs must show that the balance of equities tips in their favor and that an injunction would serve the public interest.  Where the Government is a party, these two factors merge.  See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).  It is well established that the Government "cannot suffer harm from an injunction that merely ends an unlawful practice."  Open Cmties. Alliance v. Carson, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)).  Nevertheless, "where the Court has a less intrusive means" of ensuring legal compliance, "the public interest would weigh

towards choosing such options, especially where . . . the plaintiffs seek a mandatory ('do this') rather than prohibitory ('don't do this') injunction." Garnett, 313 F. Supp. 3d at 160; see also Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, *especially a mandatory one*, should be sparingly exercised." (emphasis added) (internal quotation marks omitted)).

Judicial restraint is particularly warranted here, given that Plaintiffs challenge ICE's operation of its detention facilities. As the Supreme Court has explained in the criminal detention context, because "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources," administration of such facilities is "a task that has been committed to the responsibility of [the executive and legislative] branches, and separation of powers concerns counsel a policy of judicial restraint." Turner v. Safley, 482 U.S. 78, 84–85 (1987). Although Plaintiffs are held in civil immigration detention centers, not prisons, the same concerns regarding institutional competence and the separation of powers apply here. Indeed, these concerns apply all the more here given that ICE must address the impact of a novel pandemic affecting the entire nation and must do so across the entire civil immigration detention system. See Lopez-Marroquin v. Barr, 955 F.3d 759, 762 (9th Cir. 2020) (Callahan, J., dissenting) (calling for judicial restraint in a case involving the COVID-19 pandemic because judges "are not epidemiologists and have no expertise managing either pandemics or detention facilities").

Moreover, the primary remedy that Plaintiffs seek—their immediate release from ICE custody—is the most intrusive measure possible and Plaintiffs have failed to show that such incursion is necessary to redress the complained-of violations. In analogous cases concerning unconstitutional confinement, the D.C. Circuit has held that "once a right [under the Eighth

Amendment] is established, the remedy chosen must be tailored to fit the violation." Women

Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910, 928 (D.C. Cir. 1996)

(quoting Inmates of Occoquan v. Barry, 844 F.2d 828, 836 (D.C. Cir. 1988)) (alteration in

original). In accord with that reasoning, numerous district courts considering similar claims

presented by detainees have concluded that immediate release would be an inappropriately

sweeping remedy. See Urdaneta v. Keeton, No. CV-20-00654-PHX-SPL (JFM), 2020 WL

2319980, at *12 (D. Ariz. May 11, 2020) (With regard to detainees held at La Palma, "the Court

is unable to conclude that there is no set of conditions short of release that would be sufficient to

protect Petitioner's constitutional rights."); Jones, 2020 WL 1643857, at *1 (holding that

"[i]mmediate release . . . is not the appropriate remedy—at least at this juncture" with respect to

detainees held at a New York ICE facility); cf. Money, 2020 WL 1820660, at *14 (noting in the

prison context that "the public interest—which must be taken into account when considering a

TRO or preliminary injunction—mandates individualized consideration of any inmate's

suitability for release and on what conditions, for the safety of the inmate, the inmate's family,

and the public at large"). Indeed, in the prison context, the Supreme Court has admonished

courts against becoming "enmeshed in the minutiae of prison operations," Bell, 441 U.S. at 562,

and has counseled them to instead exercise discretion "by giving prison officials time to rectify

the situation before issuing an injunction," Farmer v. Brennan, 511 U.S. 825, 847 (1994); see

also Brown v. Plata, 563 U.S. 493, 501 (2011) (noting that ordering "the release of prisoners in

large numbers . . . is a matter of undoubted, grave concern").

        The Court pauses here to consider if it would even have jurisdiction to order Plaintiffs'

release, particularly those that have applied for and been denied parole. Under the INA, DHS

may parole noncitizens "on a case-by-case basis for urgent humanitarian reasons or significant

public benefit," including "to meet a medical emergency."  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R.

§ 235.3(b)(2)(iii).  But, as the Government notes, the INA expressly commits such parole

determinations to the "discretion" of the agency.  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R.

