**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| C.G.B., ~~f/k/a D.G.B.; A.F., f/k/a O.E.R.F.;~~ et al. ~~M.M.S M., f/k/a A.H.S M.; L.R.A.P., f/k/a E.A.P.; K.S., f/k/a J.H.S.; K.M., f/k/a G.M.; R.H., f/k/a F.A.H.; L.M., f/k/a S.M.; M.J.J., f/k/a O.H.J.; D.B.M.U., f/k/a W.E.M.U.; K.R.H., f/k/a W.D.R.H.; G.P., f/k/a O.A.P.; and M.R.P., f/k/a J.N.R.P.,~~ | Case No. 1:20-CV-01072-CRC |
| | ~~EMERGENCY VERIFIED PETITION FOR A WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~AMENDED COMPLAINT |
| *Petitioners*, | |
| v. | |
| ~~Chad WOLF, in his official capacity as the acting Secretary of the U.S. Department of Homeland Security; and~~ | |
| ~~Physical Address:~~ | |
| ~~Office of the General Counsel~~ | |
| ~~U.S. Department of Homeland Security~~ | |
| ~~Washington, D.C. 20528;~~ | |
| ~~William BARR, in his official capacity as the Attorney General of the United States,~~ | |
| ~~Physical Address:~~ | |
| ~~Office of the Attorney General~~ | |
| ~~U.S. Department of Justice~~ | |
| ~~950 Pennsylvania Avenue, N.W.,~~ | |
| ~~Washington, D.C. 20530-0001,~~ | |
| WOLF et al., | |
| *Respondents*. | |

---

## INTRODUCTION

1.      This lawsuit seeks to vindicate the constitutional ~~and statutory~~ rights to reasonable protection from the COVID-19 pandemic for an especially vulnerable group: transgender people in civil immigration detention. ~~These people~~Immigration and Customs Enforcement ("ICE") has consistently failed to protect transgender people in its custody from abuse, harassment, and

violence.  The COVID-19 pandemic sweeping through ICE detention facilities has exacerbated these systematic failures.  Transgender people in immigration detention are not being punished for any crime, but now they are being put at unreasonable and unconstitutional risk of infection, disease and death by the government's failure to enact adequate rules and to follow even its own basicinadequate safety and health rules.

2.     Although federal authorities recognize the severe risks posed by outbreaks of the COVID-19 virus in immigration detention centers, Immigration and Customs Enforcement ("ICE")ICE has done little more than pay lip service to protecting those in its custody. Transgender people in civil immigration detention – many of whom came to this country seeking safety from violence and persecution in their home countries because of their gender identities – are among the most vulnerable during the current pandemic.  Petitioners therefore seek the supervised release of themselves and all transgender people in immigration detention because ICE has not provided and cannot implement sufficient measures to curb the spread of COVID-19 in its facilitiesneither created nor implemented measures to protect them while in custody.  Petitioners further seek an order requiring ICE to incorporate the model procedures outlined in Attachment 1 to the 2015 Transgender Care Memorandum[1], entitled "ICE Detention Facility Contract Modification for Transgender Care" into its facility contracts with its service vendors.  Finally, Petitioners seek an order requiring ICE to enact rules and regulations specifically designed to protect transgender detainees in its custody from the COVID-19 pandemic.

3.     Since ICE first reported a COVID-19 infection in one of its detention centers on March 19, 2020, outbreaks have spread to at least 3270 detention centers across the country.  As

---

[1]    Thomas Homan, Executive Associate Director, U.S. ICE, *Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015), *available at* https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf (hereinafter "Transgender Care Memorandum").

of ~~April 21,~~August 14, 2020, ICE had publicly reported ~~285~~4,531 confirmed cases of COVID-19 ~~in those facilities, including 253 detainees and 32 staff members.  At least ten facilities where transgender people in civil immigration detention are housed are experiencing reported outbreaks with 103 detainees and 12 staff members infected.~~among detainees, five of whom died, out of a total current detainee population of 21,118.  ICE Detainee Statistics, ice.gov/coronavirus (last visited Aug. 14, 2020).  Shockingly, approximately one in five civil immigration detainees tested has or has had COVID-19.[2]

4.      Immigration detention centers are congregate facilities in which detainees live in close proximity.  That fact makes them especially dangerous during pandemics such as COVID-19, which easily spreads from person to person~~, both~~ through the air and potentially via contamination on commonly used surfaces such as tables and toilets.

5.      On April 10, 2020, a month after the World Health Organization declared a global pandemic, ICE finally recognized this problem and issued rules for its detention centers to take some steps designed to reduce the risk of COVID-19 outbreaks, and also required its facilities to follow guidance for detention centers published by the Centers for Disease Control ~~("CDC")~~and Prevention ("CDC").  But ICE has systematically failed to provide even these fundamental protections to people in civil immigration detention.

6.      ICE~~'s failures are dramatically illustrated by the experience of Petitioner C.G.B., a transgender woman who is being held at a detention facility in Arizona.  The facility placed a newly arrived detainee in the bunk above C.G.B., and he began coughing uncontrollably.  But he~~

---

[2]    ICE has publicly reported testing 22,580 detainees as of August 14, 2020, meaning test results were positive for COVID-19 in approximately one of every five detainees tested.  ICE Detainee Statistics, ice.gov/coronavirus (last visited Aug. 14, 2020).  These numbers are unreliable and understate the numbers of infected detainees.  Some of ICE's declarants in this litigation have provided higher numbers of positive cases in their facilities than ICE had publicly announced on its website in the same time frame. *See generally* Petitioners' Mot. for Expedited Discovery (ECF 33).

~~was not seen by a medical provider for several days, and then he was returned to the general population.  Days later, C.G.B. began experiencing symptoms of COVID-19, including vomiting, a fever, and what she described as pain in her bones.  C.G.B. was tested for COVID-19 on April 9, 2020, but has not been told what the results of that test were.  She is being held in a pod with a dozen other detainees suffering from COVID-19 symptoms, two of whom have confirmed cases of the disease.~~ has a long history of systematically failing to protect and care for the transgender people in its custody.  ICE guidelines and regulations explicitly recognize that people who are transgender face a higher risk of victimization and abuse in custody.  For example, the federal regulations implementing the Prison Rape Elimination Act ("PREA") in ICE detention facilities require ICE, in assessing a detainee's risk of victimization and abuse, to consider "whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming."  6 CFR § 115.41 (c) (7).

7.      ICE's own statistics bear out the increased risk of abuse and assault faced by transgender people in its care. ICE publicly reports its statistics on detainee allegations of sexual abuse and assault in custody in accordance with its obligations under PREA. In 2017, 264 detainees reported allegations of sexual abuse or assault.  Of those 264, 12 or 5% were transgender. ICE, PREA Statistics, https://www.ice.gov/prea.  In 2017, ICE booked 323,591 people into custody.  ICE (2017), Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf. Of those more than three hundred thousand total detainees over the course of 2017, 247 self-identified as transgender.  Elise Foley, *LGBTQ Immigrant Detainees Reported Sexual Assault at Higher Rates*, HuffPost (May 30, 2018)

huffpost.com/entry/ice-lgbtq-immigrant-detainees-sexual-assault. Thus, while transgender people represented .07% of the total detainee population in 2017, they were the victims in 5% of reported instances of sexual abuse or assault. These numbers likely understate that extent of the problem as transgender detainees fear retribution and punishment and thus often decline to report abuse and assault while in custody.

8.     In 2015, recognizing the unique issues transgender people face in detention, ICE promulgated its "Further Guidance Regarding the Care of Transgender Detainees," which included an attached model "ICE Detention Facility Contract Modification for Transgender Care."  Transgender Care Memorandum, Attachment 1.  *See also* ICE, ICE issues new guidance on the care of transgender individuals in custody, (Jun 29, 2015), *available at* https://www.ice.gov/news/releases/ice-issues-new-guidance-care-transgender-individuals-custody ("this new guidance is the result of a six-month agency Working Group that examined these issues with subject matter experts, sought input from transgender individuals, and visited various non-federal facilities across the country to observe best practices.")  Though the Transgender Care Memorandum required ICE to "to incorporate the model procedures outlined in Attachment 2 [*sic*], 'ICE Detention Facility Contract Modification for Transgender Care' into facility contracts[,]" upon information and belief, ICE has not incorporated the model procedures in the facility contracts at any of its detention centers.  *Id.* at § 5.

9.     In January 2020, ICE suddenly closed the Transgender Protective Care Unit at Cibola Detention Center/Cibola County Correctional Center ("Cibola") with no explanation. Since then, the Aurora Detention Center ("Aurora") has been the only ICE detention facility with a unit specifically dedicated to housing transgender detainees.  As a result, nearly all transgender

women in civil immigration detention are housed with cisgender men, exposing them to risks of sexual assault and verbal and physical abuse.

10.     Moreover, if transgender people complain of abuse, ICE places them in solitary confinement rather than intervening to stop the abuse.  This practice has the effect of punishing transgender detainees for reporting mistreatment and leads to the chronic underreporting of abuse.

11.     The extreme danger of harassment, abuse and sexual assault to transgender detainees further enhances their risk of contracting COVID-19.  ICE has not even created policies to protect transgender people in their custody from the risk of contracting COVID-19, let alone implemented measures to protect transgender detainees during the pandemic, despite knowing of this group's unique vulnerabilities to such abuse.

12.     ICE also systematically fails to provide adequate and necessary medical care for transgender people in detention.  Over the last two years, two transgender women have died due to lack of adequate medical care while in ICE custody.  And Department of Homeland Security Office of the Inspector General reports published in 2017 and 2019 found inadequate medical care at multiple ICE detention facilities where transgender people are held.

13.     This failure to provide medical care has exacerbated Petitioners' risks of contracting COVID-19.  For example, although two Petitioners are living with HIV, ICE has not only refused to release them, but also has failed to supply their necessary HIV medications on a consistent schedule.  This irregular delivery of medication compromises their immune systems, making them more vulnerable to contracting COVID-19.

14.     Despite these risks, ICE has no specific policies and has taken no specific measures to protect transgender people in its custody, not only from abuse and harassment, but

also from contracting this deadly virus.  Due to ICE's failure to protect them, Petitioners K.S. and K.R.H. have been exposed to other detainees in their units who have subsequently tested positive for COVID-19.  On July 2, 2020, K.S. reported that her unit, housing approximately 50 detainees, had been placed under quarantine three times.  During these quarantines, facility staff, including counselors and commissary workers, does not enter the unit.  This improper use of quarantine is in direct violation of the ICE pandemic guidelines, which mandate that only individuals with laboratory-confirmed cases of COVID-19 should be isolated as a cohort.  ICE has been instructed not to cohort confirmed cases with suspected cases or case contacts.  Yet, the overuse of cohorting is not unusual.

15.   7. Transgender people in civil immigration detention report that it is often impossible to practice social distancing – beds and tables are bolted to the floor, forcing detainees to sleep and sit only a few feet from each other, and some detainees are still lining up in large groups for meals as they did before the outbreak.  Few guards and staff members wear face masks when interacting with detainees, and some wear no protective equipment at all – including a doctor who performed a physical examination of a transgender woman without even wearing gloves.  Most detainees have not been provided face masks; some do not have access to soap and must wash their hands with shampoo.  Detainees have assigned sleeping bunks and are unable to distance from others even when the numbers of detainees in a unit have dropped.  Detainees report that all detainees in their units must share a single water fountain – drinking from this communal fountain is their only source of water in detention.  Many detainees must clean their own living spaces without disinfectant.  Detainees exhibiting symptoms such as coughing or fever are not always given a medical examination or isolated from the rest of the

~~population~~Several detainees report that they have been given a face mask that they have had to use for months, going without protection when the mask is damaged, soiled or being washed.