§ 235.3(b)(2)(iii).  The INA strips courts of jurisdiction to review or set aside these discretionary

determinations.  With respect to noncitizens detained prior to issuance of a final removal order,

§ 1226(e) expressly provides that "[n]o court may set aside any action or decision by the

Attorney General under this section regarding the detention or release of any alien or the grant,

revocation, or denial of bond or parole."  8 U.S.C. § 1226(e).  With respect to noncitizens

detained subject to a final removal order, a catchall provision in § 1252 provides that "no court

shall have jurisdiction to review . . . any other decision or action of the Attorney General or the

Secretary of Homeland Security the authority for which is specified under this subchapter to be

in the discretion of the Attorney General or the Secretary of Homeland Security."  Id.

§ 1252(a)(2)(B)(ii).[34]

     The scope of these jurisdictional bars is hotly contested.  What is uncontroverted, the

Supreme Court has observed, is that § 1226(e) precludes a noncitizen from "challenging a

'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has

made regarding his detention or release."  Demore v. Kim, 538 U.S. 510, 516 (2003); see also

R.I.L-R, 80 F. Supp. 3d at 176 (noting that § 1226(e) "clearly bar[s] [courts] from reviewing the

Executive Branch's exercise of discretion in determinations made under § 1226(a)").

---

[34]  A third provision in the INA provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).  The Government does not invoke this provision.

Unreviewable discretionary decisions undoubtedly include "the [parole] determinations *themselves—i.e.*, the actual balancing of the merits of each application for parole." Damus, 313 F. Supp. 3d at 327 (emphasis in original); Abdi, 280 F. Supp. 3d at 385 ("[A]sking this Court to interfere with the ultimate decision regarding parole . . . would plainly fall outside this Court's jurisdiction pursuant to § 1252(a)(2)(B)(ii).").

That said, the Supreme Court has recognized that the INA does not preclude judicial review of all claims related to detention or parole. In Kim, the Court held that § 1226(e) does not preclude "challenges [to] the statutory framework that permits [a noncitizen's] detention without bail." 538 U.S. at 517. And, in Zadvydas v. Davis, 533 U.S. 678 (2001), the Court held that § 1252(a)(2)(B)(ii) does not bar judicial review of a "challenge [to] the extent of the Attorney General's authority under the post-removal-period detention statute." Id. at 688. In both Kim and Zadvydas, however, the Supreme Court emphasized that "[t]he extent of th[e] [agency's] authority" under the statute "is not a matter of discretion." Id.; Kim, 538 U.S. at 516 ("[R]espondent does not challenge a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release."). The Court could therefore review such structural challenges without running afoul of the INA's bars to judicial review of the agency's discretionary determinations.

Here, however, Plaintiffs are not making a structural argument that ICE is without authority to detain noncitizens during a global pandemic. Although Plaintiffs try to fit their claim into the mold of a "challenge [to] an overarching agency action as unlawful," TRO Reply 18 (quoting Make the Rd. N.Y. v. McAleenan, 405 F. Supp. 3d 1, 32 (D.D.C. 2019)), their real challenge is to the particular conditions of their confinement. Resolving such a challenge, as this Court has explained, requires a fact-specific assessment of the circumstances of each individual's

confinement rather than the pure statutory interpretation inquiry undertaken in <u>Kim</u> and

<u>Zadvydas</u>.  <u>See</u> <u>Kim</u>, 538 U.S. at 517 (noting that "[s]ection 1226(e) . . . deals with challenges to

operational decisions, rather than to the legislation establishing the framework for those

decisions" (quoting <u>Parra v. Perryman</u>, 172 F.3d 954, 957 (7th Cir. 1999))).  <u>But see</u> <u>Singh v.</u>

<u>Holder</u>, 638 F.3d 1196, 1202 (9th Cir. 2011) ("Like § 1226(e), § 1252(a)(2)(B)(ii) . . . does not

limit habeas jurisdiction over questions of law, including application of law to undisputed facts,

sometimes referred to as mixed questions of law and fact." (internal quotation marks and

citations omitted)).[35]

Courts appear divided on whether the INA's jurisdictional bars preclude them from

ordering ICE to release noncitizens who have been denied parole based on a conditions-of-

confinement claim.  In the habeas context, some courts have concluded that they maintain

jurisdiction to order release based on such a constitutional challenge.  <u>See, e.g.</u>, <u>Jeferson V.G. v.</u>

<u>Decker</u>, No. CV 20-3644 (KM), 2020 WL 1873018, at *4–5 (D.N.J. Apr. 15, 2020) (exercising

jurisdiction over plaintiff's claim that his detention in an ICE facility during the COVID-19

pandemic imposed "conditions of confinement which amount to punishment under the Due

Process Clause"); <u>Sallaj v. ICE</u>, No. CV 20-167-JJM-LDA, 2020 WL 1975819, at *2 (D.R.I.