16.   ~~8.~~ Transgender people in civil immigration detention are particularly susceptible to COVID-19 infection because as a group they are more likely to have underlying medical conditions making them vulnerable, such as infection with HIV, diabetes and high blood pressure.  Further, transgender people in civil immigration detention have not only suffered the trauma of being discriminated against, persecuted, tortured and raped because of their gender identity, they live with the constant stress of continuing discrimination, harassment and the risk of sexual assault.  Such stress lowers their immune systems' response to infection, meaning transgender detainees are more likely to become infected, become sick, and die from COVID-19.

17.   ~~9.~~ Petitioners have no other avenue to seek relief.  ICE has announced that it has completed its release of detainees it determined to be at high risk of infection, yet Petitioners and ~~dozens, if not hundreds, of~~many other transgender people remain in ICE custody as outbreaks inside immigration detention centers rapidly worsen.  Absent this Court's intervention, Petitioners and all other transgender people in civil immigration detention will continue to be at an unreasonably high risk of falling victim to this deadly virus.

18.   ~~10.~~ ICE's failures have made detention centers death traps for transgender people in civil immigration detention.  That situation violates Petitioners' Fifth Amendment due process rights and the Administrative Procedure Act.  Therefore, this Court should issue an injunction mandating the release on parole ~~or other supervised release~~ of all transgender people in civil immigration detention so they may take the necessary precautions against COVID-19.  This Court could also direct Respondents to release all transgender people in civil detention on a supervised release program.  Another option for this Court is to order Respondents to set

individual bonds for all transgender people in custody.  The nonprofit organizations and other groups supporting transgender people in civil immigration detention have the resources and plans necessary to support all of the transgender people in civil immigration detention in release.  Short of the release of transgender detainees, Respondents should be directed to incorporate the model procedures outlined in Attachment 1 to the 2015 Transgender Care Memorandum, "ICE Detention Facility Contract Modification for Transgender Care" into its facility contracts with its service vendors and to enact rules and regulations specifically designed to protect transgender detainees in its custody from the COVID-19 pandemic.

**PARTIES**

**PETITIONERS IN ICE CUSTODY**

19.   11. Petitioner C.G. B., f/k/a D.G.B., is a citizen of Mexico who has been detained at the Florence Correctional Center ("Florence") in Florence, Arizona, since January 2020.  D.G.B., a transgender woman, is seeking asylum because she fears persecution in Mexico because of her transgender status.  C.G.B. has experienced COVID-19 symptoms since April 9, 2020, and is being held in quarantine with other detainees who are showing symptoms of the virus.  She had a COVID-19 test performed on April 9, 2020, but despite being told she would have results in three days, she has not been told of those test results to date.  C.G.B. was being held in a pod with approximately 64 other detainees when, on April 2, 2020, the newly arrived man in the bunk above her began coughing uncontrollably.  He was eventually seen by a doctor five days later, but was returned to the general population and the bunk above C.G.B..  She saw nurses and then a doctor after she began vomiting, had a fever, had pain in her throat, head and bones, and began losing hair.  She is now housed in a pod with a dozen people experiencing COVID-19 symptoms, two of whom have tested positive for the virus.   Petitioner K.S., f/k/a J.H.S., is a citizen of Jamaica who is detained at the Nevada Southern Detention Center

("Nevada Southern") in Pahrump, Nevada.  She has been in ICE custody since March 27, 2019.

K.S., a transgender woman, is seeking asylum because she has received death threats from her

family and fears persecution in Jamaica because of her transgender status.  K.S. is living with

HIV and suffers from acute anxiety.  At times, she has difficulty ensuring that she receives her

antiretroviral medication as prescribed.  She has not been allowed to wear her face mask when

leaving her dorm to go to a medical appointment.  ICE reviewed the custody of K.S. pursuant to

the *Fraihat* injunction[3] and determined that although she has risk factors due to her HIV positive

status, she is not suitable for release.  Dr. Carlos Franco-Paredes, an infectious disease expert

who has treated HIV-positive transgender detainees, has specifically opined that K.S. falls into a

high-risk category should she contract COVID-19, due to her HIV-positive status, and that she

would, in his professional judgment, be significantly safer in the home of her sponsor for the

duration of the COVID-19 pandemic.  As of May 8, 2020, Nevada Southern had not tested a

single detainee or staff member for COVID-19.  By June 10, 2020, ICE reported one confirmed

case of COVID-19 after testing two detainees at Nevada Southern.  And as of August 14, 2020, a

total of 10 detainees at Nevada Southern had tested positive for COVID-19.

12.     Petitioner A.F., f/k/a O.E.R.F., is a citizen of Nicaragua who is detained at the La

Palma Correctional Center ("La Palma") in Eloy, Arizona.  She has been in ICE custody since

January 9, 2020.  A.F., a transgender woman, intends to seek asylum because she was detained

and tortured for her participation in a transgender rights organization.  A doctor at La Palma told

A.F. that she is at greater risk for COVID-19 infection because she was born with only one

kidney.  She is concerned because there is no way to practice social distancing at La Palma; for

example, detainees have meals in groups of more than 100 people and cannot maintain a six-foot

---

[3]   *See Fraihat v. United States Immigration & Customs Enf't*, No. EDCV 19-1546 JGB (SHKx), 2020 U.S. Dist. LEXIS 72015 (C.D. Cal. Apr. 20, 2020).

distance while waiting in line or eating.  Guards at La Palma refuse to answer questions about COVID-19, although ICE reports at least 13 confirmed cases of the disease among detainees there.  She has not observed guards wearing face masks or gloves while interacting with detainees.

13.    Petitioner M.M.S-M., f/k/a A.H.S-M., is a citizen of El Salvador who is detained at the Winn Correctional Center ("Winn") in Winnfield, La.  She has been in ICE custody for nearly a year.  M.M.S-M., a transgender woman, is seeking asylum because she fears persecution and death in El Salvador because of her transgender status.  She has been unable to obtain critical health care, including hormone replacement therapy, while in ICE custody.  Because of her fear and anxiety from being housed with 40 cisgender men, M.M.S-M. has been placed in segregation, which is exacerbating her mental health issues.  Nurses at Winn do not wear gloves or masks, and neither medical staff nor guards have provided M.M.S-M. with information about COVID-19.

14.    Petitioner L.R.A.P., f/k/a E.A.P., is a citizen of Mexico who came to the United States when she was three or four years old.  She has been detained at La Palma since December 16, 2019.  L.R.A.P., a transgender woman, is seeking asylum because she fears persecution in Mexico because of her transgender status.  L.R.A.P. has not received information about COVID-19 from the staff at La Palma and was not informed that there are 18 confirmed cases among detainees there.  L.R.A.P. is "distressed, stressed, and panicked," both out of fear of contracting the coronavirus and also because of the harassment she endures from both detainees and staff members, who often use anti-gay and anti-transgender slurs.  Social distancing is impossible for her because detainees congregate together and must sit at tables one foot apart.  She has not seen any guards wearing face masks or gloves

15. ~~Petitioner K.S., f/k/a J.H.S., is a citizen of Jamaica who is detained at the Nevada Southern Detention Center ("Nevada Southern") in Pahrump, Nevada. She has been in ICE custody since March 27, 2019. K.S., a transgender woman, is seeking asylum because she has received death threats from her family and fears persecution in Jamaica because of her transgender status. K.S., who is living with HIV, at times has difficulty ensuring that she receives her antiretroviral medication as prescribed. Staff at Nevada Southern, including medical staff, do not always wear gloves and masks.~~

20. ~~16.~~ Petitioner K.M., f/k/a G.M., is a citizen of Haiti who has been detained at Nevada Southern since March 27, 2019. K.M., a transgender woman, is seeking asylum because she fears persecution and violence in Haiti because of her transgender status. A cousin of hers in Haiti was beheaded because he was gay. K.M. suffers from acute anxiety. Staff at the facility sometimes do not provide K.M., who is living with HIV, with her antiretroviral medication, causing her to miss doses. ~~She has observed other detainees in her pod showing possible COVID-19 symptoms such as coughing and fever; those detainees were sent to medical care but returned to the general population.~~ K.M.'s medication for HIV is sometimes skipped entirely at night or given out after midnight. On three occasions, K.M. received her medications at 3:00 a.m. In June she missed 5 to 6 days of her HIV medication because it was out of stock. Missing doses of HIV medications can reduce their usefulness and increase the possibility of developing drug resistance, which makes certain HIV drugs lose their efficacy. ICE reviewed the custody of K.M. pursuant to the *Fraihat* injunction and determined that although she has risk factors due to her HIV positive status, she is not suitable for release. Dr. Franco-Paredes specifically opined that K.M. falls into a high-risk category should she contract COVID-19, due to her HIV-positive status, and that she would, in his professional judgment, be significantly safer in the home of her

sponsor for the duration of the COVID-19 pandemic.  As of May 8, 2020, Nevada Southern had not tested single detainee or staff member for COVID-19.  By June 10, 2020, ICE reported one confirmed case of COVID-19 after testing two detainees at Nevada Southern. And as of August 14, 2020, a total of 10 detainees at Nevada Southern had tested positive for COVID-19.

17.     Petitioner R.H., f/k/a F.A.H., is a citizen of Honduras who is detained at Caroline Detention Facility ("Caroline") in Bowling Green, Virginia.  She has been in ICE custody since January 18, 2020.  R.H., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She suffers from asthma, which requires her to use an inhaler three times a day.  She also takes medically necessary hormones as part of her gender-affirming care.  Upon being detained, her hormones were changed, and she experienced side effects including severe headaches.  Because of her asthma, she is at high risk for severe illness or death if she contracts COVID-19.  There are 35-40 people in her dorm, and she has experienced some harassment from the people with whom she is detained.  These conditions have made it impossible for her to practice social distancing.

18.     Petitioner L.M., f/k/a S.M., is a citizen of Jamaica who is detained at the Aurora Detention Center ("Aurora") in Aurora, Colorado.  She has been detained since she presented herself at the San Ysidro Port of Entry on February 17, 2020, seeking asylum because she has experienced beatings, death threats, discrimination and persecution in Jamaica because of her status as a transgender woman.  At Aurora, it took approximately 3-4 weeks for her to obtain an appointment with a doctor, who resumed her prescribed hormone treatments at one-quarter of her previous dose, and who examined her without wearing gloves or a mask.

19.     Petitioner M.J.J., f/k/a O.H.J., is a citizen of Honduras who is detained at Aurora.  She has been detained for about one month—originally at El Paso Processing Center ("El Paso")

~~in El Paso, Texas, then transferred to Florence, and eventually to Aurora.  M.J.J., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She is in a dorm with seven other transgender women, five of whom are HIV positive.  She does not believe that anyone in the dorm has been tested for COVID-19.  She has not been given gloves or masks.  The guards at Aurora wear gloves but do not wear masks.~~

~~20.      Petitioner D.B.M.U., f/k/a W.E.M.U., is a citizen of Honduras who is detained at Aurora.  She has been detained for more than a month—originally at El Paso, then transferred to Florence, and eventually to Aurora.  D.B.M.U., a transgender woman, is seeking asylum because she fears persecution in Honduras because of her transgender status.  She has not been given any information about why she has been transferred.  She is detained in a room with seven other transgender women.  She heard on the news that there was a confirmed case of COVID-19 at Aurora.  She does not have access to any disinfectants, gloves, or masks, and she has not seen anyone at Aurora being tested for COVID-19.  She is worried that she will contract COVID-19 and die.~~

21.     Petitioner K.R.H., f/k/a W.D.R.H., is a citizen of Guatemala who has been detained in ICE custody at the La Palma <u>Correctional Center ("La Palma") in Eloy, Arizona</u> since the beginning of April ~~2020~~<u>2019.</u>  K.R.H., a transgender woman, is seeking asylum because she fears persecution based on her LGBTQ+ identity in Guatemala, where she experienced threats and a kidnapping attempt.  ~~She suffers from tachycardia (an abnormally rapid heartbeat) and anxiety.  In early April, K.R.H. suffered a headache and fever, which are potential symptoms of COVID-19, but a nurse at La Palma did not see her until a week later, did not test her for the virus, and did not provide medication for her symptoms.  Although as of April 21,~~<u>K.R.H. has been verbally and physically assaulted by other detainees, including an incident in which she was</u>

spit on, due to her transgender identity.  K.R.H. has a history of asthma and tachycardia and suffers from acute anxiety.  Between April 27 and May 8, 2020, eight detainees exhibiting symptoms of COVID-19 were taken from her housing unit.  At least three of those detainees tested positive, but K.R.H. was denied a test when she requested one.  As of May 8, 2020, ICE reported ~~18~~53 detainees at La Palma had ~~been diagnosed with COVID-19, staff members have not notified K.R.H. about the presence of the virus at the facility.  She learned of three~~tested positive for COVID-19.  By June 10, 2020, ICE reported that number had risen to 78 confirmed cases of COVID-19 among the 98 detainees who had been tested at La Palma ~~from other detainees who work in the medical area.  K.R.H. is housed in a 120-person pod and does not have sufficient space in the pod to stay more than six feet away from other people; the detainees congregate in groups of 20 to 30 to have meals and watch television, and the beds in the two-person cells do not provide a six-foot distance for sleeping.~~.  As of July 1, 2020, K.R.H. reported there were about 100 detainees in her unit, or 83% of its total capacity of 120 detainees.  And as of August 14, 2020, a total of 122 detainees at La Palma had tested positive for COVID-19.