Apr. 24, 2020) ("[A]lthough the INA limits the jurisdiction of district courts in removal

proceedings, a district court may review a question that is independent of removal or 'cannot

---

[35]  In <u>Guerrero-Lasprilla v. Barr,</u> 140 S. Ct. 1062 (2020), the Supreme Court held that the
statutory phrase "questions of law" in § 1252(a)(2)(D) encompasses "the application of a legal
standard to undisputed or established facts."  <u>Id.</u> at 1067.  But neither § 1226(e) nor
§ 1252(a)(2)(B)(ii) expressly preserve judicial review for "questions of law."  Nor is there any
contention here that resolution of Plaintiffs' claims would only involve the application of law to
undisputed or established facts.

effectively be handled through the available administrative process,' including a constitutional

challenge." (quoting <u>Aguilar v. ICE</u>, 510 F.3d 1, 11 (1st Cir. 2007))).[36]  Some courts have come

out the other way.  <u>See, e.g.</u>, <u>Jose D.M. v. Barr</u>, No. CV 20-4031 (KM), 2020 WL 1969893, at

*3–4 (D.N.J. Apr. 24, 2020) (construing petitioner's claim that "his continued detention [in ICE

during the COVID-19 pandemic] violates his due process rights" as one "directly challenging the

decision to deny his request for parole, which th[e] Court is not authorized to review"); <u>Emerson</u>

<u>O.C.-S. v. Anderson</u>, No. CV 20-3774 (JMV), 2020 WL 1933992, at *7 (D.N.J. Apr. 22, 2020)

("Assuming Petitioner is referencing the IJ's last decision denying a change to his custody status,

this Court does not have jurisdiction to entertain this claim.").  Others have ordered release

without confronting the INA's jurisdictional provisions at all.  <u>See, e.g.</u>, <u>Refunjol v. Adducci</u>,

No. 2:20-CV-2099, 2020 WL 1983077, at *6 (S.D. Ohio Apr. 27, 2020) (ordering the release of

detainees from ICE facility under habeas); <u>Chavez Garcia v. Acuff</u>, No. 20-CV-357-NJR, 2020

WL 1987311, at *3 (S.D. Ill. Apr. 27, 2020) (same); <u>Ferreyra v. Decker</u>, No. 20 CIV. 3170 (AT),

2020 WL 1989417, at *13 (S.D.N.Y. Apr. 27, 2020) (same).  Notably, all of these cases involved

habeas claims.  Here, Plaintiffs do not bring their claims under habeas.  They instead bring a

direct constitutional challenge to the conditions of their confinement, the remedy for which, they

---

[36]  Judge Nichols opined in <u>National Immigration Project of National Lawyers Guild v.</u>
<u>EOIR</u>, that "[t]he INA . . . does not appear to foreclose Plaintiffs' claims based on the increased
risk of contracting COVID-19 as a result of being forced to appear for in-person hearings, which
likely could not be remedied through a petition to the relevant court of appeals."  No. 1:20-CV-
00852 (CJN), 2020 WL 2026971, at *9 n.77 (D.D.C. Apr. 28, 2020).  Similarly, Judge Bernal
held in <u>Torres v. DHS</u>, that that "claims regarding the conditions of immigration detention that
are not challenges to removal proceedings likely fall outside of the channeling provisions."  411
F. Supp. 3d 1036, 1048 (C.D. Cal. 2019).  However, both courts were interpreting § 1252(b)(9),
which channels judicial review of all questions arising from removal proceedings to review of
the final removal decision.  Importantly, the plaintiffs in neither case sought release from
detention and therefore did not implicate § 1226(e) or § 1252(a)(2)(B)(ii).

contend, is their release.  See Shamal v. Barr, No. 19-CV-6375 CJS, 2020 WL 2193663, at *4