~~22.    Petitioner G.P., f/k/a O.A.P., is a citizen of Honduras who has been detained at Imperial Regional Detention Facility ("Imperial") in Calexico, California for fifteen months.  G.P., a transgender woman, is seeking asylum because she fled Honduras due to persecution because of her transgender status.  Until recently, she lived in a dorm with 64 people, which makes social distancing impossible.  She does not know if anyone at Imperial has contracted COVID-19, but she does not believe that anyone has been tested.  She does not have access to gloves or hand sanitizer and was offered a mask only in the past week.  She does not feel safe, and she is concerned because there are still new people coming into the Detention Center.~~

23. ~~Petitioner M.R.P., f/k/a J.N.R.P., is a citizen of El Salvador who has been detained since June 11, 2019.  Since February 2020, she has been detained at El Paso.  She was previously detained at Cibola and Otero Detention Center ("Otero") in Chaparral, New Mexico.  M.R.P., a transgender woman, is seeking asylum because she fled persecution, torture and death threats in El Salvador because of her transgender status.  She has respiratory issues, hypothyroidism, Hepatitis A, abnormally high bilirubin, and abnormally high hemoglobin.  She has a family history of diabetes, and while she does not have a formal diagnosis, she knows she is at risk of getting diabetes.  She sleeps in a barrack with nine cisgender men.  The beds in the barrack are only three or four feet apart, so social distancing is impossible.  She is afraid that she will become infected with COVID-19 and that she will develop serious medical issues because people with diabetes and respiratory issues are at a higher risk for serious symptoms if they contract COVID-19.~~

## **RESPONDENTS**

22. ~~24.~~ Respondent Chad Wolf is the acting secretary of the United States Department of Homeland Security ("DHS"). He is a legal custodian of Petitioners and is sued in his official capacity.  Respondent Wolf is charged with the administration and enforcement of the immigration laws of the United States, 8 U.S.C. § 1103(a), and has supervisory authority over Immigration and Customs Enforcement ("ICE"), the Department of Homeland Security ("DHS") component responsible for the civil detention of immigrants including Petitioners.

23. ~~25.~~ Respondent William P. Barr is the United States Attorney General.  In this capacity, he has supervisory authority over all operation of the Executive Office of Immigration Review (EOIR), which includes all the immigration courts and the Board of Immigration Appeals (BIA).  8 U.S.C.§ 1103(g); 8 C.F.R. § 1003.0.  He is also charged with the administration and the

enforcement of the immigration laws under 8 U.S.C. § 1103(a).  Respondent Barr is a legal custodian of Petitioners.  He is sued in his official capacity.

**PROPOSED CLASS**

24. ~~26.~~ Petitioners file this action on behalf of a highly vulnerable putative class: all transgender people in civil immigration detention in the United States.

25. ~~27.~~ On information and belief, transgender people in civil immigration detention are being held in at least the following ~~17~~six facilities: ~~Adelanto Detention Center/Adelanto ICE Processing Center, Adelanto, California;~~ Aurora Detention Center, Aurora, Colorado~~; Caroline Detention Facility, Bowling Green, Virginia; Cibola Detention Center/Cibola County Correctional Center, Milan, New Mexico~~; El Paso Processing Center, El Paso, Texas~~; Florence Correctional Center, Florence, Arizona; Imperial Regional Detention Facility, Calexico, California; Irwin County Detention Center, Ocilla, Georgia~~; La Palma Correctional Facility, Eloy, Arizona; Nevada Southern Detention Center, Pahrump, Nevada; Otay Mesa Detention Center, San Diego, California; ~~Otero Detention Center/Otero County Processing Center, Chaparral, New Mexico; Pearsall Detention Center/South Texas ICE Processing Center, Pearsall, Texas; Prairieland Detention Center, Alvarado, Texas; Stewart Detention Center, Lumpkin, Georgia; Tacoma Northwest Detention Center, Tacoma, Washington;~~ and Winn Correctional Center, Winnfield, Louisiana.

26. ~~28.~~ Each transgender person in civil immigration detention is at imminent risk of contracting ~~COIVD~~COVID-19 because of the life-threatening conditions under which they are confined—conditions that violate CDC guidelines, ICE directives, and State and County orders as they pertain to COVID-19.  This risk is heightened further because transgender people in civil immigration detention suffer from medical conditions such as HIV, diabetes, and mental illness,

and have an increased likelihood of harassment and assault that put them at greater risk of contracting COVID-19 and suffering serious symptoms and death as a result.

27. ~~29.~~ Named Petitioners bring this action as representatives of the following proposed class:

> All transgender people in civil immigration detention who are held~~, or who will be held,~~ by Respondents in any U.S. detention center or facility during the pendency of the COVID-19 pandemic.

28. ~~30.~~ The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a) and (b).

29. ~~31.~~ The class is sufficiently numerous. ~~Although ICE does not publish the number of~~ As of May 2020, ICE attested that at least seventy transgender people were being held in civil immigration detention~~, Petitioners on information and belief estimate that the number is at least 60 and may be as many as several hundred~~.

30. ~~32.~~ All members of the class are bound together by common questions of law and fact – most prominently, whether in the face of the lethal COVID-19 pandemic, ~~the continued civil detention of the class members at the Detention Centers in violation of the CDC guidelines~~ ICE's failure to create and implement any measures protecting transgender people in its custody, placing the class members' health and safety at grave risk, violates their constitutional rights. The class members are also united by the question of whether ICE has failed to implement measures to protect them from the increased risk of sexual assault and abuse they face in detention, including a total failure to incorporate the model procedures outlined in the Transgender Care Memorandum into any of its contracts with service vendors at its detention centers.

31. ~~33.~~ The named Petitioners are proper class representatives because their claims are typical of the absent class members and because they and their counsel will adequately and vigorously represent the class.

32. ~~34.~~ Rule 23(b)(2) is also satisfied here because the Respondents have "acted or refused to act on grounds that apply generally to the class" through ~~creating~~ failing to implement their own model policies for the care of transgender detainees at a single facility, failing to create specific guidelines to protect the vulnerable population of transgender detainees from their increased risk of contracting and suffering from COVID-19, and maintaining conditions that put the class at imminent risk of contracting COVID-~~19, the deadly virus that is currently sweeping the globe.~~19.

**VENUE**

33. ~~35.~~ Venue in the District Court for the District of Columbia is proper under 28 U.S.C. § 1391(b) and (e) because Respondents reside in this district and are sued in their official capacities.

**JURISDICTION**

34. ~~36.~~ Respondents reside within the jurisdiction of this Court.

35. ~~37.~~ This case arises under the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.

36. ~~38.~~ This Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a).

37. ~~39.~~ This Court has jurisdiction pursuant to 28 U.S. Code § 1331 (Federal Question), 28 U.S. Code § 1361 (Action to compel an officer of the United States to perform his duty), and 28 U.S.C. § 2201(a), (Federal Declaratory Judgment Act).

## FACTS

**A.      COVID-19 is a Global Pandemic that Poses a Significant Risk of Death or Serious Illness to Petitioners.**

38. ~~40.~~ Since the first confirmed case of COVID-19 in the United States in late January 2020, the number of infected people in this country has exploded to more than ~~746,000~~5 million as of ~~April 20, 2020,~~August 14, 2020 with more than ~~39,000~~166,000 deaths, according to the CDC.  *See* Cases of Coronavirus Disease (COVID-19) in the U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited ~~Apr. 20,~~August 14, 2020).

39. ~~41.~~ State and local governments across the country have implemented measures intended to curb the spread of the disease, including banning large gatherings, closing non-essential businesses, ordering people to stay home except for essential activities, and requiring the use of face masks where large groupings of strangers are unavoidable, such as in grocery stores.

40. ~~42.~~ COVID-19 is a respiratory illness that is spread through airborne droplets, such as those expelled when a person coughs or sneezes, or via contact with contaminated surfaces such as doorknobs and countertops.  *See* What you should know about COVID-19 to protect yourself and others, Centers for Disease Control and Prevention (Apr. 15, 2020) ("CDC Factsheet"), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

41. ~~43.~~ Some people who are infected with the novel coronavirus that causes COVID-19 do not experience symptoms, but may nonetheless be contagious.  Even those who

develop symptoms may be contagious before they exhibit symptoms and may be contagious afterwards.

42. 44. Those who do suffer illness from the disease often experience flu-like symptoms such as fever, coughing, body aches, and difficulty breathing, and, in severe cases, the infection can cause pneumonia, multiple organ failure, and death.

43. 45. Severe cases require hospitalization, often with breathing assistance ranging from supplemental oxygen to use of a ventilator; those who survive severe illness may have permanent lung damage and other disability.  There is no vaccine or cure.

44. 46. Preventative measures recommended by public health experts include frequent and thorough hand washing; wearing a face mask in public; frequently disinfecting surfaces on which the virus could be deposited; and the now-familiar tactic of "social distancing" – staying at least six feet away from other people.

45. 47. Although young and otherwise healthy people can become ill and die from COVID-19, those at the highest risk for illness and death include those over age 55 and people with underlying medical issues such as asthma or other lung ailments; high blood pressure; suppressed immune systems; and diabetes.  *See* CDC Factsheet.

**B.**  **ICE Has Systematically Failed to Protect Transgender People in Civil Immigration Detention.**

46. The ICE civil detention system is ill equipped to care for transgender people in the best of times.  ICE has consistently failed to protect transgender people in its custody from rampant abuse, harassment, and violence from both other detainees and from detention facility staff.  ICE has also failed to provide adequate medical care to transgender people in its custody.

47. Although ICE has stated that discrimination against transgender people in civil immigration detention is prohibited, transgender people are subject to increased risks of

harassment and assault, including sexual assault, in immigration detention.  Transgender Care Memorandum "Background."

48.      ICE guidelines and regulations repeatedly recognize that people who are transgender face a higher risk of victimization and abuse in custody.  For example, the 2011 Performance-Based National Detention Standards ("PBNDS"), to which ICE detention centers are held, require that ICE give "special consideration" "to any factor that would raise the risk of vulnerability, victimization or assault. Detainees who may be at risk of victimization or assault include […] persons who are transgender[.]"  PBNDS § 2.2.V.C C.  Similarly, the federal regulations implementing PREA in ICE detention facilities require ICE, in assessing a detainee's risk of victimization and abuse, to consider "whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming."  6 CFR § 115.41 (c) (7).  In response to public comments on the proposed version of these regulations, the government stated "DHS agrees, however, that LGBTIGNC [Lesbian, Gay, Bisexual, Transgender, Inter-sex, or Gender Non-Conforming] status can contribute to vulnerability."  Federal Register Vol. 79 No. 45 13100, 13146 (Mar. 7, 2014).