(W.D.N.Y. May 6, 2020) (noting that plaintiff "cites no legal authority by which the Court may

order his release" from ICE custody during the COVID-19 pandemic).[37]

Plaintiffs contend that their challenge to their confinement conditions is wholly collateral

to the agency's decisions to deny parole.  But, while Plaintiffs may not be directly questioning

the agency's discretionary weighing of factors in denying their parole, the relief they seek—an

order compelling ICE to release all of them from detention—might effectively be an order

"set[ting] aside an[] action or decision . . . regarding the detention or release of any alien or

the . . . denial of bond or parole," which the INA expressly prohibits.  8 U.S.C. § 1226(e).  See

generally Giammarco v. Kerlikowske, 665 F. App'x 24, 26 (2d Cir. 2016) ("[B]ecause [the]

petition for a writ of habeas corpus ad testificandum essentially seeks to void discretionary

decisions denying [a detainee] the same relief, his petition is inextricably linked to those

decisions," there is no "jurisdiction to consider the merits of [the] habeas petition [under 8

U.S.C. § 1252(a)(2)(B)]." (citations omitted)).  The Court need not decide whether the INA

strips it of jurisdiction to order Plaintiffs' release.  Still, the Court's uncertainty over its

---

[37] The habeas context presents distinct statutory and constitutional considerations.  With respect to military detainees, the D.C. Circuit has held that "one in custody may challenge the conditions of his confinement in a petition for habeas corpus."  Aamer v. Obama, 742 F.3d 1023, 1032 (D.C. Cir. 2014).  But see Ziglar v. Abbasi, 137 S. Ct. 1843, 1862–63 (2017) ("le[aving] open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus").  Neither case implicated the INA's jurisdictional provisions.  Moreover, the courts that have granted habeas petitions by ICE detainees have invoked their "inherent power to grant bail to habeas petitioners with 'substantial claims' and in 'extraordinary circumstances.'"  Shamal, 2020 WL 2193663, at *4 (quoting Mapp v. Reno, 241 F.3d 221, 230 (2d Cir. 2001)); see, e.g., Avendano-Hernandez v. Decker, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *2 (S.D.N.Y. Mar. 31, 2020); Savino I, 2020 WL 1703844, at *8–9.  Plaintiffs do not invoke that authority here.

jurisdiction to issue that relief is yet another reason to decline to release Plaintiffs at this juncture.

A less intrusive remedy for any constitutional violations at La Palma and Nevada Southern would be an injunction "simply requir[ing] [the agency] to observe their own policies and procedures in the running of their [detention facilities]." Women Prisoners, 93 F.3d at 931. However, it is not clear that an order requiring ICE to comply with the PRR at those two facilities would be in the public interest. The evidence before the Court, including the Plaintiffs' own declarations, suggests that ICE is making steady progress towards constitutionally sufficient protections against COVID-19. Further, to the extent that judicial supervision of ICE's implementation of the PRR is necessary, ICE is already operating under a nationwide injunction to implement the PRR at every detention facility in the country. See Fraihat, 2020 WL 1932570, at *29 (ordering ICE to "monitor and enforce facility-wide compliance with the Pandemic Response Requirements"). As part of the on-going Fraihat litigation, Judge Bernal continues to strictly monitor the Government's compliance with the court's April 20, 2020 injunction. Specifically, on May 15, 2020, Judge Bernal issued an order requiring the Government to provide plaintiffs' counsel with biweekly updates including:

> [3.] A spreadsheet with the following fields: name, alien number, detention facility, custody status (detained/released in the United States), alleged basis for detention, and the Risk Factor identified, for each Subclass Member;
> . . .
> 5. A document disclosing which Subclass Members have been released in the United States pursuant to custody determinations for each two-week period, and the conditions of their release;
>
> 6. A list of the titles and level of medical training of personnel making risk factor determinations for each facility;
>
> 7. Records showing the extent of compliance with the order to issue a new Performance Standard or supplement for individuals with Risk Factors;

8. Records regarding monitoring and enforcement of facility-wide compliance with the PRR and subsequent Performance Standard, including:

- Positions and titles of individuals, including contractors, tasked with monitoring and ensuring compliance with the PRR;

- Documents illustrating whether, since March 11, 2020, any facility has been or will be subject to noticed or un-noticed in-person inspections, what forms or documents have been or will be used in connection with this, and the consequences if a facility is determined not to be in compliance with the PRR and the Performance Standard;

- On a biweekly basis, updates to the above documents, as well as reports generated from inspections[.]