49.      Research has repeatedly demonstrated that transgender prisoners suffer substantially higher rates of abuse than the general population. *See, e.g.,* Lori Sexton, Valerie Jenness & Jennifer Macy Sumner, *Where the Margins Meet: A Demographic Assessment of Transgender Inmates in Men's Prisons,* Justice Quarterly, 27:6 (2010) at 835-866. This research correlates with ICE's own statistics, which bear out the increased risk of sexual assault and abuse that transgender people face in detention.

50.      From 2014 to 2018, ICE has publicly reported its statistics on detainee allegations of sexual abuse and assault in custody according to its obligations under the Prison Rape

Elimination Act.  These statistics include categorizing the allegations by victim gender, including a separate category for allegations by transgender detainees.  In 2018, for example, 374 detainees reported sexual abuse or assault in ICE custody.  ICE PREA Statistics. https://www.ice.gov/prea. Of those 374, 23 or 6% were transgender. *Id.*  This percentage is quite substantial given the infinitesimal percentage of people detained by ICE each year who self-identify as transgender.

51.     In 2017, 264 detainees reported allegations of sexual abuse or assault in ICE custody. Of those 264, 12 or 5% were transgender.  ICE PREA Statistics, https://www.ice.gov/prea.  In Fiscal Year 2017, ICE booked 323,591 people into custody.  U.S. ICE (2017), Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf.  Of those over three hundred thousand detainees in 2017, only 247 self-identified as transgender.  Elise Foley, *LGBTQ Immigrant Detainees Reported Sexual Assault at Higher Rates*, HuffPost (May 30, 2018) huffpost.com/entry/ice-lgbtq-immigrant-detainees-sexual-assault.  While transgender people represented .07% of the total detainee population in 2017, they were the victims in 5% of reported sexual abuse or assault.  Put another way, while fewer than 1 in a thousand cisgender people in detention reported sexual assault or abuse, 1 in twenty transgender people in detention reported sexual abuse or assault.

52.     These PREA statistics likely underreport the actual rates of sexual assault experienced by transgender people in detention because sexual assault is under-reported as a whole as victims fear the consequences they might face if they report.  This phenomenon is especially pronounced among victims who are transgender because they fear if they report assault they will suffer retaliation, including being placed in administrative segregation.

53.     In 2015, ICE promulgated its Transgender Care Memo, which included an attached model "ICE Detention Facility Contract Modification for Transgender Care."  Though the Transgender Care Memo required ICE  "to incorporate the model procedures outlined in Attachment 2 [sic.], 'ICE Detention Facility Contract Modification for Transgender Care' into facility contracts[,]" ICE has not implemented the model facility contract modification for transgender care at a single one of its detention centers – including La Palma and Nevada Southern.

54.     Under the model procedures, the facility would be required to form a Transgender Classification and Care Committee ("TCCC").  Transgender Care Memorandum Attachment 1, at § 2.  The TCCC would then be required to devise an individualized detention plan for each transgender detainee at the facility.  *Id.* at § 3(d).  The individualized detention plan would include, at a minimum, housing options including general housing consistent with the detainee's sex assigned at birth, general housing consistent with the detainee's gender identity, a protective custody unit, and medical or administrative segregation.  *Id.* at § 3(e).  Allowing transgender people in detention to select from among these housing options would reduce the risk of assault that transgender women face when forced to be housed with cisgender men.

55.     ICE formerly maintained a Transgender Protective Care Unit, which was housed within a detention facility in Santa Ana, CA until the summer of 2017, when it was moved to Cibola.  The unit was abruptly shut down, with no explanation, in January 2020.  The only ICE unit dedicated solely to housing transgender detainees is at Aurora.  As a result, nearly all transgender women in civil immigration detention are housed with cisgender men, exposing them to risks of sexual assault and verbal and physical abuse.

56.     Transgender women are typically forced to live with cisgender men in civil immigration detention.  These housing conditions make transgender women acutely vulnerable to sexual assault by the cisgender men with whom they are housed.  Transgender people in detention are often assaulted by their cell or dorm mates, typically at night.

57.     Transgender people in ICE detention are harassed by other detainees as well as by staff and guards working in the detention facilities.  Verbal harassment of transgender people may take the form of yelling derogatory terms or of whispering in someone's ear.  Another common form of harassment that transgender people face in detention is spitting.  Many transgender detainees have reported being spit on.  Verbal harassment of transgender people often escalates to physical abuse, including pushing, shoving, and punching.  Transgender people who have been detained often report experiencing sexual assault while in detention.

58.     If transgender people complain of abuse, ICE places them in solitary confinement rather than intervening to stop the abuse.  When transgender people complain of abuse or harassment they are suffering, ICE often places them in segregation.  Such solitary confinement constitutes cruel and unusual punishment and is not the appropriate means of protecting vulnerable individuals, and allows abusers to escape consequences for their actions.

59.     ICE follows this practice of putting transgender people in segregation when they complain of abuse despite its own guidance on the use of segregation recognizing that people "who would be susceptible to harm in general population due in part to their sexual orientation or gender identity" have special vulnerabilities.  ICE Review of the Use of Segregation for ICE Detainees, § 3.3 Special Vulnerability (Sept. 4, 2013).  The guidance also directs that "[a] detainee's age, physical disability, sexual orientation, gender identity, race or religion may not provide the sole basis for a decision to place the detainee in involuntary segregation."  *Id.* at §

**5.2 Segregation Placements Related to Disability, Medical or Mental Illness, Suicide Risk, Hunger Strike, Status as a Victim of Sexual Assault, or other Special Vulnerability.**

60.     Petitioners have suffered abuse and harassment at the hands of other detainees and ICE staff.  K.R.H. has been harassed by male detainees, including an incident in which another detainee spit on her.  She has also been sexually assaulted by ICE staff when being patted down.  She and other transgender women at La Palma asked for a change of housing.  ICE temporarily moved three transgender women being housed at La Palma to segregation at Eloy detention center but moved them back to the general cisgender male population at La Palma after a week.

61.     ICE has also failed to provide adequate medical care to the detainee population overall and in particular to transgender people in detention.  Transgender people in ICE detention have higher rates of underlying medical conditions, such as HIV, and many are on some form of gender-affirming hormone therapy.

62.     A 2017 Department of Homeland Security Office of Inspector General ("OIG") report of inspections of six facilities found inadequate medical care, including long delays for detainees to receive care, inadequate documentation of the care they received, and failure to use translation services to allow detainees to communicate their symptoms to medical workers and to understand and knowingly consent to medical treatment.[4]

63.

64.     A June 2019 OIG report[5]

---

[4]   Report No. OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (Dec. 11, 2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

[5]   Report No. OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (June 3, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun 19.pdf.

65.    found inadequate medical care at the Adelanto, California facility and other egregious health and safety violations at facilities in Aurora; Essex County, New Jersey; and LaSalle, Louisiana.

66.    Two transgender women, Roxsana Hernandez and Joana Medina, died between May 2018 and June 2019 due to lack of adequate medical care while in ICE custody.

67.    Congress has expressed concern about treatment of transgender people in civil immigration detention when approving the fiscal 2020 appropriations for DHS.  The congressional report accompanying the appropriations directs ICE to limit the detention of transgender people to facilities operating under contracts that comply with ICE's 2015 guidance on best practices for transgender detainees.  *See* H. R. Rep. No. 116-180 at 37 (2019).  Despite Congressional urging to push ICE to implement its own best practices, no ICE detention contracts so far have incorporated those improvements.

68.    In the last year, two U.S. Senators and 45 members of the House of Representatives have written to the acting directors of ICE and DHS, citing "overwhelming evidence of systemic neglect and mistreatment of transgender individuals in immigration and detention facilities," including a lack of adequate medical care, that "demonstrate ICE's inability to provide adequate conditions for transgender immigrants."  Letter from Sens. Elizabeth Warren and Tammy Baldwin to Kevin McAleenan, Acting Secretary, U.S. Department of Homeland Security (Oct. 15, 2019), *available at* https://www.warren.senate.gov/imo/media/doc/ 2019.10.15%20Letter%20to%20DHS%20ICE%20and%20CPB%20regarding%20transgender%2 0migrants%20and%20asylum%20seekers.pdf; Letter from Rep. Mike Quigley, et al. to Chad Wolf, Acting Secretary, U.S. Department of Homeland Security (Jan. 14, 2020), *available at* https://quigley.house.gov/sites/quigley.house.gov/files/01.14.20%20ICE%20Letter.pdf.

69.     Advocacy organizations also have filed several complaints with DHS and ICE in the past year citing egregious examples of medical neglect and mistreatment of transgender people in civil immigration detention.

70.     The Transgender Law Center and a dozen other nonprofit organizations filed a complaint with DHS and its Inspector General's Office in September 2019 over ICE's failure to provide adequate medical and mental health care to LGBT and HIV positive detainees, citing the maltreatment of 19 current and former detainees, most of them transgender.

71.     Earlier this year, a coalition of eight groups led by the Santa Fe Dreamers Project filed a complaint with ICE, the DHS OIG, and the DHS Office for Civil Rights and Civil Liberties over conditions for transgender people in civil immigration detention at the Winn Correctional Center.

72.     The complaint documented severe abuse and mistreatment of transgender people in civil immigration detention and medical care failings including interrupted and inconsistent provision of HIV medication; refusal to provide medically necessary gender-affirming hormone treatments; delayed or denied dental care causing extreme pain and weight loss; and refusal to allow a woman to perform physical therapy exercises after her leg was broken by another inmate because she was transgender.

73.     ICE's systematic failures to protect transgender people in its custody from assault and harassment as well as its failures to provide adequate medical care have only been exacerbated by this pandemic.  These failures put transgender people in civil immigration detention at risk of serious illness or death should they become infected with COVID-19.

**C.     Transgender People in Civil Immigration Detention Are At High Risk for Becoming Infected, Experiencing Severe Illness, and Dying from COVID-19.**

74. 48. Transgender people in civil immigration detention, as a group, are at a greater risk of contracting the virus that causes COVID-19 than the general population and, if they do become infected, are more likely to become seriously ill or die.

75. 49. It is no exaggeration to state that during this pandemic, ICE detention facilities are death traps for the transgender people being held there.

76. 50. Several well-documented, preexisting factors combine to make transgender people in civil immigration detention a high-risk group for developing severe illness and death from COVID-19.

77. 51. First, as discussed above, transgender people in civil immigration detention are at higher risks of abuse, assault, and harassment.  These assaults involve the kind of close personal contact that can spread COVID-19.  For example, K.R.H. attested that she has been spit on.

78. ICE's 2015 guidelines for the treatment of transgender detainees, as well as oversight actions by Congress and the DHS Office of Inspector General, show that the agency is well aware of the severe risks of such abuse to transgender people in civil immigration detention.  Yet ICE has ignored these known dangers and has done absolutely nothing to protect transgender detainees from the increased risk of viral transmission posed by such abuses.

79. Second, transgender people are more likely to have underlying health conditions that put them at high risk for developing the most serious complications from COVID-19, including health conditions caused by tobacco use, immune suppression caused by HIV or viral hepatitis, diabetes, high blood pressure, and obesity.

80. 52. For example, some studies have found that 20% to 25% of transgender women are HIV-positive, with even higher rates among transgender women of color and those who live in urban areas.  Indeed, two Petitioners, K.S. and K.M. are both living with HIV.