Minutes re: Order Granting Pl.'s Ex Parte Application 9–10, Fraihat v. ICE, No. 5:19-cv-1546-JBG-SHK (C.D. Cal. May 15, 2020), ECF No. 150.

Any injunction that this Court could issue requiring ICE to comply with the PRR would be duplicative of the Fraihat order. Overlapping and unnecessary judicial involvement in the Government's management of its immigration detention facilities would be contrary to the public interest. See generally Garnett, 313 F. Supp. 3d at 159–62. The Court therefore declines to issue an injunction ordering ICE to comply with the PRR at this juncture. That does not mean that Fraihat precludes Plaintiffs from proceeding to the merits of this case. Nor does it mean that Fraihat prevents the Court from ordering future injunctive relief specific to the Plaintiffs as the rapidly changing circumstances surrounding COVID-19 continue to develop. To that end, in lieu of issuing an injunction at this time, the Court will order periodic reporting from the agency documenting the conditions at all five facilities and the situation of all Plaintiffs. The Court therefore directs the Government, by June 10, 2020, to provide updated declarations including the following information for each facility where a named Plaintiff is detained:

(1) the number of positive cases of COVID-19 among detainees and staff, and the number of detainees who have been tested;

(2) the number of detainees at each facility and the facility's total capacity, including the number of detainees in each unit where a named Plaintiff is being held and that unit's total capacity;

(3) a description of the sleeping arrangements used by each named Plaintiff, if changed;

(4) a description of the dining quarters for each named Plaintiff, if changed;

(5) a description of the personal protective equipment provided to staff and detainees;

(6) a description of the hand cleansing and cleaning materials provided to staff and detainees;

(7) a description of detainees' access to medical care, including whether K.M. and K.S. are being provided with their antiretroviral medication at a consistent time; and

(8) clarification regarding the extent to which the detainees have been considered for release under the Fraihat injunction.  See infra n.12.

Upon review of these declarations, the Court will determine whether it is necessary for the Government to provide further updated reports.

> 2.      APA Claim

The Court next considers the Plaintiffs' APA claim.  As mentioned, the claim is largely based on the Accardi doctrine.  In United States ex rel. Accardi v. Shaughnessy ("Accardi"), 347 U.S. 260 (1954), the Supreme Court vacated a deportation order that was issued in a manner contrary to "[r]egulations [that] prescribe[d] the procedure to be followed in processing an alien's application for suspension of deportation."  Id. at 265.  "[A]s long as the regulations remain operative," the Court explained, "the Attorney General denies himself the right to sidestep the[m]," even if the statute otherwise grants him discretion.  Id. at 267.  "Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."  Battle, 393 F.3d at 1336.  Rules that fall within Accardi's ambit include

"internal agency guidance" that are "intended" to be "binding norm[s]." <u>Damus</u>, 313 F. Supp. 3d at 336 (quoting <u>Padula v. Webster</u>, 822 F.2d 97, 100 (D.C. Cir. 1987)).

Plaintiffs contend that, under <u>Accardi</u>, ICE's failure to abide by the PRR is arbitrary and capricious and contrary to law.[38]  The Government responds that Plaintiffs' <u>Accardi</u> claim does not identify a final agency action, that the PRR are not the type of rules or regulations encompassed by the <u>Accardi</u> doctrine, and that, in any event, Plaintiffs have not established that ICE is violating the PRR.  As the Court has already explained, most of the named Plaintiffs are unlikely to show that ICE has failed substantially to comply with the PRR at their detention facilities.[39]  The <u>Accardi</u> claims of those plaintiffs therefore stumble right out of gate.  As to remaining Plaintiffs, their <u>Accardi</u> claims are nonetheless barred because they are not based on final agency action and are not the type of claims covered by <u>Accardi</u>.