81.   Dr. Edith Lederman, ICE Health Service Corps' subject matter expert for transgender care, admitted that the agency recognizes transgender individuals are more likely to have co-morbidities or underlying conditions which are risk factors for COVID-19 such that, specifically, all transgender people (rather than all detainees) being admitted to ICE detention are screened for HIV.

82.   53. Second Third, transgender people in civil immigration detention also are far more likely to suffer from mental health issues such as depression, anxiety and post-traumatic stress disorder that cause immune suppression and other physical ailments.

83.   54. One common factor for transgender people is the mental and emotional trauma caused by the endemic discrimination, violence and social stigma against transgender people – a phenomenon known generally as "minority stress" – which, in turn, can further suppress the immune system and exacerbate other underlying medical conditions.  This stress is in addition to and compounded by the stress all civil immigration detainees necessarily experience.

84.   55. Transgender people in ICE custody are especially vulnerable to mental health problems due to the fact that they left their native countries because of violence and persecution because of their transgender status, and thus have a profound history of trauma leading to high rates of depression, anxiety, and post-traumatic stress disorder. For example, a detainee at La Palma reports having her depression exacerbated by harassment by other detainees and staff.  Another La Palma detainee reports being depressed by being called anti-transgender and anti-gay

slurs by staff and other detainees, and being terrified when staff let men into the bathroom while she was showeringIn fact K.S., K.M., and K.R.H. all suffer from severe anxiety.

85. 56. In other words, transgender immigrants are at higher risk of infection for precisely the same reasons they fled their home countries and came to be in ICE custody.

86. 57. ThirdFourth, thatthe discrimination, violence and social stigma means transgender people experience means they also are more likely to live in poverty and less likely to have health insurance or the ability to pay for health care, and therefore are less likely to have received proper, ongoing medical care for their underlying medical conditions – or even diagnoses of them – prior to their detention.

87. 58. FourthFifth, because some transgender people in civil immigration detention cannot self-administer their injectablecertain hormone treatments while in ICE custody, they must have more frequent interactions with medical staff, who themselves are at higher risk of contracting – and thus spreading – the CoronavirusCOVID-19 because of their contact with sick people.

59. One transgender woman being detained in Aurora, for example, was examined by a doctor who was not wearing a face mask or gloves.

60. Another transgender woman being detained in Aurora has observed that the medical staff who distribute medication do so wearing gloves but not face masks.

61. Fifth, transgender people in ICE custody are far more likely to be victims of abuse and sexual assault than other detainees – indeed, ICE's own data show that lesbian, gay, bisexual and transgender detainees are 97 times more likely to be sexually victimized than non-LGBT detainees.

62.    That abuse—and the fear of falling victim to it—only compounds the stress transgender people in civil immigration detention experience and exacerbates their other mental and physical health problems.  For example, a transgender woman in civil immigration detention who was raped at age 12 suffered panic attacks when housed with dozens of cisgender men.

63.    Further, physical and sexual assaults by definition involve the kind of close contact that can spread Coronavirus and are more likely to occur when detainees are kept in close quarters.

88.    For example, Dr. Lederman reported that there are three transgender men in ICE custody who receive injectable testosterone, which must be administered by a medical professional.

89.    64. In sum, the distressing reality for transgender people in ICE custody is that they are more likely to be exposed to the Coronavirus; more likely to become infected if they are exposed; more likely to experience severe illness if they become infected; and more likely to die if they experience severe illness.

90.    65. The heightened susceptibility of transgender people in civil immigration detention to COVID-19 means that releasing them from detention will not only help curb their risks of illness and death, it will help protect any remaining detainees, guards and staff who might otherwise be exposed to enhanced spread of the virus and avoid further overwhelming area health care facilities. .  Short of humanitarian release, supervised releases, or issuance of an ICE bond, ICE should protect transgender people from their increased risks of contracting COVID-19 in its custody by implementing its model procedures outlined in the 2015 Transgender Care Memorandum, including allowing each transgender detainee to select housing consistent with the detainee's gender identity or a protective custody unit.

**CD.    ICE's Failure to Provide the Most Basic Pandemic Precautions Has Increased the Risk of Illness and Death to Transgender People in Civil Immigration Detention.**

91.    66. Despite the fact that transgender people in civil immigration detention are at high risk for contracting and suffering severe illness from COVID-19, ICE has not created policies to protect transgender people in their custody from the risk of contracting COVID-19, let alone taken the steps necessary to protect transgender people from COVID-19, nor have the 19. ICE has not even ensured that its detention centers holding transgender people followed follow the COVID-19 response requirements that ICE itself sets forth.

92.    67. To the contrary, ICE's actions and inactions unacceptably and unconstitutionally have put transgender people in civil immigration detention at increased risk of suffering and dying from this pandemic.

**i.    Social Distancing**

93.    68. As government and private sector medical experts have repeatedly emphasized, limiting the spread of the pandemic requires "social distancing" – keeping at least six feet away from other people.  ICE detention centers have not and cannot provide sufficient space for transgender detainees to do so.

94.    69. The consequences of the lack of opportunity for social distancing in ICE custody are dramatically illustrated by the experience of C.G.B., who became ill with a suspected case of COVID-19 after a newly arrived bunkmate spent days coughing before being seen by a doctor and then returned to the general population.  The pod where C.G.B. became ill has beds spaced approximately three feet apart. unit where K.S. and K.M. are housed at Nevada Southern, Unit F4, was at 54% capacity as of June 10, 2020.  New detainees are being brought in regularly.

70.    At Winn, detainees stay in pods of approximately 44 people, sleeping in beds that are approximately four or five feet apart.

71.     At La Palma, some 100 to 120 detainees eat meals together, where they must sit approximately one foot away from each other and cannot keep a six-foot distance while waiting in line.  Approximately 60 detainees at a time are allowed on a patio, where they also do not have enough room to stay six feet apart.

72.     At the El Paso Processing Center, detainees sleep in beds four feet apart.

73.     At Aurora, beds, as well as the tables and seating where detainees eat, are bolted to the floor and cannot be moved to increase the distance between detainees. Detainees are not able to practice social distancing.

95.     74. At Though ICE attests it is making efforts to assign one detainee to each bunk bed at Nevada Southern Nevada, the, there were, as of June 10, 2020, 52 detainees being housed in a unit with 48 bunk beds – meaning detainees are forced to share bunks. These bunk beds are close enough for detainees to reach across the aisle and touch the adjacent bed.  Detainees ICE attests the beds are four feet ten inches apart.  Both K.S. and K.M. attest that all detainees sleep with their heads in the same direction.  Detainees have assigned bunks.

96.     Detainees in Unit F4 at Nevada Southern are required to eat at tables seating four people that are too small to accommodate all four food trays at once.  Detainees line up for meals, often less than a foot apart.  ICE attests adjacent seats are three feet three inches apart.  All the detainees in Unit F4 use a single water fountain.  This is their only source of water.  Detainees have not seen the water fountain cleaned.

75.     At the Caroline detention facility, detainees cannot maintain proper social distancing because they sleep four to a room in close quarters, in dormitories of approximately 35-40 people.  Detainees from each dorm at Caroline travel as a group to the cafeteria for meals and to the law library, providing additional opportunities for disease to spread.

97.    Although La Palma was at 39% of capacity as of June 10, 2020, the unit where K.R.H. is housed, Zuni Delta, was, as of July 1, 2020, housing about 100 detainees, **83%** of its total capacity of 120.  K.R.H. is housed in a two-person cell with another transgender woman.  They share one bunk with upper and lower beds.

98.    The only telephones available for detainees to use in Zuni Delta are only two feet apart from each other and are in use all day. The phones are not disinfected between uses.

ii.    **Hand-washing and Hygiene**

99.    76. Since the beginning of the pandemic, public health experts have emphasized that proper hand washing, cleaning and other hygiene practices are key preventative measures that everyone should follow.  E.g., How to Protect Yourself and Others, Centers for Disease Control and Prevention (last updated Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

100.    77. ICE's pandemic response requirements – issued on April 10, 2020, a month after the World Health Organization declared a global pandemic – mandate that detention facilities require everyone in the facility, staff and detainees alike, "to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds," and to provide at no cost sufficient supplies such as hand soap and tissues to allow detainees to meet these requirements.[16]

101.    ICE also requires its detention facilities to follow the guidance for detention facilities published by the CDC.  ~~ICE Pandemic Requirements~~PRRs at 5-6.

---

[16]    *ERO COVID-19 Pandemic Response Requirements* at 9, U.S. ~~Immigration and Customs Enforcement~~ICE (Version 1.0, Apr. 10, 2020), *available at* ~~https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf~~https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (hereinafter, "~~ICE Pandemic Requirements~~PRRs").

102. 78. The CDC guidance also mandates that facilities provide staff and detainees with sufficient supplies and opportunities for frequent and adequate hand washing.[27]

103.

104. 79. Despite these basic requirements, ICE detention centers lack sufficient facilities to allow all detainees to practice frequent hand washing.  ICE detention centers also fail to provide detainees with sufficient supplies.

80.    At the Imperial Regional Detention Facility, 32 detainees residing on one floor of a dormitory share four sinks and one soap dispenser.

81.    At Winn, approximately 44 detainees share one bathroom with three sinks and toilets.  The only regular cleaning is sweeping by detainees once per day.  A transgender woman detained in segregation is able to clean her cell only once or twice a week, whenever a guard gets around to providing her with cleaning supplies.

82.    At Southern Nevada, 46 detainees share one bathroom with eight sinks and toilets.

83.    The bathroom sink in a dormitory housing transgender detainees in Aurora has been clogged for an extended period of time, and the detainees do not have the equipment to fix it.  Detainees use a container to capture the dirty water and pour it in the shower.

84.    ICE detention centers also fail to provide detainees with sufficient supplies.

85.    At La Palma, for example, detainees are provided with shampoo, but have to purchase soap—which indigent detainees are unable to do.  Detainees at Southern Nevada and Caroline also have to purchase soap at the commissary.

---

[27]    *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 10, U.S. Centers for Disease Control and Prevention (last updated Mar. 23, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdfhttps://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (hereinafter, "CDC Guidance.").

105.   Detainees at Nevada Southern are not allowed hand sanitizer.

106.   86. ICE also requires that its detention centers use household cleaners and disinfectants several times a day to "clean and disinfect surfaces and objects that are frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment.)"  ICE Pandemic Requirements PRRs at 10.[38]

107.   87. ICE detention facilities holding transgender people in civil immigration detention are not even coming close to fulfilling this mandate.

108.   88. Frequently used surfaces such as sinks and toilets are cleaned, at most, once a day, and detainees often are not provided with the cleaning and disinfecting supplies necessary to protect themselves.

89.   For example, detainees in Aurora, who are responsible for cleaning their own living areas, attempt to clean three times daily but are provided only two rags, one for the living area and one for the bathroom.

90.   Sinks and bathrooms in the El Paso facility are cleaned only once daily, and the detainees are not provided with disinfectant to clean more often.

109.   91. ICE has failed to provide detainees with the supplies to permit them to follow the most basic hygiene measures required by its own regulations or required them to risk their health to use strong disinfectants without proper protection.

110.   92. The agency's inability to sufficiently provide for such common-sense and low-tech preventative measures shows that supervised release from detention is the only way to remedy the unacceptable risk of infection, disease and death ICE has created for transgender people in civil immigration detention.

---

[38]   The mandatory CDC guidelines also require this kind of cleaning and disinfecting several times per day.  CDC Guidance at 9.

### iii.     Protective Equipment

111. ~~93.~~ ICE regulations mandate that "[c]loth face coverings should be worn by detainees and staff . . . to help slow the spread of COVID-19." ~~ICE Pandemic Requirements~~PRRs at 9.  ICE facilities are not complying with this requirement, either.