Only "final agency action for which there is no other adequate remedy in a court" is reviewable under the APA.  5 U.S.C. § 704.  The "final agency action" requirement involves two discrete inquiries.  First, Plaintiffs must identify an "agency action."  The APA defines "[a]gency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  <u>Id.</u> § 551(13).  "'[A]s their definitions make clear,'" "[t]he five listed categories—and their equivalent or the denial thereof—all 'involve *circumscribed, discrete* agency actions[.]'"  <u>CREW v. DHS</u>, 387 F. Supp. 3d 33, 48–49 (D.D.C. 2019) (quoting <u>Norton v. S. Utah Wilderness Alliance</u> ("<u>SUWA</u>"), 542 U.S. 55, 62 (2004))

---

[38]  Plaintiffs clarified at oral argument that they do not challenge the promulgation of the PRR themselves as arbitrary and capricious.  <u>See</u> TRO Tr. 49:21–50:5.

[39]  Plaintiffs concede that the <u>Accardi</u> doctrine only requires an agency to "take reasonable steps to comply with its own regulations," not to achieve 100 percent compliance.  TRO Tr. 52:2–13.

(emphasis added).  Second, that agency action must be "final."  An "agency action" is "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "[is] one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).

Plaintiffs' APA claim is premised on ICE's alleged failure to implement the PRR in the various detention facilities at which Plaintiffs are housed.  Compl. ¶ 66; TRO Mot. 29.  To be sure, "agency action" includes "failure to act."  5 U.S.C. § 551(13).  As the Supreme Court has recognized, however, "failure to act" is "properly understood as a failure to take an *agency action*—that is, a failure to take one of these agency actions . . . earlier defined in § 551(13)."  SUWA, 542 U.S. at 62 (emphasis in original).  Here, Plaintiffs challenge the "continuing (and thus constantly changing) operations" of ICE across many detention facilities.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 890 (1990).  Such a challenge does not identify "an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704."  Id. (holding that BLM's so-called "land withdrawal review program"—which referred to "at least 1250 or so individual classification terminations and withdrawal revocations"—was not reviewable "agency action" (internal quotation marks omitted)); see also Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure is reviewable, an on-going program or policy is not, in itself, a 'final agency action' under the APA.").

In contending otherwise, Plaintiffs invoke Torres v. DHS, 411 F. Supp. 3d 1036 (C.D. Cal. 2019), which held that ICE's alleged failure to enforce its Performance-Based National Detention Standards at a contracted detention facility was final agency action for the purposes of surviving a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss.  Id. at 1068–69.  There,

however, the complaint's factual allegations sufficiently established that "any past or ongoing

non-compliance at [the detention facility] [wa]s allegedly the result of an agency decision not to

enforce the terms of its contract."  Id. at 1069 (emphasis added).  Here, as the Government points

out, TRO Opp. 22 n.40, Plaintiffs do not identify any discrete final agency decision not to

implement the PRR.  See CREW, 387 F. Supp. 3d at 49 ("[A] plaintiff must challenge a 'discrete

agency action' and cannot make 'a broad programmatic attack' on an agency's compliance with

a statutory scheme."); RCM Techs., Inc. v. DHS, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("Courts

stand ready to entertain appeals from specific, concrete agency adjudications.  But absent that,

courts have neither the resources nor the expertise to superintend agency policy-making.").  To

the contrary, the record shows the agency is making reasonable efforts to implement the PRR at

the facilities at issue in the face of "the rapidly changing situation relating to the COVID-19

pandemic."  Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR ("NILPNLG"), No.

1:20-CV-00852 (CJN), 2020 WL 2026971 at *5 (D.D.C. Apr. 28, 2020).[40]

      The Court finds persuasive the reasoning of other courts in this jurisdiction.  In NIPNLG,

Judge Nichols held that EOIR's and ICE's policies on detainees' access to counsel during the

COVID-19 pandemic were not reviewable final agency actions under the APA.  Id. at *9–

10.  ICE's policies on the COVID-19 pandemic, Judge Nichols explained, "are implemented on a

facility-by-facility and individual-by-individual basis, based on the particularized circumstances

present at detention centers and the specific requests for attorney-client teleconferences, VTCs,

or in-person meetings."  Id. at *10.  Similarly, allegations of "general deficiencies in [ICE's]

---

[40]  Plaintiffs also allege that "[b]y failing to establish and implement policies and
procedures to protect Petitioners from the transmission of COVID-19 in the Detention Centers,
Respondents have enacted a final decision."  Compl. ¶ 177.  That allegation too "lack[s] the
specificity requisite for agency action."  SUWA, 542 U.S. at 66.

compliance" with the PRR in its day-to-day operations of detention facilities across the country "lack the specificity requisite for agency action."  SUWA, 542 U.S. at 66.