~~94.     Many detainees report that they have not been provided with face masks, despite asking for them.  One detainee states that she has not asked for a mask because she assumes they are unavailable since guards do not wear them.~~

~~95.     Detainees at La Palma were provided with one paper mask each on April 14, 2020, and were told that it would not be replaced if it was damaged.  Facility staff initially tried to require detainees to sign a liability waiver to obtain a mask, but relented after detainees refused to sign.  Detainees at Nevada Southern were not provided with cloth masks until April 16, 2020.~~

112.     K.S. only has one mask that she was given in April.  Some detainees have two masks but she thinks she was asleep when the second set of masks was given out so she has never received one.  If her only mask is being washed, she does not have protection.

113.     K.R.H. was given two cloth masks but when one broke and she requested a replacement she was told they have no more masks available.

114. ~~96.~~ Guards and other staff frequently interact with detainees without wearing protective equipment or wearing it improperly, such as having face masks pulled down around their necks rather than covering their nose and mouth.

115. ~~97.~~ A doctor at ~~Aurora~~La Palma performed a hands-on medical examination without wearing gloves or a mask.  ~~So did a doctor at La Palma.~~

98.     Medical personnel delivering medication to detainees at Aurora also do not wear masks.

116.   99. Ironically, a guard giving detainees a presentation on COVID-19 at Nevada Southern Nevada did so without wearing a mask or gloves.  Guards at Southern Nevada also perform pat-down searches of detainees without wearing gloves or masks.

100.    Several detainees report observing guards wearing gloves, but not masks.  101.  Guards at La Palma do not even wear gloves or masks.

117.   102. ICE's failure to provide protective gear such as face masks to detainees and to ensure that staff members use the required equipment further heightens the unconstitutional risk of infection to which transgender people in civil immigration detention are subjected through their continued detention.

### iv.     Information and Training

118.   103. Both the ICE rules and the CDC guidance require that detainees be provided with accurate and up-to-date information about COVID-19, precautions they can take to reduce the risk of infection, and the presence of the virus in their facility.  ICE Pandemic RequirementsPRRs at 7, 9; CDC Guidance at 6, 10, 12, 22.

119.   104. ICE has failed to provide any of this required lifesaving information to many detainees, has not provided regular updates to the limited amount of information it has provided to other detainees, and in some instances has misled detainees by falsely denying the presence of COVID-19 at their facility.  As of July 2020, K.S. reported that the detainees at Nevada Southern had not received any information, formal or informal, from any ICE official.

120.   105. Many current and recently released detainees report that guards or other staff gave them no information about COVID-19.  They include C.G.B., who received no information

about COVID-19 from the staff at La Palma despite being quarantined with a suspected case of the disease.  Another La Palma detainee reports that she has not received any information from staff regarding COVID-19 and guards refuse to answer questions about the virus.  This problem also has occurred at Aurora.

106.    One detainee at Aurora said that the only information she received was a suggestion to wash her hands.  107.    At Nevada Southern Nevada, for example, a guard gave a COVID-19 presentation in the morning while some detainees were sleeping and did not ensure that all detainees attended.

121.    108. The CDC Guidelines, which ICE facilities are required to follow, require that information about COVID-1019 must be provided "in a manner that can be understood by non-English speaking individuals and those with low literacy."  CDC Guidelines at 22; *see also id.* at 6, 10 (same).

122.    109. Some statements made by facility staff have contradicted ICE's public statements.  For example, staff informed detainees at Nevada Southern on April 15, 2020 that there was one person with COVID-19 at the facility, but ICE hashad not reported onethat case to the public.

110.    Worse, ICE has violated the CDC Guidelines by affirmatively misinforming detainees about the presence of COVID-19 at their facility.

111.    Although ICE now reports that two staff members at Aurora have tested positive for the COVID-19 virus,[4] officials falsely denied to detainees that anyone at the facility had been infected.

---

[4]    *See ICE Guidance on COVID-19,* https://www.ice.gov/coronavirus (last visited Apr. 20, 2020).

123. 112. By failing to provide any information about the virus to many detainees and providing incomplete, false and misleading or incorrect information to others, ICE has not only violated its own rules and mandatory CDC guidance, but also has further heightened the risks of COVID-19 transmission to transgender people in civil immigration detention.

124. 113. ICE regulations acknowledge that "[b]oth good hygiene practices and social distancing are critical in preventing further transmission" of COVID-19. ICE Pandemic RequirementsPRRs at 11.18.  In practice, however, neither are being implemented at ICE detention facilities.

125. 114. ICE's failure to follow its own regulations and inability to take the most basic precautions against the spread of this deadly virus pose dangers to transgender people in civil immigration detention that can be remedied only by the detainees' immediate release to safer areas.

**DE.   ICE's Inadequate Medical Care For Transgender People in Civil Immigration Detention Enhances Their Risk.**

126. 115. ICE detention centers are plagued by chronic and well-documented failures to provide proper medical care to transgender people in civil immigration detention – problems that have been exacerbated by the pandemic and pose another enhanced risk of infection, disease and death for transgender people in civil immigration detention.

127. 116. ICE's past handling of infectious disease outbreaks in detention centers has been inept—foreshadowing the impact COVID-19 will have if transgender people in civil immigration detention are not released.  Just last year, for example, a mumps outbreak across 57 immigration detention facilities throughout the country led to almost 900 cases of mumps, including among multiple transgender women in ICE custody, overwhelmingly contracted inside the facilities before the outbreak spread to surrounding communities.

128.    The explosive growth in COVID-19 cases in ICE detention centers illustrates the agency's inability and/or unwillingness to take the precautions necessary to slow the spread of the virus.  ICE reported 77 confirmed cases among detainees on April 14, 2020, a number that increased by more than 50 times in four months to 4,531 confirmed detainee infections on August 14, 2020.  At least five infected detainees have died.

129.    In fact, due to ICE's failure to implement the PRRs, all of the Petitioners have likely been exposed to COVID-19. Three detainees from K.R.H's pod were taken to another pod after three days of suffering COVID-19 symptoms. All three detainees subsequently tested positive for COVID-19.  Her pod was then put into quarantine but she was denied a COVID-19 test.  Two people removed from the unit housing K.S. and K.M. tested positive for COVID-19.

130.    117. As explained by Dr. ~~Carlos~~ Franco-Paredes, an infectious disease expert who has treated HIV-positive transgender detainees at the Aurora facility:

> [I]t is my professional opinion that the medical care available in immigration detention centers cannot properly accommodate the needs of patients should there be an outbreak of COVID-19 in these facilities. Immigration detention centers are often poorly equipped to diagnose and manage infectious disease outbreaks. Many of these centers lack onsite medical facilities or 24-hour medical care.

~~118.   Besides C.G.B., whose bunkmate was not isolated for many days despite showing classic COVID-19 symptoms, several other transgender people in civil immigration detention report that they or other detainees showing possible COVID-19 symptoms have not been tested, quarantined or isolated.  One detainee reports that when she had a cough, she saw medical personnel who gave her aspirin and returned her to the general population; another states that when she suffered COVID-19-like symptoms including a fever, she had to wait a week before seeing a nurse, who told her she was fine, did not test her or provide any medication, and did not schedule a follow-up appointment; and another reports that a fellow detainee with a fever and~~

~~flu-like symptoms was told to make a regular medical request rather than receiving immediate attention.~~

~~119.    This is a violation of ICE regulations and CDC guidance, which require that people suspected or confirmed to have COVID-19 must be placed in medical isolation and their close contacts must be quarantined.  ICE Pandemic Requirements at 14-16; CDC guidance at 10-11.  Notably, ICE did not issue its regulations until the day after C.G.B. had her COVID-19 test, which was more than a week after she was first exposed to the coughing bunkmate.  ICE Pandemic Requirements at 1.~~

131. ~~120. Another alarming example of ICE's bungling of medical care during the pandemic is the failure~~ICE has failed to provide adequate treatment to transgender people in civil immigration detention living with HIV, which further threatens their already compromised immune response.

~~121.    Prior to the outbreak, Dr. Franco-Paredes, a doctor specializing in infectious diseases, was treating transgender people in civil immigration detention living with HIV at Aurora.~~

~~122.    Since the outbreak began, authorities at Aurora have barred Dr. Franco-Paredes from providing care to any if his patients there; as a result, Dr. Franco-Paredes has been unable to see any of his patients in person, and even has had difficulty in scheduling virtual evaluations.~~

132. ~~123.~~ Dr. Franco-Paredes is concerned that the lack of adequate treatment will expose HIV-positive detainees to a high risk of contracting COVID-19, noting that one patient he evaluated had been given prescriptions for medications that negatively interacted with each other and thus could suppress the patient's immune response.

133. 124. Multiple transgender people in civil immigration detention Both K.S. and K.M., who are living with HIV, report that they do not receive their medication at regular times, which puts them at greater risk of contracting life-threatening infections such as COVID-19 because it can lessen their immune response. and increase the possibility of developing drug resistance, which makes certain HIV drugs lose their effectiveness.  Indeed, ICE has confirmed that K.M. received her HIV medications on a schedule that is irregular at best, at times receiving her evening medication at 3 a.m.  Both K.S. and K.M. have missed days of their medications, including necessary antiretrovirals, when their prescriptions have run out.  In June 2020, K.M. missed nearly a week of her HIV medication.

125.   Other transgender people in civil immigration detention have had their medically necessary gender-affirming hormone treatments or other prescribed medications denied or changed without explanation.

126.   The COVID-19 outbreak has exacerbated the problems with a system that was already ill equipped to provide adequate medical care to transgender people in civil immigration detention.  Although ICE has stated that discrimination against transgender people in civil immigration detention is prohibited,[5] detainees report continued harassment; one detainee reports that when notified of such harassment, a facility psychologist said there was nothing to be done because "we aren't big on trans rights here."

---

[5] Thomas Homan, Executive Associate Director, U.S. Immigration and Customs Enforcement, *Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015), *available at* https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.

127.    A June 2019 Department of Homeland Security Office of Inspector General report[6]

 found inadequate medical care at the Adelanto, California facility and other egregious health and safety violations at facilities in Aurora; Essex County, New Jersey; and LaSalle, Louisiana.

128.    A 2017 OIG report of inspections of six facilities found inadequate medical care including long delays for detainees to receive care, inadequate documentation of the care they received, and failure to use translation services to allow detainees to communicate their symptoms to medical workers and to understand and knowingly consent to medical treatment.[7]

129.    Congress has expressed concern about treatment of transgender people in civil immigration detention when approving the fiscal 2020 appropriations for DHS.  The congressional report accompanying the appropriations directs ICE to limit the detention of transgender people to facilities operating under contracts that comply with ICE's 2015 guidance on best practices for transgender detainees.  *See* H. R. Rep. No. 116-180 at 37 (2019).  Despite Congressional urging to push ICE to implement its own best practices, no ICE detention contracts so far have incorporated those improvements.

134.    In the last six months, two U.S. Senators and 45 members of the House of Representatives have written to the acting directors of ICE and DHS, citing "overwhelming evidence of systemic neglect and mistreatment of transgender individuals in immigration and

---

[6]  Report No. OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (June 3, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

[7]  Report No. OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, U.S. Department of Homeland Security, Office of Inspector General (Dec. 11, 2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

detention facilities," including a lack of adequate medical care, that "demonstrate ICE's inability to provide adequate conditions for transgender immigrants." Letter from Sens. Elizabeth Warren and Tammy Baldwin to Kevin McAleenan, Acting Secretary, U.S. Department of Homeland Security (Oct. 15, 2019), *available at*

https://www.warren.senate.gov/imo/media/doc/2019.10.15%20Letter%20to%20DHS%20ICE%2 0and%20CPB%20regarding%20transgender%20migrants%20and%20asylum%20seekers.pdf; Letter from Rep. Mike Quigley, et al. to Chad Wolf, Acting Secretary, U.S. Department of Homeland Security (Jan. 14, 2020), *available at*

https://quigley.house.gov/sites/quigley.house.gov/files/01.14.20%20ICE%20Letter.pdf. Dr. Franco-Paredes has specifically opined that K.S. and K.M. fall into a high-risk category should they contract COVID-19, due to their HIV-positive status. He further opined that both K.S. and K.M. would, in his professional judgment, be significantly safer in the homes of their sponsors for the duration of the COVID-19 pandemic where they would be able to practice social distancing and take other preventative measures. Dr. Franco-Paredes concluded that continued detention of K.S. and K.M. would place them are a significantly heightened unacceptable risk of complications and death if they become infected with COVID-19.