Damus, 313 F. Supp. 3d at 317, on which Plaintiffs heavily rely, is not to the contrary. There, Judge Boasberg found likelihood of success on the merits of an Accardi claim that ICE was not abiding by its own Parole Directive in making parole determinations.  Id. at 336–42.  But the Damus plaintiffs, asylum applicants who were found to have a credible fear of prosecution but detained, were clearly challenging the agency's failure to abide its own regulations *in the course of taking final agency actions*—that is, in making parole determinations.  Id.; see also Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) ("The rejections of Plaintiffs' parole requests—purportedly upon consideration of an improper factor—are agency actions that have actual or immediately threatened effects.").  Here, Plaintiffs do not purport to challenge the agency's parole determinations themselves.

Even if ICE's alleged non-compliance with the PRR were final agency action, it is far from clear that the PRR are the type of rules or regulations that can be enforced through the Accardi doctrine.  Plaintiffs contend that ICE is "in violation of the Fifth Amendment Due Process Clause by depriving detainees the rights guaranteed under the COVID-19 regulations enacted by ICE."  TRO Mot. 29.  But agency regulations do not create *substantive* due process rights.  Accardi is rooted instead in notions of *procedural* due process.[41]  See, e.g., Lopez v. FAA, 318 F.3d 242, 246 (D.C. Cir. 2003) (noting that Accardi "require[s] agencies to abide by internal, *procedural* regulations"); Thomas W. Merrill, The Accardi Principle, 74 Geo. Wash. L.

---

[41]  As explained, to the extent that Plaintiffs' constitutional due process claim is based on Accardi, it is well settled that "Accardi is based on administrative law principles, not constitutional due process requirements."  Vanover, 77 F. Supp. 2d at 103.

Rev. 569, 577 (2006) (noting that all post-1950s Supreme Court cases "that reference the

Accardi principle . . . involve procedural as opposed to substantive regulations").[42]

Other cases from this jurisdiction are illustrative.  In Damus, Judge Boasberg held that a

challenge to ICE's failure to comply with its own Parole Directive was cognizable under

Accardi.  313 F. Supp. 3d at 336–37.  The directive at issue there imposed "a number of

*procedural* requirements for assessing asylum-seekers' eligibility for release," such as "an

opportunity to submit documentation, the availability of an individualized parole interview, and

an explanation of the reasons for a parole denial."  Id. at 324, 337 (emphasis added).  Similarly,

in Aracely, R., Judge Contreras recognized an Accardi claim based on ICE's failure to comply

with the Morton Directive, which "la[id] out specific factors to be applied when making

individual parole determinations[] and . . . establishe[d] *procedural* rights for asylum seekers in

connection with the parole process."  319 F. Supp. 3d at 151 (emphasis added).  It is not readily

apparent that the PRR, which provide substantive guidelines on how ICE should operate its

detention facilities, falls "within the ambit of those agency actions to which the [Accardi]

doctrine may attach."  Damus, 313 F. Supp. 3d at 338.[43]

---

[42]  Under Accardi, "even where a procedural error has occurred, courts will not void the
result of the proceeding if the error was harmless (or equivalently, 'non-prejudicial')."  Vanover,
77 F. Supp. 2d at 106 (citing Mazaleski v. Treusdell, 562 F.2d 701, 719 (D.C. Cir. 1977)); see
also Solomon v. Office of Architect of Capitol, 539 F. Supp. 2d 347, 351 (D.D.C. 2008).  The
Court is hard-pressed to see how to apply this type of harmless error rule to substantive
regulations, which is another indication that Accardi only encompasses procedural rules.

[43]  Plaintiffs also invoke a recent case from outside this jurisdiction, Gayle v. Meade, No.
20-21553-CIV, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020).  There, the court found that "ICE's
flout[ing] [of] own guidelines by, *inter alia*, failing to ensure that each detainee practices social
distancing" could likely be shown to be an Accardi violation.  Id. at *5.  It does not appear that
the parties in Gayle raised the threshold questions whether the plaintiffs had identified a final
agency action or whether the guidelines were covered by Accardi.  See Legal Servs. Corp. v.