131.   Advocacy organizations also have filed several complaints with DHS and ICE in the past year citing egregious examples of medical neglect and mistreatment of transgender people in civil immigration detention.

132.   Just last month, a coalition of eight groups led by the Santa Fe Dreamers Project filed a complaint with ICE, the DHS Office of Inspector General, and the DHS Office for Civil Rights and Civil Liberties over conditions for transgender people in civil immigration detention at the Winn Correctional Center.

133.    The complaint documented severe abuse and mistreatment of transgender people in civil immigration detention and medical care failings including interrupted and inconsistent provision of HIV medication; refusal to provide medically necessary gender-affirming hormone treatments; delayed or denied dental care causing extreme pain and weight loss; and refusal to allow a woman to perform physical therapy exercises after her leg was broken by another inmate because she was transgender.

134.    The Transgender Law Center and a dozen other nonprofit organizations filed a complaint with DHS and its Inspector General's Office in September 2019 over ICE's failure to provide adequate medical and mental health care to LGBT and HIV positive detainees, citing the maltreatment of 19 current and former detainees, most of them transgender.

135.    ICE's failures to provide adequate medical care during the pandemic—building upon its inability to do so even in the best of times—put transgender people in civil immigration detention at further risk of serious illness or death should they become infected with the Coronavirus.

135.    136. Because ICE cannot provide adequate medical care to them, transgender people in civil immigration detention should be released immediately to safer environments.

**E.    ICE Protocols for Dealing With COVID-19 Are Inadequate.**

**G.    ICE Has Discretionary Authority to Release Petitioners on Parole or under a Supervised Release Program, or to Issue an ICE bond.**

136.    ICE has vigorously opposed release of the three Petitioners remaining in ICE custody, arguing that some of them are subject to so-called mandatory detention.

137.    137. Even if it followed its own requirements, ICE could not adequately protect transgender people in civil immigration detention from unconstitutional risks of infection posed by suspected or confirmed COVID-19 infections of other detainees or facility staff.  Indeed, the

shortcomings of these rules actually increase the risk that transgender people in civil immigration detention would contract, suffer and die from the virus. ICE has discretion and authority to release all Petitioners. Since this suit was filed, ICE has released four Petitioners on bond (C.G.B. on July 22, A.F. on May 14, L.R.A.P. on May 4, and R.H. on April 24), three Petitioners under humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5) (L.M. on June 1, M.J.J. on June 5, and D.B.M.U. on June 10), one Petitioner after being diagnosed with a health condition that increased her vulnerability to COVID-19 (G.P. on April 30), and one Petitioner after an immigration judge granted her relief from removal (.M.R.P. on July 14). Three of the Petitioners ICE has released were being detained under 8 U.S.C. § 1225(b), which ICE has contended requires mandatory detention (L.M., M.J.J., and D.B.M.U.). Accordingly, there is no impediment to Petitioners' release.

138.    The screening procedures ICE has announced are insufficient to keep those infected with COVID-19 from spreading the disease.

139.    The ICE rules require facilities to screen employees and detainees upon entry for COVID-19 symptoms—fever, cough, and shortness of breath—and to bar entry to staff with those symptoms and to isolate incoming detainees with those symptoms.  ICE Pandemic Requirements at 12.

140.    However, many infected with the Coronavirus either never show symptoms or become infectious before they develop symptoms; and many with COVID-19 have gastrointestinal or other symptoms, not respiratory symptoms like a cough.

141.    Thus, ICE's screening would miss many infections which could then spread extensively in a crowded detention setting.

142.   ICE's website states that in detention centers, "cohorting" — keeping people together in a contained group — "serves as an alternative to self-monitoring at home" for those potentially exposed to the virus who do not have symptoms.  *See ICE Guidance on COVID-19*, www.ice.gov/coronavirus (last visited Apr. 19, 2020).  The CDC Guidelines, which the ICE Pandemic Requirements make mandatory, state that cohorting should only be used as a last resort, however.  CDC Guidelines at 16.

143.   ICE's rules for its detention centers say "facilities should consider cohorting" all detainees who arrive on one or more days.  ICE Pandemic Requirements at 14.[8]  Cohorting is a dangerous practice for detention facilities because it could amplify, rather than prevent, an outbreak, because unless the detainees are able to stay six feet away from each other, one infected person could spread the virus to the entire cohort.

144.   The risk is particularly acute for anyone in the cohort with increased susceptibility to the virus, such as transgender people in civil immigration detention or others with underlying medical conditions.

145.   C.G.B.'s experience illustrates this problem.  Although she has been separated from the general population, she is not isolated in a single room but stays in a room with a dozen patients, two of whom have confirmed cases of COVID-19.  Thus, even if she and the other nine detainees without confirmed COVID-19 infections did not have the virus when they went into quarantine, they almost certainly do now.

146.   Because ICE's own guidelines are insufficient to reduce the risk of infection to transgender people in civil immigration detention and actually enhances that risk, transgender people in civil immigration detention should be paroled to safer quarters.

[8]   For suspected or confirmed COVID-19 cases, the rules state that "[c]ohorting should only be practiced if there are no other available options" and that only those who have tested positive should be "cohorted" together.  ICE Pandemic Requirements at 14.

# LEGAL FRAMEWORK

## A.    Violation of Constitutional Rights.

138.    ~~147.~~ When the government detains or incarcerates a person, it has an affirmative duty to guarantee conditions of reasonable health and safety: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety."  Id. at 200.

139.    ~~148.~~ The Supreme Court has held that the Eighth Amendment protects against future harm to incarcerated people, as "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Further, in this context, "[t]he science is well established – infected, asymptomatic carriers of the coronavirus are highly contagious," and therefore "[t]he Government cannot be deliberately indifferent to the Petitioners' potential exposure to [COVID-19] on the ground that they are not, now, infected or showing current symptoms."  *Castillo v. Barr*, No. 20-00605, 2020 U.S. Dist. LEXIS 54425, at *13–14 (C.D. Cal. Mar. 27, 2020) (citing *Helling*, 509 U.S. at 33).

140.    ~~149.~~ The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'"  *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200).  The Supreme Court in *Helling* recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety."  *Id.*

141. 150. These Constitutional protections also apply in the context of immigration detention because immigrant detainees, even those with prior criminal convictions, are civil detainees held pursuant to civil immigration laws.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Because detained immigrants are civil detainees, they are entitled to the due process protections derived from the Fifth Amendment, which prohibit punishment.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished.").  Because the Fifth Amendment rather than the Eighth Amendment governs civil detention, the "deliberate indifference" standard required to establish a constitutional violation in the latter context does not apply to civil detainees like Petitioners.  *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005).  Still, the Eighth Amendment's guarantees represent a "constitutional floor" that must also be met for detainees who are not being punished, such as those jailed prior to trial and civil immigration detainees.  *United States v. Moore*, No. 1:18-cr-198 (JEB), 2019 U.S. Dist. LEXIS 104300, at *6-7 (D.D.C. June 21, 2019).

142. 151. A condition of confinement for a civil immigration detainee violates the Constitution "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 U.S. Dist. LEXIS 189767, at *13 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).  This Court has held that detaining people during the COVID-19 pandemic in such a manner that they are unable to practice social distancing or take other precautions necessary to contain the spread of the virus creates an unreasonable risk of damage to detainees' health.  *Banks v. Booth*, No. 20-849, 2020 U.S. Dist. LEXIS 68287, at *27–30 (D.D.C. Apr. 19, 2020) (holding that pre-trial

detainee plaintiffs established a likelihood of success on the merits on their Fifth Amendment due process claim).

143.    Other courts addressing ~~TRO~~ motions for injunctive relief by civil detainees during the COVID-19 pandemic  have found that detaining people under conditions such that they are unable to practice social distancing or take other precautions necessary to contain the spread of the virus is sufficient to establish a likelihood of success on the merits of a Fifth Amendment due process claim.  *See, e.g., Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL (JFM), 2020 U.S. Dist. LEXIS 83551, at *29 (D. Ariz. May 11, 2020) ("Because reasonable measures have not been implemented in LPCC to limit the risk of Petitioner's exposure … Petitioner has a medical condition which places him at high-risk of severe illness or death, the conditions under which Petitioner is detained poses a substantial risk of serious harm to his health and safety."); *Valenzuela Arias v. Decker*, No. 20 Civ. 2802, 2020 U.S. Dist. LEXIS 81544, at *18 (S.D.N.Y. May 8, 2020) ("Petitioners argue that a return to confinement in the Essex County Jail would violate their due process rights. …The Court agrees."); *Thakker v. Doll*, 1:20-480, 2020 U.S. Dist. LEXIS 75362, at *18 (M.D. Pa. Apr. 27, 2020) ("PCCF Petitioners are likely to succeed on the merits of their due process claim that their conditions of confinement expose them to serious risks associated with COVID-19."); *Castillo*, 2020 U.S. Dist. LEXIS 54425, at *16 (plaintiffs established more than a mere likelihood of success on the merits of their due process claim where the conditions of confinement did not allow detainees to socially distance); *Thakker v. Doll*, No. 1:20-480, 2020 U.S. Dist. LEXIS 59459, at *25 (M.D. Pa. Mar. 31, 2020) (plaintiffs established likelihood of success on the merits of their due process claim where plaintiffs were detained in "tightly-confined, unhygienic spaces" and unable to socially distance).

144. 152. Similarly, here, Plaintiffs have established that they Here, even before the pandemic, ICE failed to take any measures to protect transgender people in detention from higher risks of abuse, harassment, and violence.  ICE has also systematically failed to provide appropriate and necessary medical care to transgender people in its care.  ICE's consistent and systematic failures to care for transgender people have been exacerbated by this pandemic.  Transgender detainees are unable to practice social distancing or take other precautions to contain the spread of the virus under their current conditions of confinement.  Therefore, they have established a likelihood of success on the merits of their And ICE has not created any policy or procedure to specifically protect transgender people in its custody from the risk of COVID-19.  Therefore, those conditions of confinement violate transgender detainees' Fifth Amendment Due Process claim rights.

## B.     Violation of the Administrative Procedures Procedure Act.

145. 153. Respondents are also in violation of the Fifth Amendment Due Process Clause by depriving detainees the rights guaranteed under the COVID-19 regulations enacted by ICE.

146. 154. When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266, 268 (1954) (reversing in immigration case after review of warrant for deportation).  Agencies must follow their own "existing valid regulations," even where government officers have broad discretion, such as in the area of immigration. *Id.* at 268; *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come

to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."). Breaches of *Accardi*'s rule constitute violations of both the Administrative ~~Procedures~~Procedure Act ("APA") and the Fifth Amendment's Due Process Clause.

147. ~~155.~~While violations of "internal agency procedures" do not always require a remedy, *Accardi*'s rule applies with full force when "the rights or interests of the objecting party" are "affected." *Monitlla v. INS*, 926 F.2d 162, 167 (2d. Cir. 1991) (citing cases) ("*Accardi* doctrine is premised on fundamental notions of fair play underlying the concept of due process"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (noting that an *Accardi* violation may be a due process violation, and the government's action may be set aside pursuant to the APA); *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations . . . may result in a violation of an individual's constitutional right to due process.").