Plaintiffs are, accordingly, unlikely to succeed on the merits of their APA claim.  The

Court will therefore decline to issue a temporary restraining order on this basis.[44]

### 3.   *Mandamus Claim*

Plaintiffs also "seek a writ of mandamus to require the Respondents to act immediately in

accordance with their legal obligations to protect Petitioners and class members and to follow

their own parole guidelines and directives."  Compl. ¶ 184.  "[M]andamus is a drastic remedy, to

be invoked only in extraordinary circumstances."  Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir.

2005) (citations and internal quotation marks omitted).  Mandamus is only available where "(1)

the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no

other adequate remedy available to plaintiff."  Council of & for the Blind of Delaware Cty.

Valley v. Regan, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc).

As the Government observes, obligations that allow for judgment or discretion—such as

how to mitigate the spread of a virus at a detention facility or whether to parole or release a

detainee based on discretionary considerations—are not generally subject to writs of mandamus.

TRO Opp. 25.  Here, "Plaintiffs have failed to cite any legal source requiring the government to

take any particular action or that otherwise cabins the agencies' discretionary choices on how to

---

Velasquez, 531 U.S. 533, 557 (2001) ("Judicial decisions do not stand as binding 'precedent' for
points that were not raised, not argued, and hence not analyzed.").  In any event, the Court
obviously is not bound by a district court case from another jurisdiction.

[44]  In any case, the remedy for an Accardi violation appears to be limited to compelling
the agency to abide by the PRR, not release from detention.  See, e.g., Damus, 313 F. Supp. 3d at
343 ("To be clear, in finding that injunctive relief is warranted in this case, this Court is simply
ordering that Defendants do what they already admit is required—follow the ICE Directive when
adjudicating asylum-seekers' detention.").  As the Court has explained, the Fraihat nationwide
injunction already requires ICE to abide by the PRR in all detention centers.

best respond to a pandemic." <u>NIPNLG</u>, 2020 WL 2026971, at *10 (internal quotation marks omitted).

Moreover, other adequate remedies are available to Plaintiffs.  Section 706(1) of the APA permits courts to "compel agency action unlawfully withheld or unreasonably delayed."[45]  "The standards for APA relief under § 706(1) and for mandamus here are identical."  <u>CREW v. SEC</u>, 916 F. Supp. 2d 141, 151 (D.D.C. 2013).  That is, Plaintiffs must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*."  <u>SUWA</u>, 542 U.S. at 64 (emphasis added).  "[T]o the extent that [Plaintiffs are] unable to compel specific action under the APA, this Court is similarly unable to issue mandamus in such a circumstance."  <u>CREW</u>, 916 F. Supp. 2d at 151.  And as the Court has explained, Plaintiffs have failed to identify discrete agency actions that ICE is required to and has failed to take with respect to protecting transgender detainees during the COVID-19 pandemic.

Because Plaintiffs are unlikely to succeed on the merits of their mandamus claim, the Court also declines to issue a TRO on this basis.

---

[45] As the Government points out, Plaintiffs do not invoke § 706(1).  TRO Opp. 26 & n.45.  But the gravamen of their complaint seeks to compel agency action.  <u>See, e.g.</u>, Compl. ¶ 66 (alleging that "[d]espite the fact that transgender people in civil immigration detention are at high risk for contracting and suffering severe illness from COVID-19, ICE has not taken the steps necessary to protect transgender people from COVID-19").  "The Court [must] look[] through the form of the Complaint to the substance of the allegations to determine the true nature of [Plaintiffs'] claim[s]."  <u>Scottsdale Capital Advisors Corp. v. Fin. Indus. Regulatory Auth.</u>, 390 F. Supp. 3d 72, 82 (D.D.C. 2019) (Cooper, J.) (citing <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 477 (1982)).

## IV.   Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' motions for class certification, joinder, and a temporary restraining order.  A separate order follows.


_____
CHRISTOPHER R. COOPER
Date: <u>June 2, 2020</u>                                          United States District Judge