148. ~~156.~~Under the *Accardi* doctrine, due process and the basic principle of administrative law dictate that rules promulgated by a federal agency regulating the rights and interests of others are controlling upon the agency. That doctrine is premised on the fundamental notion of fair play underlying the concept of due process. ~~322.~~The *Accardi* doctrine applies with particular force when "the rights of individuals are affected." *Morton*, 415 U.S. at 235.

149. ~~157.~~The D.C. Circuit has explained "that 'agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion.'" *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018)~~,~~ (citing *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) as amended (Feb. 11, 2003)).

150. ~~158.~~On March 18, 2020, ICE issued a statement on enforcement during the COVID-19 crisis:

159.   In the statement, ICE states that as a result of the COVID-19 epidemic, "ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals subject to mandatory detention based on criminal grounds.  For those individuals who do not fall into those categories, ERO will exercise discretion to delay enforcement actions until after the crisis or utilize alternatives to detention, as appropriate." *Id.*

151.   160.  ICE did not issue its mandatory rules for COVID-19 response until April 10, 2020, nearly a month later.  *See* ICE Pandemic RequirementsPRRs at 1.

152.   Since April 2020, ICE has consistently failed to even implement its own mandatory rules for COVID-19 responses, resulting in deadly conditions in detention centers and ultimately, the deaths of several people in immigration detention from COVID-19 and related complications.  *See, e.g.,* Center for Migration Studies, *Immigrant Detention and COVID-19: How a Pandemic Exploited and Spread through the U.S. Immigrant Detention System* (Aug. 2020), *available at* cmsny.org/publications/immigrant-detention-covid/.

153. ~~161.~~ ICE has the authority to comply with its constitutional requirements by paroling transgender people in civil immigration detention, who are vulnerable to severe illness or death if they contract COVID-19.  Section 212(d)(5)(A) of the Immigration and Nationality Act permits the Attorney General, at his or her discretion, to parole any noncitizen into the United States "temporarily under such conditions as [she or] he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Further, 8 C.F.R. § 235.3(b)(2)(iii) vests the Attorney General with the discretion to parole detained aliens with negative credible/reasonable fear findings as required "to meet a medical emergency."  Responding to the current pandemic appropriately by releasing transgender people in civil immigration detention who are not a threat to public safety meets all three standards: a medical emergency, a legitimate law enforcement objective and a "significant public benefit."  Even if the government paroles a detainee, it can still issue notices to appear and place parolees in removal proceedings, thus ensuring that their immigration court cases continue even if they are released from detention.  *See* 8 C.F.R. § 235.3(c).

154. ~~162.~~ Here, ICE's failure to implement even the most basic protections its rules require violates both the Fifth Amendment and the APA.  *See Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068-69 (C.D. Cal. 2019) (detainees stated *Accardi* claim with allegations an ICE detention center did not follow the agency's standards for treatment of detainees).

155. ~~163.~~ Even if Respondents have taken some proactive measures to address the crisis, this is not enough to achieve compliance with CDC guidelines or to eliminate risk of exposure.  *See Cristian A.R. v. Decker*, No. 20-3600, 2020 U.S. Dist. LEXIS 66658, at *34 (D.N.J. Apr. 12, 2020).  For example, because detainees cannot avoid coming into close contact

with frequently used surfaces and shared spaces, Respondents' failure to ensure proper disinfecting of detainees' living areas at the recommended intervals of several times per day exposes detainees to a high risk of infection, even if some cleaning is performed.

156.    164. Respondents' failure to act in a timely manner to protect Petitioners interferes with the rights of Petitioners in an arbitrary and capricious manner and is without justification.

157.    165. The continued refusal to establish and implement policies and procedures designed to prevent the transmission of COVID-19 to transgender detainees violates the substantive and procedural due process rights of Petitioners and all transgender people in civil immigration detention.  Courts have consistently held that detainees are likely to succeed on the merits of their claims under similar circumstances.  *See, e.g., Castillo*, 2020 U.S. Dist. LEXIS 54425, at *16 ("Civil detainees must be protected by the Government.  Petitioners have not been protected").

158.    166. By failing to establish and implement any policies andor procedures to protect to prevent Petitioners, as transgender people in detention, from the transmissionstransmission of COVID-19 in the Detention Centers, Respondents have enacted a final decision that violates both the APA and the Fifth Amendment.  *See Torres*, 411 F. Supp. 3d at 1069.

## CLAIMS FOR RELIEF

### Count I

**(Violation of Fifth Amendment Right to Due Process – Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)**

159.    167. Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

160.   ~~168.~~ The Fifth Amendment to the U.S. Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment.  The federal government violates this substantive due process right when it subjects civil detainees to treatment and conditions of confinement that amount to punishment or does not ~~does~~ ensure those detainees' safety and health.

161.   ~~169.~~ Respondents' conditions of confinement subject Petitioners and all class members to heightened risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure.

162.   ~~170.~~ Respondents are subjecting Petitioners and all class members to a substantial risk of serious harm, in violation of Petitioners' and class members' rights under the Due Process Clause.

163.   ~~171.~~ As public health experts in correctional medical care and infectious disease agree, transgender people in immigration detention are at grave risk of COVID-19 infection, illness and death.

164.   ~~172.~~ Accordingly, Respondents are subjecting Petitioners and class members to detention conditions that amount to punishment and that fail to ensure their safety and health.

165.   ~~173.~~ For these reasons, Respondents' ongoing detention of Petitioners and all class members violates the Due Process Clause.

## Count II

**(Violation of the Administrative Procedure Act ~~as to All Respondents~~)**

166.   ~~174.~~ Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

167.   175. Respondents' failure to act in a timely manner to protect Petitioners and class members interferes with the rights of Petitioners and class members in an arbitrary and capricious manner and is without justification.

168.   Respondents' failure to implement and enforce their own 2015 model procedures in the care of transgender detainees in any of ICE's detention facilities violates Petitioners' and class members' constitutional and substantive due process rights by exposing them to unwarranted risks or harassment and abuse, which have been magnified by the current pandemic.

169.   176. The continued refusal to establish and implement policies and procedures designed to prevent the transmission of COVID-19 is contrary to Petitioners' and class members' constitutional rights as it violates their substantive and procedural due process rights, as outlined above.

170.   177. By failing to establish and implement policies and procedures to protect Petitioners from the transmission of COVID-19 in the Detention Centers, Respondents have enacted a final decision.

171.   178. This decision constitutes a final agency action and is reviewable by this Court.

172.   179. When a government agency detains people for civil immigration purposes during a pandemic crisis and fails to adhere to the most basic and minimally adequate plan or procedure it is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law." 5 U.S.C. § 706(2)(A).

173.   180. Here, detaining Petitioners and class members without a minimally adequate plan or procedure for their safety is arbitrary and capricious and an abuse of discretion.  The

failures to comply with Respondents' own policies and procedures is not in accordance with law – in violation of the Administrative Procedure Act.

## Count III

### (Writ of Mandamus)

174. ~~181.~~ Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

175. ~~182.~~ As set forth above, Respondents are in violation of federal statutes and regulations and the U.S. Constitution.

176. ~~183.~~ These legal obligations for care of people held in civil immigration detention create affirmative duties to act, which Respondents have failed to respect.

177. ~~184.~~ Petitioners accordingly seek a writ of mandamus to require the Respondents to act immediately in accordance with their legal obligations to protect Petitioners and class members and to follow their own parole guidelines and directives.

~~185.   Petitioners are contemporaneously filing a motion for a temporary restraining order.~~

## Count IV

### (Declaratory Judgment Act)

178. ~~186.~~ Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

179. ~~187.~~ The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

180. ~~188.~~ There is an actual controversy between the parties because Respondents are failing to implement adequate protocols to prevent the transmission of COVID-19 in the ICE detention centers.

181. ~~189.~~ The Court should exercise its authority under the Declaratory Judgment Act to declare that Respondents have no basis to refuse to implement adequate protocols to prevent the transmission of COVID-19 and should order Respondents to immediately release on parole or other supervised released Petitioners and all class members to protect them from the dangers of COVID-19 transmission.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request this Court to:

1. Assume jurisdiction over this matter;

2. Declare that the Respondents' conduct constitutes a danger to public health and safety;

3. Order the immediate release on parole or other supervised release of Petitioners and all class members pending the completion of these proceedings, pursuant to the Court's inherent powers;

4. Order Respondent to issue an ICE bond for all Petitioners and all class members pending the completion of these proceedings, pursuant to the Court's inherent powers;

5. ~~4. Prohibit Respondents from placing any new transgender people in civil immigration detention;~~ Order Respondents to incorporate the model procedures outlined in Attachment 1 to the 2015 Transgender Care Memorandum, "ICE Detention Facility Contract Modification for Transgender Care" into each of its facility contracts with its service vendors;

6. 5. Order Respondents to immediately implement all protocols designed to prevent the transmission of COVID-19 as indicated in the attached expert declarations or protocols of the CDC;

7. 6. Declare that Respondents' detention of Petitioners and class members creates an undue increased risk of infection, disease and death, and therefore is unconstitutional in violation of the Fifth Amendment;

8. 7. Declare that Respondents have violated the Administrative Procedures Procedure Act;

9. 8. Award Petitioners and the Class their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act; and

10. 9. Grant such further relief as the Court deems just and proper.

April 23. Dated:  August 14, 2020                    Respectfully submitted,

                                                     /s/ Matthew E. Kelley
                                                     Matthew E. Kelley (Bar No. 1018126)

Gregory P. Copeland                                  Matthew E. Kelley (Bar. No. 1018126)
(D.D.C. Bar # NY0311)                                Leslie E. John ** (admitted *pro hac vice*)
Sarah T. Gillman                                     Elizabeth Weissert ** (admitted *pro hac vice*)
(D.D.C. Bar # NY0316)                                Alex Levy ** (admitted *pro hac vice*)
RAPID DEFENSE NETWORK                                BALLARD SPAHR LLP
11 Broadway, Suite 615                               1909 K Street, NW - 12th Floor
New York, NY  10004-1490                             Telephone: (202) 661-2200
Phone: (212) 843-0910                                Facsimile: (202) 661-6299
Fax Facsimilie: (212) 257-7033                       Email: kelleym@ballardspahr.com
Email: gregory@defensenetwork.org                    Email: johnl@ballardspahr.com
Email:                                               Email: weisserte@ballardspahr.com
sarah@defensenetwork.org sarah@defensenetwork.org    Email:
                                                     levya@ballardspahr.com levya@ballardspahr.com
Lynly S. Egyes** (admitted *pro hac vice*)

TRANSGENDER LAW CENTER
PO Box 70976
Oakland, CA 94612-0976
Telephone: (973) 454-6325
Facsimile: (917) 677-6614
~~lynly@transgenderlawcenter.org~~
Email:  lynly@transgenderlawcenter.org

*Attorneys for Petitioners*

~~*** Application for admission pro hac vice forthcoming*~~

**<u>VERIFICATION</u>**

I am submitting this verification on behalf of the Petitioners because I am one of the Petitioners' attorneys.  I have discussed the claims and the events described in this ~~Emergency Petition~~<u>Amended Complaint</u> with Petitioners' legal team.  On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in the attached ~~Emergency Verified Petition for a Writ Of Mandamus~~<u>Amended Complaint</u> are true and correct to the best of my knowledge.


<u>Dated:  August 14, 2020                                          /s/ *Matthew E. Kelley*          </u>
<u>                                                                  Matthew E. Kelley (Bar. No. 1018126)</u>

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused the foregoing Amended Complaint to be filed and served electronically via the Court's ECF System upon counsel of record.


Dated:  August 14, 2020                                    /s/ *Matthew E. Kelley*
                                                                              Matthew E. Kelley




Dated: April 23, 2020                    By: /s/ *Matthew E. Kelley*
                                                          Matthew E. Kelley (Bar No. 1018126)